Marc Toberoff (S.B. #188547)
*mtoberoff@toberoffandassociates.com*
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MARK DISALLE, an individual,<br><br>Plaintiff,<br><br>v.<br><br>ALBERTO LENSI, an individual;<br>TRANS-AMERICAN FILMS<br>INTERNATIONAL<br>CORPORATION, a Delaware<br>corporation, and DOES 1-10,<br><br>Defendants. | Case No. 22-cv-02152-SSS-PVCx<br><br>**MEMORANDUM OF POINTS<br>AND AUTHORITIES IN SUPPORT<br>OF PLAINTIFF'S MOTION FOR<br>SUMMARY JUDGMENT**<br><br>Hearing Date: December 15, 2023<br>Time: 2:00 pm<br>Judge: Hon. Sunshine S. Sykes |

# TABLE OF CONTENTS

**Page**

I. INTRODUCTION ................................................................. 1

II. THE UNDISPUTED FACTS ................................................. 1

III. SUMMARY JUDGMENT LEGAL STANDARD ..................... 9

IV. ARGUMENT ................................................................... 10

    A. DiSalle Retained Significant Bloodsport Rights ............... 10

    B. Defendants Are Not Entitled To Bloodsport Trademarks
        or To Use Them To Encumber Plaintiff's Rights ............. 15

    C. The Court Should Grant Plaintiff Summary Judgment on His
        Claims for Federal Unfair Competition and Common Law
        Trademark Infringement, 15 U.S.C. § 1125(a)(1)(a) ........ 23

    D. Defendants Secured TFI's Registrations Through
        Fraud on the USPTO ..................................................... 27

    E. The Court Should Enter a Permanent Injunction Against
        Defendants' Further Use of BLOODSPORT and Order
        Cancellation of the BLOODSPORT Trademark Registration ........ 30

V. CONCLUSION ................................................................. 32

# TABLE OF AUTHORITIES

**FEDERAL CASES**

*AMF Inc. v. Sleekcraft Boats*,

599 F.2d 341, 348 (9th Cir. 1979) ...................................................... 24

*Amusement Art, LLC v. Life is Beautiful, LLC,*
  No. CV 14-8290, 2016 WL 6998566 (C.D. Cal. Nov. 29, 2016),
  *aff'd*, 768 F. App'x 683 (9th Cir. 2019 ........................................ 30

*Anderson v. Liberty Lobby, Inc.,*
  477 U.S. 242 (1986) ................................................................ 9

*Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.,*
  457 F.3d 1062 (2006) ................................................................ 27

*Brookfield Comm., Inc. v. West Coast Ent. Corp.,*
  174 F.3d 1036 (9th Cir. 1999) ......................................... *Passim*

*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) ................................................................ 9

*Century 21 Real Estate Corp. v. Sandlin,*
  846 F.2d 1175 (9th Cir. 1988) ................................................... 30

*Chutter, Inc. v. Great Mgmt. Grp., LLC,*
  2021 WL 4494251 (T.T.A.B. 2021),
  *rev'd on other grounds,* 2023 WL 6854647 (Fed. Cir. Oct. 18, 2023) ........... 28

*Crytek GmbH v. Cloud Imperium Games Corp.,*
  No. CV 17-8937 DMG, 2018 WL 9491965 (C.D. Cal. Dec. 6, 2018) ........... 14

*Cunningham v. Laser Golf Corp.,*
  222 F.3d 943 (Fed. Cir. 2000) ........................................... 16, 32

*Dastar Corp. v. Twentieth Century Fox Film Corp.,*
  539 U.S. 23 (2003) ................................................................ 16

*Dep't of Parks & Recreation for State of Cal. v. Bazaar Del Mundo Inc.,*
  448 F.3d 1118 (9th Cir. 2006) ................................................... 20

*E. & J. Gallo Winery v. Gallo Cattle Co.,*
  967 F.2d 1280 (9th Cir. 1992) ................................................... 22

*eBay Inc., v. MercExchange, LLC,*

MEMO. OF P. & A. IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUSGMENT

547 U.S. 388 (2006) .................................................................................... 31

*Electro Source, LLC v. Brandess-Kalt-Aetna Grp., Inc.*,
  458 F.3d 931 (9th Cir. 2006) ................................................................. 22

*Electropix v. Liberty Livewire Corp.*,
  178 F. Supp. 2d 1125 (C.D. Cal. 2001) ................................................. 26

*Emergency One, Inc. v. Am. FireEagle, Ltd.*,
  228 F.3d 531, 539 (4th Cir. 2000) ......................................................... 22

*Fortune Dynamic v. Victoria's Secret*,
  618 F.3d 1025 (9th Cir. 2010) ............................................................... 23

*Garcia v. Google, Inc.*,
  786 F.3d 733 (9th Cir. 2015) ................................................................. 13

*Go-To.com, Inc. v. Walt Disney Co.*,
  202 F.3d 1199 (9th Cir. 2000) ............................................................... 25

*Hotko Kinoko Co. v. Concord Farms, Inc.*,
  738 F.3d 1085 (9th Cir. 2013) ............................................................... 27

*Imperial Tobacco Ltd. v. Philip Morris, Inc.*,
  899 F.2d 1575 (Fed. Cir. 1991) ............................................................. 14

*Levy v. adidas AG*,
  No CV 18-6542 PSG (MAAx),
  2020 WL 1934977 (C.D. Cal. Mar. 24, 2020) ................................. 19-20

*Maljack Productions, Inc. v. GoodTimes Home Video Corp.*,
  81 F.3d 881, 887 (9th Cir. 1996) ........................................................... 17

*Marketquest Grp., Inc. v. BIC Corp.*,
  316 F. Supp. 3d 1234 (S.D. Cal. 2018) ................................................. 28

*McGregor-Doniger, Inc. v. Drizzle Inc.*,
  599 F.2d 1126 (2d Cir. 1979) ................................................................ 26

*Miramar Brands Grp., Inc. v. Fonoimoana*,

3

No. CV 16-4224 PSG (RAOx),
2017 WL 2903256 (C.D. Cal. June 13, 2017) .................................... 19

*Mosaic Brands, Inc. v. Ridge Wallet LLC*,
No. CV 20-4556 AB (JCx), 2021 WL 4535351 (C.D. Cal. Aug. 5, 2021) ..... 22

*MPC Franchise, LLC v. Tarntino*,
826 F.3d 653 (2d Cir. 2016) ....................................................... 28, 30

*Nat. Answers, Inc. v. SmithKline Beecham Corp.*,
529 F.3d 1325 (11th Cir. 2008) ..................................................... 22

*Network Automation, Inc. v. Advanced Sys. Concepts*,
638 F.3d 1137 (9th Cir. 2011) ...................................................... 23

*Off. Airline Guides, Inc. v. Goss*,
6 F.3d 1385 (9th Cir. 1993) .......................................................... 25

*On Site Energy Co. v. MTU Onsite Energy Corp.*,
2013 WL 3990919 (E.D.N.Y. 2013) ................................................ 27

*OTR Wheel Eng'g, Inc. v. West Worldwide Servs., Inc.*,
602 F. App'x. 669 (9th Cir. 2015) .................................................. 31

*Palladium Music, Inc. v. EatSleepMusic, Inc.*,
398 F.3d 1193 (10th Cir. 2005) ..................................................... 13

*Paramount Pictures Corp. v. Dorney Park Coaster Co.*,
698 F. Supp. 1274, 1277 (E.D. Pa. 1988) .................................... 17-18

*Perfumebay.com Inc. v. eBay, Inc.*,
506 F.3d 1165 (9th Cir. 2007) ...................................................... 26

*Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*,
894 F.3d 1015 (9th Cir. 2018) .................................................. 17, 32

*Rearden LLC v. Rearden Commerce, Inc.*,
683 F.3d 1190 (9th Cir. 2012) .................................................. 20-21

*Reno Air Racing Ass'n, Inc. v. McCord*,

4

452 F.3d 1126 (9th Cir. 2006) ........................................................31

*Ricordi & Co. v. Paramount Pictures*,
189 F.2d 469 (2d Cir. 1951) .......................................................12

*Robi v. Five Platters, Inc.*,
918 F.2d 1439 (9th Cir. 1990) ............................................. *Passim*

*Sarieddine v. Alien Visions E-Juice, Inc.*,
No. CV 18-3658 PA (MAAx),
2019 WL 1966661 (C.D. Cal. April 12, 2019) ...............................21

*Sengoku Works Ltd. v. RMC Int'l, Ltd.*,
96 F.3d 1217 (9th Cir. 1996) .......................................................20

*Slep-Tone Ent. Corp. v. Wired for Sound Karaoke & DJ Servs., LLC*,
845 F.3d 1246 (9th Cir. 2017) .....................................................16

*Sodima v. Int'l Yogurt Co.*,
662 F. Supp. 839 (D. Or. 1987) ...................................................22

*Sugar Busters LLC v. Brennan*,
177 F.3d 258, 269 (5th Cir. 1999) ...............................................17

*Sutton v. Williamsburg Winery, Ltd.*,
No. CV 12-333 GEB, 2013 WL 5348127 (E.D. Cal. Sept. 23, 2013)............22

*Twin Peaks Productions, Inc. v. Publications Intern., Ltd.*,
996 F.2d 1366 (2d Cir. 1993) ......................................................17

*Two Pesos, Inc. v. Taco Cabana, Inc.*,
505 U.S. 763 (1992).....................................................................25

*UV RML NL Assets, LLC v. Coulter Ventures, LLC*,
No. CV 21-4913 VAP, 2021 WL 5706870 (C.D. Cal. Oct. 22, 2021)............22

*Warner Bros. Entertainment, Inc. v. Global Asylum, Inc.*,
544 Fed. Appx. 683 (9th Cir. 2013).............................................17

MEMO. OF P. & A. IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUSGMENT

**FEDERAL STATUTES, RULES AND REGULATIONS**

15 U.S.C.

§ 1051..................................................................................28

§ 1064..........................................................................*Passim*

§ 1116..................................................................................31

§ 1119..................................................................................32

§ 1127............................................................................20, 22

17 U.S.C.

§ 101...................................................................................10

§ 204............................................................................*Passim*

Fed. R. Civ. P. 56.........................................................................9

**OTHER AUTHORITIES**

J. Thomas McCarthy, 2, 3, 5, *McCarthy on Trademarks and Unfair Competition* (5th ed. 2023 rev. ed.)

§ 16:03................................................................................20

§ 17:3.................................................................................22

§ 30:1.................................................................................25

Melville Nimmer & David Nimmer, 1, 3 *Nimmer on Copyright* (2023 rev. ed)

§ 2.10.................................................................................13

§ 10.03................................................................................10

§ 10.08................................................................................10

2 William F. Patry, *Patry on Copyright* § 5:2 (Sept. 2023 rev. ed.) ................... 10

MEMO. OF P. & A. IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUSGMENT

# I. __INTRODUCTION__

Plaintiff Mark DiSalle ("DiSalle") is the producer of *Bloodsport*, a highly successful and influential martial-arts action film released in 1988 starring Jean Claude Van Damme. DiSalle is the originator and statutory author of the underlying *Bloodsport* screenplay (the "Screenplay") from which this iconic film was derived.

In producing *Bloodsport*, DiSalle was careful to maintain significant rights under copyright in his Screenplay, licensing the right to only "one motion picture." After *Bloodsport* was a break-out success, DiSalle carefully licensed the right to produce only "one (1) sequel motion picture" derived from his Screenplay. This eventually resulted in the unremarkable low-budget *Bloodsport II* (1996) which he did not produce. Further down-market, direct-to video films, *Bloodsport III* and *IV* (1997, 1999), of dubious origin followed. Defendants Alberto Lensi and Trans-American Films International Corporation ("TFI") are the supposed successors-in-interest to limited sequel rights pursuant to a complex series of contracts, involving a byzantine web of offshore companies.

Beginning in 2010, DiSalle, Defendants and the Edward R. Pressman Corporation ("ERPFC") entered into agreements, pooling DiSalle's retained rights and Defendant TFI's alleged rights for the production of a new film. DiSalle's agreement was subject to an express reversion of rights. Before the reversion period was to expire ERPFC sought to leverage its and TFI's rights by having Defendants, without legal authority, seek "Bloodsport" trademarks registrations; secured in 2015 and 2019, based on applications to the USPTO rife with misrepresentations. DiSalle ended up extending ERPFC's reversion period eight times (for compensation) until 2021. But after ERPFC still failed to finance the film, DiSalle declined to further extend in favor of producing his own "Bloodsport" remake based on his rights.

In retaliation, ERPFC/ TFI sent DiSalle an aggressive "ceased and desist"

letter frivolously claiming that DiSalle had no rights; and that he could not use his own Screenplay title "Bloodsport." This, even though DiSalle's "Bloodsport" rights had been acknowledged by ERPFC, Defendants, and predecessors both contractually and by their conduct.

On March 31, 2022, DiSalle filed this suit to clear title to his *Bloodsport* rights and property. For the reasons set forth below, based on record evidence and undisputed facts, DiSalle is entitled to a declaratory judgment on his First Claim that: (i) he retained significant rights in his original "Bloodsport*"* Screenplay; (ii) he holds a prior common-law "Bloodsport" mark; (iv) that Defendants had no right to register its marks; and (v) that Defendants cannot use their purported marks to encumber Plaintiff's rights or property. Plaintiff further seeks summary judgment on his claims for Federal Unfair Competition, Trademark Infringement, and Fraudulent Trademark Registration, including cancellation of TCI's illicit trademark registrations.

## II.   THE UNDISPUTED FACTS

### A.   Chain of Title Re: DiSalle's Rights in Bloodsport

DiSalle entered into an agreement with Frank Dux ("Dux") dated as of June 15, 1985 (the "Dux Agreement"), which gave DiSalle the right to make motion pictures based on Dux's alleged life story ("Life Story"). *See* L.R. 56-1 Statement of Uncontroverted Facts ("SUF") ¶ 1.

Pursuant to an employment agreement between DiSalle and Sheldon Lettich, dated June 15, 1985, Lettich wrote an original feature motion picture screenplay entitled "Bloodsport" ("Screenplay"), the copyright to which was owned by DiSalle as a "work-made-for-hire" (collectively, Screenplay and Life Story are the "Property"). SUF ¶¶ 2-3.

DiSalle thereafter produced his *Bloodsport* film pursuant to an agreement with Cannon Films, Inc. ("Cannon") dated as of March 25, 1986 (the "Cannon Agreement"), wherein DiSalle granted Cannon "a license to produce one motion

picture based upon the Property." SUF ¶ 4. DiSalle retained all rights in his Screenplay not expressly granted to Cannon, including remake, prequel and sequel motion picture rights and television rights. Toberoff Declaration ("Toberoff Decl."), Ex. 3, ¶ 3.

DiSalle's *Bloodsport* film, released in 1988 and widely distributed, was a breakout success garnering worldwide recognition. Indeed, *Bloodsport* is credited with introducing mixed-style marital arts competitions among mainstream audiences, and is well-known to have inspired the popular UFC.

Soon thereafter, Pathé Entertainment, Inc. ("Pathé") became the assignee and successor in interest to Cannon regarding *Bloodsport*. SUF ¶ 5.. The success of the 1988 *Bloodsport* film led to Pathé's immediate interest in the production of a sequel film. But because DiSalle had meerly licensed to Cannon the right to produce "one motion picture" based on his Screenplay, Pathé was required to license from DiSalle the right to produce such sequel.  DiSalle and Pathé thus entered into an agreement dated as of November 16, 1989 (the "Pathé Agreement") for such purpose. SUF ¶ 5. While acknowledging DiSalle's right to produce *a remake* motion picture of *Bloodsport*, the Pathé Agreement licensed to Pathé the right to produce just "one (1*)* sequel motion picture to 'Bloodsport'" based on the Property called "Bloodsport II." SUF ¶¶ 6-7. Because DiSalle had retained, without limitation, remake rights in the Property, the Pathé Agreement emphasized that it would make no use of the Property "in a manner which would constitute 'Bloodsport II' a remake of 'Bloodsport'; nor shall any such use be deemed to be a remake of 'Bloodsport.'" SUF  ¶ 8.

Under the Pathé Agreement, if Pathé produced its one licensed sequel film based on the Property, it would thereafter have the right to produce sequels to and remakes of its one sequel, provided any such films *only* exploited "new and original characters" and "original plot, story, scenes and events created by [Pathé] … , including [in] 'Bloodsport II.'" SUF ¶ 9.  However, Pathé expressly

did *not* have the right to produce more than "one sequel motion picture" containing any elements (*e.g.*, character(s), plot, story, scene(s), event(s), settings, and themes) from DiSalle's Property. SUF ¶ 9.

Thereafter, DiSalle's company, Pyramid Entertainment, Inc. ("Pyramid") entered into an agreement dated as of December 9, 1992, with Metro-Goldwyn-Mayer Inc. ("MGM"), the "successor in interest to Pathe," granting Pyramid an option ("Option") to purchase MGM's rights in the Property (i.e., Pathé's limited rights to produce one sequel—*Bloodsport II*), while MGM solely retained the right to distribute the original *Bloodsport* film. SUF ¶ 10.

Although the rights purportedly optioned were written broadly, but the "grant" was in the nature of a quitclaim:

> "MGM hereby grants to [Pyramid] an option (the "Option") to acquire all of MGM's right, titles and interest **to the extent thereof** in and to the following: (a) All motion picture, television and allied, ancillary, subsidiary and incidental rights in and to one or more motion picture prequels, sequels, remakes and/or other productions based, in whole or in part, on the motion picture … entitled "BLOODSPORT" ("Picture") …"

SUF ¶ 10. (emphasis added). Despite this broad language, MGM did not have these rights to grant, because as shown above MGM, Pathé and/or Cannon, never acquired these rights under copyright in the underlying *Bloodsport* Screenplay which controls—only the right to produce *Bloodsport* and **one sequel** thereto Bloodsport II." SUF ¶¶ 4, 6.

Subsequently, in an Assignment of All Rights "Bloodsport II" dated as of December 8, 1993 (the "Bloodsport Rights Agreement") a joint venture between ComEnt Picture Corp. I and Amazon Films, Inc. called The Bloodsport II Company (the "Joint Venture")—formed to finance, develop and produce *Bloodsport II*—assigned whatever interest it may have held in such project to F.M. Entertainment International (II), N.V. ("FM"), a Netherland Antilles company. SUF ¶¶ 11-12.

MEMO. OF P. & A. IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUSGMENT

In a letter agreement dated December 8, 1993, Pyramid assigned its Option to a California company called Transcontinental Cinema Group, Inc. ("TCGI"). SUF ¶ 13. Whereas, this agreement's key grant language focused on the Option and "Bloodsport II" (defined therein as "Picture") (SUF ¶ 13) elsewhere language purports to grant TCGI the right to produce "further sequels" to *Bloodsport*, without mention of DiSalle's Property. Toberoff Decl., Ex. 7, ¶ 3.

Thereafter, a low-budget film entitled *Bloodsport II*, directed and produced by Alan Mehrez, was released on March 1, 1996, copyrighted in the name of FM. SUF ¶ 14-15.

In an Assignment Agreement dated *as of* June 10, 1996, FM then assigned its limited rights under the Bloodsport Rights Agreement to Trans-American Films International, a Cayman Islands company ("TFI"). SUF ¶ 16.

FM thereafter produced another low-budget film *Bloodsport III*, directed and produced by Alan Mehrez, which was released direct-to-video in 1997, and copyrighted in the name of Trans-American Films, Ltd. SUF ¶¶ 17-18.

By Assignment dated as of January 30, 1998, TFI assigned all of its rights in *Bloodsport IV* to Bloodsport 4, Inc., a California corporation. SUF ¶ 20.

Alan Mehrez thereafter produced the low-budget film *Bloodsport IV: The Dark Kumite*, released in 1999, also direct-to-video. SUF ¶ 21. The credited production companies were FM and TFI. SUF ¶ 21. Notwithstanding the aforesaid assignment, the film was copyrighted in the name of Trans-American Films, without iterating which entity this is. SUF ¶ 22. No further purported "Bloodsport" movies were produced.

Thereafter, by Agreement dated as of July 3, 2001, TFI and FM assigned all rights in *Bloodsport II-IV* and any underlying rights to yet another Cayman Islands company, Jet Set Aviation, Ltd. SUF ¶ 23. The page-long recitation of sixteen related companies and four signature pages are a testament to the

byzantine web of companies, many registered in offshore tax havens, involved in FM and TFI's downmarket exploitation of Bloodsport. SUF ¶ 23.

### Edward R. Pressman Corporation Attempts to Produce A Sequel

In an Option/Purchase Agreement dated as of March 24, 2010 between Edward R. Pressman Corporation ("ERPFC") and TFI (the "ERPFC/TFI Option"), TFI purported to give ERPFC an option to purchase rights in all *Bloodsport* films for the purpose of producing a *Bloodsport* sequel, including the 1988 *Bloodsport*, in which TFI had no ownership or involvement. SUF ¶ 24.

Subsequently, by Agreement dated as of October 19, 2010, ERPFC, Defendant Lensi and another Lensi company, Bloodsport Producers LLC, agreed to try to acquire "DiSalle's rights to produce motion picture productions based on [*Bloodsport*]." SUF ¶ 25.

ERPFC thereafter entered into an Assignment Agreement dated as of December 17, 2010 with DiSalle to purchase DiSalle's rights, expressly his "remake rights" to his Property and the 1988 *Bloodsport* film, and elsewhere DiSalle's remake, prequel and sequel rights and trademarks therein (the "ERPFC/DiSalle Agreement"). SUF ¶ 26-27. Paragraph 13(a) thereof expressly called for the "automatic[] reversion" to DiSalle of "the Rights granted ERPFC", "including without limitation all copyrights, trademarks and other intellectual property rights" if ERPFC did not set up a Bloodsport picture with a financier within 18 months ( "First Period"). SUF ¶ 28. The agreement therefore effectively functioned as an 18-month option. ERPFC had "the right to extend the First Period for an additional (18) months ('Second Period')" by written notice and a $50,000 increase in DiSalle's compensation. SUF ¶ 29.

Thereafter, in careful amendments dated November 22, 2013, May 4, 2015, September 22, 2016, and March 5, 2018, ERPFC further extended this "Reversion Period" five consecutive times to a "Seventh Period" ending December 30, 2020, each significantly increasing DiSalle's compensation. SUF ¶ 30. In each

amendment, Pressman/ERPFC reiterated: "In the event that ERPFC does not execute a production financing agreement for the Picture prior to the end of the Reversion Period (as so extended …), the Rights granted to ERPFC by [DiSalle] under the [ERPFC/DiSalle Agreement] shall revert to [DiSalle] as per and subject to Paragraph 13 of the Agreement." SUF ¶ 32.

In October-November 2020, ERPFC requested yet another extension. When this failed, ERPFC asserted an automatic six-month *force majeure* extension, until June 30, 2021 (the "Eighth Period"), after which DiSalle's rights would automatically revert to him. SUF ¶ 33.

### *TFI's Wrongful Registration of "Bloodsport" Trademarks*

DiSalle did not authorize third parties to register trademarks in the Cannon Agreement, Pathe Agreement or any other agreement. Nonethelss, on August 21, 2013, less than four months before DiSalle's rights would revert per the ERPFC/DiSalle Agreement, ERPFC, supposedly on TFI's behalf, tried to leverage its rights by filing a "Bloodsport" trademark application with the U.S. Patent and Trademark Office ("USPTO") for "motion picture films" (Serial No. 86043656, corresponding to TFI's subsequent 2015 trademark Registration No. 4,865,217) plus an "intent-to-use" application for "motion picture film production and distribution" (Serial No. 86043667, corresponding to TFI's subsequent 2019 Registration No. 5,655,926), without any legal right of TFI (or ERPTC) to do so. SUF ¶¶ 35-36.

In a March 24, 2014 declaration filed with the USPTO in connection with all of TFI's trademark applications, Defendant Lensi swore on behalf of TFI that "no other person, firm or corporation … has the right to use the mark in commerce" except TFI. SUF ¶ 38. Defendants filed this knowing full well that DiSalle held remake motion picture rights and other significant rights to *Bloodsport*. Nor was this an isolated misrepresentation to the USPTO.

MEMO. OF P. & A. IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUSGMENT

Defendants repeated this false statement under oath numerous times, including in five separate Requests for Extension of Time to File a Statement of Use, from mid-2016 to mid-2018, regarding TFI's application (Serial No. 86043667) for the 5,655,926 mark. SUF ¶ 45. And this falsehood was repeated yet again in a sworn declaration by Lensi in late-2018 for TFI's Statement of Use (re: Serial No. 86043667) a filing necessary to attain registration for applications like this filed as an intent-to-use. SUF ¶ 45.

In connection its trademark application, Serial No. 86043656 (for the 4,865,217 mark), TFI filed five specimens consisting of "screenshots" "showing … goods bearing the mark." SUF ¶ 37. However, two of the five specimen's depict DiSalle's 1988 film *Bloodsport* in which TFI had absolutely no involvement; a third depicts *Bloodsport II* in which TFI was not involved either, and a fourth depicts *Bloodsport III* on which TFI has no credits and likely also had no involvement. SUF ¶ 37.

In connection its trademark application, Serial No. 86043667 (for the 5,655,926 mark), TFI provided as a specimen screenshots depicting a mere deck for a new Bloodsport film which was never financed, cast or produced, but nonetheless Lensi/TFI signed a sworn declaration dated November 11, 2015 that these "specimen(s) show the mark … as used in commerce" and once again falsely swore that "no other person, firm or corporation … has the right to use the mark in commerce". SUF ¶ 39.

Based on Defendants' misrepresentations to the USPTO of material fact, certificates for "Bloodsport" trademarks, Registration No. 4,865,217 (Serial No. 86043656) and Registration No. 5,655,926 (Serial No. 86043667) were issued by the USPTO on December 8, 2015 and January 15, 2019, respectively. SUF ¶¶ 40-41.

On May 10, 2021, TFI filed an "Automatic Update of Assignment of Ownership" purporting to convey its mark from its purported Cayman Islands

predecessor Trans-American Films International to Defendant TFI. SUF ¶ 42.

On December 7, 2021, TFI filed a purported "Declaration of Use and Incontestability under Sections 8 & 15" with the USPTO. As purported "specimens" demonstrating TFI's supposed use of the "Bloodsport" mark in commerce, Defendants provided the USPTO as specimens solely with three screenshots each showing only the ***Bloodsport film that DiSalle had originated and produced, as to which Defendants had absolutely no involvement***. SUF ¶ 43. Defendants thereby intentionally misrepresented to the USPTO that DiSalle's *Bloodsport* film was proof of Defendants' use of the mark in commerce.

Each of these filings with the USPTO represent (and often expressly confirm) that they are made by an attorney(s) at Pryor Cashman, LLP, as the attorney(s) for the applicant TFI, Defendant Lensi, TFI's alleged "President" averred in his sworn deposition testimony that Pryor Cashman has not represented him or his company, emphasizing that they have "never been my lawyers." SUF ¶ 47. [

Each of the sworn declarations signed by Defendant Lensi, as President of TFI, in connection with the above filings with the USPTO contain affirm the following (or similar): "The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements and the like may jeopardize the validity of this submission and the registration, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true." SUF ¶¶ 38, 39, 44, 45.

Neither TFI's 2019 Registration No. 5,655,926 nor 2015 Registration No. 4,865,217 has secured "incontestable" status. The 5,655,926 mark is too recent, and on May 31, 2022, the USPTO issued an Office Action stating that TFI's Section 15 affidavit of incontestability regarding its 4,865,217 mark would ***not***

be accepted because the mark was in litigation. SUF ¶ 46. Defendants were given six months to respond and were warned that failure to do so would result in abandonment of TFI's Section 15 affidavit. SUF ¶ 46. No response by TFI is on record at the USPTO resulting in such abandonment.

### *DiSalle Decides Not to Further Extend the ERPFC/DiSalle Agreement*

Both at the time of the original ERPFC/DiSalle Agreement and through its *eight* extensions, DiSalle's rights were ratified and never questioned. Even after their December 4, 2020 *force majeure* extension, ERPFC/TFI tried to convince DiSalle to *further* extend the Reversion Period *a ninth time*, for substantial compensation. However, given ERPFC/TFI's failure, during an eleven-year period, to secure production financing for a new "Bloodsport" film, DiSalle declined to extend further, as was his right. Thus, on June 30, 2021, DiSalle's rights—recognized by ERPFC, TFI and all their predecessors on multiple occasions, both expressly and by conduct—reverted to DiSalle. SUF ¶ 33.

On February 25, 2021, in retaliation, and despite their above conduct ratifying and confirming DiSalle's rights, ERPFC and TFI (described as ERPFC's "partner") sent an aggressive cease and desist letter to DiSalle, frivolously claiming for the first time: (i) that DiSalle had no Bloodsport rights; and (ii) that, in any event, any use by DiSalle of the title of his original Screenplay and *Bloodsport* film would allegedly violate TFI's alleged trademarks. The letter threatened that any effort by DiSalle to finance or produce a remake of "Bloodsport" would "subject [him] to injunctive relief as well as damages, attorneys' fees and costs." SUF ¶ 34.

Subsequently, TFI declined to renew ERPFC's option under the ERPFC/TFI Agreement because without DiSalle's obvious rights, ERPFC/TFI could not produce a new film using any elements in DiSalle's iconic *Bloodsport* film or Property.

On March 31, 2022, DiSalle filed this suit to clear title to his *Bloodsport* rights and Property. ECF-1.

## III. <u>SUMMARY JUDGMENT LEGAL STANDARD</u>

The Court may grant summary judgment on "each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id*. A disputed fact is material for purposes of summary judgment if, when applied to substantive law, it affects the outcome of the litigation. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). An issue is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party. *Id*. The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It may satisfy that burden by showing "that there is an absence of evidence to support the non-moving party's case." *Id*. at 325. When a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting prior version of Fed. R. Civ. P. 56(e)). The mere existence of some evidence to support the nonmoving party is not sufficient; there must be "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id*. at 249.

## IV. <u>ARGUMENT</u>

### A. <u>DiSalle Retained Significant Bloodsport Rights</u>

Pursuant to the undisputed facts and record evidence, DiSalle retained significant rights in his Bloodsport Property.

It is undisputed that DiSalle owned all rights under copyright in the original *Bloodsport* Screenplay because it was expressly written as a "work-made-for-hire" for DiSalle. SUF ¶ 2, Toberoff Decl., Ex. 2. DiSalle was therefore the

"statutory author" and owner of the Screenplay. 17 U.S.C. § 101. As a matter of law, DiSalle's copyright in the Screenplay consists of a bundle of exclusive rights, including, without limitation, motion picture rights (including remake, prequel and sequel rights), television and other rights. "[W]hile there is always only one protected original work of authorship, there is no such single 'copyright' in that work. 'Copyright' is simply the name given to the exclusive rights granted in Sections 106 and 106A and vests initially as a bundle in the author. After initial vesting, the author may disaggregate the bundle of exclusive rights by assignment or bequest." 2 William F. Patry, *Patry on Copyright* § 5:1 (Sept. 2023 rev. ed.).

In the 1986 Cannon Agreement, DiSalle granted Cannon a mere "license to produce one motion picture based upon the Property." SUF ¶ 4 Toberoff Decl., Ex. 3. Under the Copyright Act a transfer of copyright or of any rights under copyright "is not valid unless an instrument of conveyance . . . is in writing and signed by the owner of the rights conveyed." 17 U.S.C. § 204(a). *See* 3 *Nimmer on Copyright* § 10.08 (describing an author's ability to transfer or assign distinct rights to one work; *see also Id*. at § 10.03 (regarding the requirement that any conveyance of any right the bundle of rights comprising a copyright must be in a writing signed by its owner).

The rights expressly licensed to Canon were simply the right to produce and distribute "one motion picture" based on the Property (Screenplay and Life Story) to distribute that film in all media and to exploit "merchandising for that [p]icture." Toberoff Decl., Ex. 3, ¶ 3, 5(b) Accordingly, by operation of law, DiSalle retained all rights in his *Bloodsport* Screenplay, not expressly conveyed to Cannon, including, without limitation, the right to produce remake, prequel and sequel motion picture rights and television shows, and interactive rights (e.g., videogames) based on his original Screenplay.

The *Bloodsport* film, starring Jean-Claude Van Damme, produced by DiSalle, and released in 1988 pursuant to the Cannon Agreement, was a

breakout success. SUF This naturally resulted in Pathé's desire, as Cannon's successor, to produce a sequel. However, because Canon merely had a one-picture license, Pathé was required to license from DiSalle the right to produce such sequel based on DiSalle's Property, resulting in the 1989 Pathé Agreement. SUF ¶¶ 4, 6.

Just as with the Cannon Agreement, DiSalle retained by operation of law all rights in his underlying *Bloodsport* Screenplay not expressly conveyed in the Pathé Agreement. 17 U.S.C. § 204(a).

The Pathé Agreement licensed to Pathé the right to produce just "one (1*)* sequel motion picture to 'Bloodsport'" called "Bloodsport II" based on the Property (Screenplay and Life Story). SUF ¶ 6.]. The Pathé Agreement went to great lengths distinguishing the "characters" and "the plot, story, scenes and events depicted in "Bloodsport" (based on DiSalle's Screenplay) defined as "Underlying Property" from "new and original characters"[,] "plot, story, scenes and events" created by Pathé in the derivative sequel "Bloodsport II," defined as "Bloodsport II Original Property." SUF ¶¶ 6, 9. This makes perfect sense because "Bloodsport II" would be a derivative work based *Bloodsport* and DiSalle's underlying Screenplay, and the copyright to such derivative work would solely cover new elements therein, not pre-existing elements in the underlying works.

Accordingly, if Pathé produced its one-licensed-sequel film—"Bloodsport II"—based on the Property, it would thereafter have the right to produce remakes of and sequels to "Bloodsport II," "derived from the Bloodsport II Original Property," as opposed to the "Underlying Property." SUF ¶¶ 6, 9. Under the agreement, Pathé was granted the right to produce only one sequel to *Bloodsport*, "Bloodsport II," and would own "[a]ll rights in any motion picture (including Bloodsport II) produced pursuant to th[e Pathé Agreement]." SUF ¶ 6, 9. Because Pathé was only assigned rights in the film *Bloodsport*, and not in

the underlying Screenplay, it has rights only in "what was copyrightable as a new matter" in the film (excluding the creative expression in the Screenplay). *See Ricordi & Co. v. Paramount Pictures*, 189 F.2d 469, 472 (2d Cir. 1951) (copyright in derivative works such as a film protects "what was copyrightable as new matter" in such film not preexisting elements in the underlying work).

All other rights in the Property not expressly conveyed to Pathé were retained by DiSalle, as a matter of law, including without limitation the right to produce remake, prequel, (additional) sequels and television shows, and interactive rights (e.g., videogames) based on DiSalle's Screenplay. *Id*. Without limitation of this, the Pathé Agreement expressly acknowledged DiSalle's right to produce *a remake* motion picture of *Bloodsport*, and further emphasized that it would make no use that in "in a manner which would constitute 'Bloodsport II' a remake of 'Bloodsport.'" SUF ¶ 6.

Both the 1986 Cannon Agreement and the 1989 Pathé Agreement are governed by California law. The Cannon Agreement includes a choice of law provision that it is governed by California law, and the Pathe Agreement was entered into in California with Cannon's successor, by parties residing in California. [chk and conform this language to what is needed for Cal law to apply. Toberoff Decl., Ex. 3 at LENSI 0022, ¶ 20(a); Toberoff Decl., Ex. 4 at LENSI 0045. The explicit limitation of the rights to DiSalle's Property granted in the Cannon Agreement (i.e., "one motion picture" "Bloodsport*"*) and the Pathé Agreement (i.e., "one (1*)* sequel motion picture" "Bloodsport II") is clear and unambiguous. SUF ¶¶ 4, 6. Under these agreements, although Cannon and Pathé, respectively, had the rights to distribute the original motion picture *Bloodsport* and thereafter *Bloodsport II* in all media worldwide, it is clear that neither company was granted the right to produce additional derivative motion picture or television productions based on DiSalle's underlying Property.

MGM as the "successor-in-interest to [] Pathé" could have no more rights in DiSalle's underlying Property than that expressly conveyed in the Pathé Agreement i.e., the right to produce one sequel, "Bloodsport II," and to produce sequels and remakes based on the "Bloodsport II Original Property" elements, but not elements in the "Underlying Property." SUF ¶¶ 6, 9.

Although, MGM's Option Agreement granted Pyramid an Option to acquire broadly quitclaimed rights to produce a variety of derivative works to *Bloodsport* (i.e., "all of MGM's right, titles and interest ***to the extent thereof*** in …") (SUF ¶ 10) (emphasis added), in reality, "the extent" of MGM's rights was limited to the right to produce "one (1*)* sequel motion picture to 'Bloodsport'" based on the Property (Screenplay and Life Story) granted to Pathé in the Pathé Agreement and did not include such broad derivate rights in the underlying Property. SUF ¶ 6. See *Garcia v. Google, Inc.*, 786 F.3d 733, 741 (9th Cir. 2015) (en banc) ("[The film] is an audiovisual work that is categorized as a motion picture and is derivative of the script"); *Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1197 (10th Cir. 2005) ("a motion picture is a derivative work in relation to the novel or screenplay upon which it is based") (quoting 1 Nimmer on Copyright § 2.10[A]).

The Joint Venture, The Bloodsport II Company, was <u>not</u> granted the operative Option under the December 9, 1992 Option Agreement with MGM. SUF ¶ 11. Therefore, whatever interests in held in "Bloodsport II" (e.g., development materials, financing/distribution contracts) which it assigned to F.M. Entertainment International **(II)**, N.V. ("FM") in the so-called "Bloodsport Rights Agreement," dated as of December 8, 1993, such did not include any rights in DiSalle's underlying Property. SUF ¶ 11.

Instead, by letter agreement dated December 8, 1993, Pyramid assigned its Option to Transcontinental Cinema Group, Inc. ("TCGI" and the "TCGI Agreement, respectively). SUF ¶ 13. Whereas, this agreement's key grant

22

language properly focused on the Option and "Bloodsport II" (defined as "Picture") (SUF ¶ 13) elsewhere language purports to give TCGI the right to produce "further sequels" to *Bloodsport*, without mention of DiSalle's Property. SUF ¶ 13, Ex. 7, ¶ 3. However, "[t]he contract's meaning must be derived from the whole contract and individual provisions must be interpreted together 'in order to give effect to all provisions' and avoid rendering some meaningless." *Crytek GmbH v. Cloud Imperium Games Corp.*, No. CV 17-8937 DMG, 2018 WL 9491965, at *2–3 (C.D. Cal. Dec. 6, 2018) (citations omitted). As the TCGI Agreement was principally about the "Picture" "Bloodsport II" and the MGM Option, which could convey no more of DiSalle's rights in his Screenplay that conveyed to MGM's predecessor Pathé, the reference to "further sequels" should be read consistently with the Pathé Agreement, namely sequels to Bloodsport II based on the "Bloodsport II Original Property" elements, but not elements in the "Underlying Property." Otherwise, the reference to "further sequels" that is not even part of the main grant section of the TCGI Agreement represents a sharp departure from the prior extremely detailed chain-of-title.

The more recent 2010 ERPTC/DiSalle Agreement, with Defendants' "partner" ERPTC, its eight extensions until December 31, 2020—all for significant compensation to DiSalle—plus ERPTC's *force majeure* extension until June 30, 2021—all evidence DiSalle's significant retained rights in the underlying Bloodsport Property. SUF ¶¶ 26, 30, 33. This is evident, notwithstanding ERPTC/TFI's transparent "sour grapes" denial of DiSalle's rights when, *after over ten years* of patient extensions and no new *Bloodsport* film, DiSalle declined to extend further in favor of producing a *Bloodsport* remake film, as was his right. SUF ¶ 34

The right licensed by DiSalle to produce "one (1) sequel motion picture" to his Property, called "Bloodsport II," has been exercised by a successor to Pathé. SUF ¶ 6.

MEMO. OF P. & A. IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUSGMENT

Given all of the above, this Court can and should rule based on the record evidence that, as a matter of law, DiSalle retained exclusive rights to create further derivative works based on his original Bloodsport Screenplay, including, without limitation, remake, prequel, and additional sequel motion pictures, television programming, associated merchandising and interactive rights (e.g., videogames).

## B. DEFENDANTS ARE NOT ENTITLED TO BLOODSPORT TRADEMARKS OR TO USE THEM TO ENCUMBER PLAINTIFF'S RIGHTS

It is undisputed that DiSalle's first use of BLOODSPORT as the title of his original Screenplay and the iconic *Bloodsport* film, he both originated and produced, preceded Defendant TFI's unauthorized applications to the USTPO in 2013 for BLOODSPORT trademarks, by decades.

It is also undisputed that the chain-of-title agreements discussed *supra*, under which DiSalle retained substantially rights in his Bloodsport Screenplay, were entered into well before TFI's unauthorized trademark applications and registrations. As shown above, under those agreements (e.g., the 1986 Cannon and 1989 Pathé Agreements) DiSalle retained all rights under copyright in his Screenplay, not expressly conveyed to such predecessor licensees, pursuant to 17 U.S.C. § 204(a). As we have seen, DiSalle's retained rights included, without limitation, "remake" motion picture rights, as expressly acknowledged in the Pathé Agreement. SUF ¶ 7. Inherent in Plaintiff's retention of significant rights to produce new derivative works based on his original Screenplay entitled "Bloodsport," both before and after he produced *Bloodsport*, which popularized the name and gave rise to the mark, was his obvious right to continue to use his own original title ""Bloodsport."

Defendants cannot use trademark law to effectively enlarge the scope and exclusivity of their limited rights under copyright in DiSalles "Bloodsport"

Screenplay by encumbering Plaintiff's retained rights therein. *"Dastar* requires [courts] to avoid recognizing a 'species of mutant copyright law' by making such claims cognizable under the Lanham Act." *Slep-Tone Ent. Corp. v. Wired for Sound Karaoke & DJ Services, LLC*, 845 F.3d 1246, 1250 (9th Cir. 2017) (quoting *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34 (2003)).

Nowhere do the agreements underlying Defendant TFI's alleged chain-of-title to limited "sequel" rights of its purported predecessor authorize TFI to register BLOODSPORT trademarks in its name.

Defendants had absolutely nothing to do with the now iconic 1988 *Bloodsport* film produced by DiSalle—the only film that generated public recognition. TFI also had no involvement in the low budget *Bloodsport II* (1996), no participation or credits on *Bloodsport III* (1997) and limited involvement in *Bloodsport IV* (1999). SUF ¶¶ 14, 17, 21.

TFI's trademark applications (Serial Nos. 86043656 and 86043667) to the USPTO pursuant to which it obtained its unauthorized trademark Registrations Nos. 4,865,217 and 5,655,926, respectively are riddled with intentional misrepresentations of material fact mandating their cancellation.

TFI's 5,655,926 mark was issued on January 15, 2019. As a trademark registration that is less than five years old, it may be cancelled on "any ground that would have prevented registration in the first place." *Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*, 894 F.3d 1015, 1021 (9th Cir. 2018); 15 U.S.C. § 1064(1).

The same applies to TFI's 4,865,217 mark: although issued earlier it also has not secured "incontestable" status. On May 31, 2022 the USPTO sent an Office Action stating that TFI's Section 15 affidavit of incontestability would ***not*** be accepted because the mark was in litigation. SUF ¶ 46. Defendants were given six months to respond and were warned that failure to respond in such

time would result in abandonment of TFI's Section 15 affidavit. SUF ¶ 46..
There is no response on record at the USPTO, resulting in such abandonment.

### 1. The Film *Bloodsport*, Originated and Produced by DiSalle, Acquired A Secondary Meaning

The title of a film may receive trademark protection upon a showing that the title has acquired secondary meaning. *Warner Bros. Entertainment, Inc. v. Global Asylum, Inc*., 544 Fed. Appx. 683 (9th Cir. 2013); 15 U.S.C. §§ 1052(e), (f). A film title acquires secondary meaning when the title becomes well known such that the public associates it with a single source. *See Twin Peaks Productions, Inc. v. Publications Intern., Ltd.*, 996 F.2d 1366, 1379 (2d Cir. 1993). The "particular source" may be unknown, as long as consumers believe the mark refers to a "single source, even if that source is anonymous." *Maljack Productions, Inc. v. GoodTimes Home Video Corp.,* 81 F.3d 881, 887 (9th Cir. 1996). For example, "to establish secondary meaning, Paramount [would be] required to show that the public associates the words Top Gun with its motion picture, thereby suggesting to the public that products bearing the same name emanated from a single source." *Paramount Pictures Corp. v. Dorney Park Coaster Co*., 698 F. Supp. 1274, 1277 (E.D. Pa. 1988).

It is undisputed that DiSalle originated *Bloodsport* and received sole "Produced by" credit on the resulting *Bloodsport* film, famously starring kick-boxer Jean-Claude Van Damme. It is also undisputed that *Bloodsport* was a break-out success, popularizing mixed-martial arts fighting among a worldwide audience. It is further undisputed (and admitted by Defendants) that DiSalle's original *Bloodsport*, and that film alone, achieved iconic status among the film going public, acquiring a secondary meaning. SUF ¶ 39. The success of *Bloodsport* and resulting notoriety of its title, particularly among action movie audiences, readily lends itself to the conclusion that consumers would associate it with a singular source, supporting that the title of DiSalle's original

MEMO. OF P. & A. IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUSGMENT

Screenplay and resulting film evolved into to a common law BLOODSPORT mark, retained by DiSalle.

### 2. There Is Nothing in *Bloodsport II-IV* To Associate Them With A Singular Source

In contrast to the remarkable success of DiSalle's original *Bloodsport*, *Bloodsport II* (1997) did middling business, and the direct-to-video releases *Bloodsport III* (1998) and *Bloodsport IV* (1999), were even bigger flops. The limited release of these ultra-low-budget, low-quality films garnered no consumer recognition or single source identification in the minds of the film-going public.

Unlike DiSalle who originated and produced the iconic *Bloodsport* film, Defendants had no involvement in it whatsoever. Nor did Defendants have any credit or involvement in *Bloodsport II* (1997), copyrighted in the name of FM, a Netherlands Antilles entity. SUF ¶ 15. TFI was not a credited production company of *Bloodsport III* (1998), copyrighted under a different company, and the Cayman Islands TFI was first credited only as a production company of *Bloodsport IV* (1999), and before its release, assigned it to Bloodsport IV, Inc. SUF ¶¶ 18, 20, 21. *Bloodsport II-IV* were distributed and marketed by an even wider variety of disparate entities.

The scattershot exploitation of these down-market films by numerous unknown offshore entities, did not cultivate consumer recognition or suggest to the public that products bearing the same name emanated from a single source. Quite the contrary. No consumer goodwill or recognition of a single source for these films existed or could possibly take hold when no consistent origin among the films even remotely existed. Accordingly, neither TFI (nor its alleged offshore predecessor) acquired any independent trademark rights in BLOODSPORT.

### 3. The Court Should Grant Plaintiff Summary Judgment On Priority of Use.

While TFI's trademark registrations may create a presumption that TFI has an exclusive right in the U.S. to the BLOODSPORT mark, this presumption is rebutted on a number of grounds, including by DiSalle's undisputed evidence that he made bona fide commercial use of BLOODSPORT in commerce in connection with his iconic 1988 film long prior to TFI's claimed first use date. Moreover, in the 1986 Cannon Agreement and again in the 1989 Pathe Agreement, DiSalle contractually retained the right to produce additional BLOODSPORT derivatives, including without limitation remake motion pictures, which obviously entailed continued use of the mark. SUF ¶¶ 4, 7. DiSalle, not Defendants, therefore own any BLOODSPORT mark in the U.S.

"Ownership of a mark can be challenged on a number of grounds, including 'priority of use'. . . ." *Miramar Brands Grp., Inc. v. Fonoimoana*, No. CV 16-4224 PSG (RAOx), 2017 WL 2903256, at *4 (C.D. Cal. June 13, 2017) "It is axiomatic in trademark law that the standard test of ownership is priority of use. To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services." *Sengoku Works Ltd. v. RMC Int'l, Ltd.*, 96 F.3d 1217, 1219 (9th Cir. 1996)

The non-registrant can rebut the presumption of ownership arising from a trademark registration "by showing that the registrant had not established valid ownership rights in the mark at the time of registration—in other words, if the non-registrant can show that he used the mark in commerce first, then the registration may be invalidated." *Sengoku Works*, 96 F.3d at 1220; *Levy*, 2020 WL 1934977, at * 3. Under the Lanham Act, a party seeking to establish priority must establish that its claimed prior use was a "use in commerce." *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1204 (9th Cir. 2012). A mark is

deemed in "use in commerce" where the mark is "placed in any manner on the goods … and "the goods are sold … in commerce." 15 U.S.C. § 1127(1).

The Ninth Circuit uses a "totality of the circumstances" analysis to determine whether these two prongs of the "use in commerce" test have been satisfied. *Rearden*, 683 F.3d at 1205. Sales activity accompanied by the mark is of course relevant, but "non-sales activities such as solicitation of potential customers may [also] be taken into account as part of the 'totality of the circumstances' inquiry," and may be used to establish priority. *Id*.

Where evidence of a mark's use in connection with sale of goods or services is offered, those sales "need not be extensive." *Dep't of Parks & Recreation for State of Cal*. *v*. *Bazaar Del Mundo Inc*., 448 F.3d 1118, 1126 (9th Cir. 2006). A "single sale" under a mark is enough, followed by acts indicating a "continuing effort or intent to continue the use" with commercial sales. *Id*.; *Sarieddine*, 2019 WL 1966661, at *6.

Here, it is undisputed that DiSalle engaged in commerce and used the BLOODSPORT mark prior to TFI from at least 1986 through 1993 (the "Priority Period"). SUF ¶ 48. After commissioning the BLOODSPORT Screenplay, bearing the mark, DiSalle offered it to motion picture financier/distributors resulting in the 1986 Cannon Agreement for the production of a film using the mark. SUF ¶ 4. DiSalle then produced that famous film bearing the BLOODSPORT mark which was widely distributed in 1988 and continues to be exploited in commerce to this day. DiSalle's retention of significant rights in his "Bloodsport" Screenplay pursuant to the limited license in the Cannon Agreement, as discussed above, reflected both his right and intent to continue to use his BLOODSPORT mark. SUF ¶ 4. DiSalle then further engaged in commerce by licensing in the Pathé Agreement the rights to produce the sequel motion picture bearing the BLOODSPORT mark—entitled "Bloodsport II." SUF ¶ 6. Thereafter, in 1992, DiSalle engaged in commerce by entering into the Option

Agreement with MGM to secure the rights back to produce "Bloodsport II" bearing the mark and in 1993 by entering in an agreement with TCFI as to the production of "Bloodsport II" and potential further films, which thereafter all used the BLOODSPORT mark and were released in commerce. SUF ¶¶ 10, 13. In short, the undisputed evidence, assessed under the "totality of the circumstances" inquiry, shows beyond any doubt that DiSalle's use of the BLOODSPORT mark during the Priority Period met both prongs of the "use in commerce" requirement. *See Rearden*, 683 F.3d at 1204.

### 4. Defendant TFI's Registrations Should Also Be Cancelled Due To Abandonment.

A federal court may cancel a trademark *registration* if it is abandoned. 15 U.S.C. § 1064(3). Here, Defendants have made no use in commerce of its registered purported mark(s) since its first mark was registered nearly *seven* years ago in 2015 and even its second mark *four* (soon to be *five*) years ago. Under the Lanham Act, "[n]onuse for 3 consecutive years shall be prima facie evidence of abandonment[,]" shifting the burden of proof on this issue to Defendants. *Id.* § 1127; *Sutton v. Williamsburg Winery, Ltd.*, No. 12-333, 2013 WL 5348127, at *3 (E.D. Cal. Sept. 23, 2013) (granting summary judgment); *Mosaic Brands, Inc. v. Ridge Wallet LLC*, No. CV 20-4556, 2021 WL 4535351 (C.D. Cal. Aug. 5, 2021).

Continued use of a mark on promotional items that are ancillary to the mark owner's discontinued goods or services is generally insufficient to overcome an abandonment claim. *See e.g., Imperial Tobacco Ltd. v. Philip Morris, Inc.*, 899 F.2d 1575, 1582-83 (Fed. Cir. 1991). Once a mark has been abandoned, subsequent use will not revive the mark. 3 *McCarthy* § 17:3.

Trademark use means use that "includes placement on goods sold or transported in commerce; [that] is bona fide; is made in the ordinary course of trade; and is not made merely to reserve a right in a mark." *Electro Source, LLC*

*v. Brandess-Kalt-Aetna Grp., Inc.*, 458 F.3d 931, 936 (9th Cir. 2006). "[A] mark [i]s deemed abandoned [if] the party fail[s] to ever present any 'concrete plans to resume use'[.]" *UV RML NL Assets, LLC v. Coulter Ventures, LLC,* No. 221CV04913, 2021 WL 5706870, at *15 (C.D. Cal. Oct. 22, 2021).

As Defendants cannot meet its burden, the presumption of abandonment, summary judgment should be granted for Plaintiff on this issue.

## C. The Court Should Grant Plaintiff Summary Judgment on His Claims for Federal Unfair Competition and Common Law Trademark Infringement, 15 U.S.C. § 1125(a)(1)(a)

Summary judgment is appropriate on Plaintiffs' Second Claim for Federal Unfair Competition under 15 U.S.C. § 1125(a), and Fifth Claim for Common Law Trademark Infringement.

The elements necessary to prevail on Lanham Act claims for unfair competition and common law causes of action for trademark infringement mirror each other. *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1288 (9th Cir. 1992). To prevail, Plaintiff must establish: (1) ownership of the BLOODSPORT mark in the U.S.; and (2) a likelihood that use by Defendants of their competing BLOODSPORT mark is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association" of Defendants with Plaintiff or "as to the origin, sponsorship, or approval of [Defendants'] . . . services, or commercial activities". 15 U.S.C. § 1125(a)(1)(A); *Network Automation, Inc. v. Advanced Sys. Concepts*, 638 F.3d 1137, 1144 (9th Cir. 2011).

As shown above, Plaintiff has established the first element as a matter of law: prior use and ownership of the BLOODSPORT mark. As alleged in Plaintiff's Second Claim, Defendants' unauthorized registration and use of such BLOODSPORT marks, coupled with their misleading descriptions, representations and insinuations that Plaintiff's iconic *Bloodsport* film (and even

the unsuccessful *Bloodsport II and Bloodsport III* films) were their own film productions is all "likely to cause confusion, mistake and deception" among consuming "members of the public and the entertainment industry." Dkt 1 ¶¶ 55-72.

### 1. The Court Should Grant Plaintiff Summary Judgment on "Likelihood of Confusion"

In the Ninth Circuit, courts consider the eight "Sleekcraft" factors in determining whether there is a likelihood of confusion: "(1) the similarity of the marks; (2) the relatedness of the parties' goods; (3) the similarity of trade or marketing channels; (4) the strength of the plaintiff's marks; (5) the defendant's intent; (6) evidence of actual confusion; (7) the degree of care exercised by the average purchaser; and (8) the likelihood of expansion into other markets." *Miramar Brands*, 2017 WL 2903256, at *8 citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).

**Similarity:** This factor, which is often deemed a particularly important one in the *Sleekcraft* analysis, *see Brookfeld Comms.*, 174 F.3d at 1054, indicates a likelihood of confusion. "Obviously, the greater the similarity between the two marks at issue, the greater the likelihood of confusion." *Fortune Dynamic, Inc.*, 618 F.3d at 1032. Here it is undisputed that the BLOODSPORT marks are virtually identical.

**Relatedness of the Goods/Services and Similarity of Marketing Channels**. There is no dispute that Plaintiff is in the business of producing films, offering the same kind of production services to the same U.S. client base. *See* SUF ¶¶ 4, 5, 10, 26.. Nor is there any dispute that Plaintiff and Defendants use and would use the same trade and marketing channels to promote their motion pictures and production services in the film industry, which is inherently limited. The identity of goods, services and trade channels, combined with the fact that the marks are *identical*, effectively requires judgment for Plaintiff on "likely

confusion" even before other *Sleekcraft* factors are considered. *Brookfield*, 174 F.3d at 1056 ("In light of the virtual identity of marks…likelihood of confusion would follow as a matter of course."). "The use of similar marks to offer similar products accordingly weighs heavily in favor of likelihood of confusion." *Brookfield*, 174 F.3d at 1056-57.

**Strength of the Mark**. The first factor, the strength of the mark, heavily favors likelihood of confusion. An unregistered mark is protected against infringement if it is inherently distinctive, even if it has not acquired secondary meaning. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992).

Marks are classified on a spectrum of increasing distinctiveness as: generic, descriptive, suggestive, arbitrary, or fanciful. *Id*. BLOODSPORT should reasonably be deemed a suggestive mark for purposes of this analysis. Because here, the uses, services and marks are virtually identical, the strength of DiSalle's mark is of "diminished importance in the likelihood of confusion analysis." *Id*. at 1059; *Go-To.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000). That said, BLOODSPORT is a commercially strong mark, particularly with consumers of action films. From the time DiSalle originated and produced *Bloodsport* to the present, BLOODSPORT has continued to resonate with the film-going public and within the film industry.

**Defendants' Intent**. Here it is self-evident that Defendants recognized and intended to copy DiSalle's BLOODSPORT mark. However this factor is of "minimal importance." *Brookfield*, 174 F.3d at 1059; *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1208 (9th Cir. 2000) (Even if "Disney was as innocent as a fawn with *no* intent to copy or appropriate GoTo's logo, it would prove nothing since no such intent is necessary to demonstrate a likelihood of confusion.").

**Actual Confusion**. Proof of actual confusion is not necessary to a finding of likelihood of confusion. *Perfumebay.com Inc. v. eBay, Inc.*, 506 F.3d 1165,

1176 (9th Cir. 2007). The absence of such evidence does not weigh against a finding of likelihood of confusion. 2 *McCarthy,* §§ 23.12, 23.18.

### Degree of Care Exercised by Purchasers

The degree of customer care factor also favors DiSalle. Moreover, "where [as here] the products are identical and the marks are identical, the sophistication of buyers cannot be relied on to prevent confusion." *McGregor-Doniger, Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1137 (2d Cir. 1979); see also *Electropix v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125 (C.D. Cal. 2001) ("virtually no amount of consumer care can prevent confusion where" goods or services "have the same name.) The same is true here. The identical BLOODSPORT would be used in connection with identical types of products—motion pictures—and the same film production services sold to the same film audiences and film industry client base. There is a strong likelihood that these consumers will become confused.

**Weighing of Factors**. "The [*Sleekcraft*] factors should not be rigidly weighed; we do not count beans." *Dreamwerks*, 142 F.3d at 1130. Even three factors are sufficient to find a strong showing of likelihood of confusion. *Brookfield*, 174 F.3d at 1057-61.

**Relevant *Sleekcraft* Factors Conclusion**. In sum, the undisputed evidence here is "clear and tilts heavily in favor of likelihood of confusion." *Au-Tomotive Gold*, 457 F.3d at 1075. The Court should therefore enter summary judgment in Plaintiff's favor on likelihood of confusion and thus Plaintiffs' Second Claim for Unfair Competition, and Fifth Claim for Common Law Trademark Infringement.

### D.     Defendants Secured TFI's Registrations Through Fraud on the USPTO

Fraud in the procurement of trademark registration is grounds for cancellation. 15 U.S.C. § 1064(3). The "Fraud on USPTO" doctrine helps ensure that applicants do not subvert the trademark registration system by

misrepresentations or the omission of key information. To prevail Plaintiff must establish: "[1] a false representation regarding a material fact, [2] the registrant's knowledge or belief that the representation is false, [3] the intent to induce reliance upon the misrepresentation and reasonable reliance thereon, and [4] damages proximately resulting from the reliance." *Id*., 918 F.2d at 1444; *see also Hotko Kinoko Co. v. Concord Farms, Inc*., 738 F.3d 1085, 1097 (9th Cir. 2013). The standard is that of clear and convincing evidence; however, an intent to deceive may be inferred from indirect or circumstantial evidence. *Marketquest Grp., Inc. v. BIC Corp*., 316 F. Supp. 3d 1234, 1278 (S.D. Cal. 2018).

Reckless disregard for the truth of a statement is sufficient to prove the defendant's intent (*Chutter, Inc. v. Great Mgmt. Grp., LLC,* 2021 WL 4494251, at *6, 13 (T.T.A.B. 2021) ("We find the facts of this case at a minimum demonstrate reckless disregard, and hold as a matter of law that reckless disregard satisfies the requisite intent for fraud on the USPTO in trademark matters."), rev'd on other grounds, 2023 WL 6854647 (Fed. Cir. Oct. 18, 2023); On *Site Energy Co. v. MTU Onsite Energy Corp*., 2013 WL 3990919, at *6-7 (E.D.N.Y. 2013) (holding willful blindness can support a fraud claim based on an exclusive use misrepresentation).

As shown below, there is no genuine dispute that Defendants committed fraud on the USPTO through numerous false representations and intentional omissions in the filings it made to secure its trademark registrations.

One essential aspect of a trademark application is that the applicant must swear that "no other person has the right to use [the] mark in commerce." 15 U.S.C. § 1051(b)(3)(D). Where an applicant makes this statement knowing it to be false, cancellation is proper. *See e.g., Robi*, 918 F.2d at 1444 (registration cancelled where mark holder made knowing false statements to USPTO); *MPC Franchise, LLC v. Tarntino*, 826 F.3d 653, 661 (2d Cir. 2016) (summary judgment and cancellation affirmed where registrant "knew that others had

35

rights to use the mark that were at least equal, if not clearly superior, to his own"). Such is the case here. Defendants did not possess the sole and exclusive rights to make films with titles bearing the BLOODSPORT mark.

Despite this, in a March 24, 2014 declaration in connection with all of TFI's trademark applications, Defendant Lensi swore that "no other person, firm or corporation … has the right to use the mark in commerce" except TFI. SUF ¶ 38. He made this representation even though he and the attorneys filing TFI's applications were aware of Plaintiff's contractual right to use the mark in connection with the production of further BLOODSPORT films, expressly including a "remake motion picture" (SUF ¶ 7; see discussion *supra* at Section II.A). And this was not a singular event. Lensi repeated this false statement under oath *numerous times*, including in signing five separate back-to-back Requests for Extension of Time to File a Statement of Use in connection with the 5,655,926 mark (from mid-2016 to late-2017). (SUF ¶ 45). This falsehood was again repeated in a declaration signed by Lensi in late-2018 for Defendant TFI's Statement of Use, a filing which is necessary to attain registration for underlying applications (like Serial No. 86043667) filed as an intent-to-use. SUF ¶ 39.

Nor is this the only untruth contained in Defendants' filings with the USPTO. In fact, and without exception, Defendants repeated misrepresented their use of the BLOODSPORT mark in the specimens they submitted to the USPTO to attain registration and incontestability. These specimens falsely and unfairly misrepresented that Defendants were and are the source responsible for each of the films, when TFI is only first credited as a production company on *Bloodsport IV*, and Defendants had no credit or involvement in *Bloodsport* II and III. SUF ¶¶ 14, 17, 21. Repeatedly featured most prominently in the specimens Defendants submitted was the iconic 1988 film, starring Jean Claude Van Damme, which

Plaintiff originated and produced and which Defendants had no involvement whatsoever. SUF ¶¶ 37, 43

For example, on December 7, 2021, TFI filed a "Declaration of Use and Incontestability under Sections 8 & 15" with the USPTO. SUF ¶¶ 43-44. As purported "specimens" demonstrating TFI's supposed use of the BLOODSPORT mark in commerce, Defendants provided as sole specimens three screenshots each showing only the ***Bloodsport film that DiSalle had originated and produced in which Defendants had absolutely no involvement***. SUF ¶¶ 43-44. Defendants thereby intentionally misrepresented to the USPTO that DiSalle's *Bloodsport* film was proof of *Defendants'* use of the mark in commerce.

In addition, each of Defendants' filings with the USPTO represent, and often expressly confirm, that they are made by an attorney(s) at Pryor Cashman, LLP, as the attorney(s) for the applicant TFI, when Defendant Lensi, TFI's alleged "President" averred in his sworn deposition testimony that Pryor Cashman has not represented him or his company, emphasizing that they have "never been my lawyers." SUF ¶ 47; SUF ¶ 39 at DISALLE-0330.

Thus, Defendants' fraudulently-submitted the specimens misrepresented BLOODSPORT's goodwill, and Plaintiff's association with it, as well as his rights to utilize the mark. Defendants' false statements caused significant damage because Defendants "falsely secur[ed] the registration[s]" and thereafter sought to encumber and prevent Plaintiff's further utilization of the mark, as is his right, and from being able to apply for registration of his mark based on his *Bloodsport* film and intended derivative motion pictures in the foreseeable future. *See Amusement Art, LLC v. Life is Beautiful, LLC*, No. 14-cv-08290, 2016 WL 6998566, at *5 (C.D. Cal. Nov. 29, 2016) (summary judgment based on fraud on the USPTO), *aff'd,* 768 F. App'x 683 (9th Cir. 2019).

Defendants made these false representations to induce the USPTO to grant its registrations, all to Plaintiff's detriment. This conduct alone is reason to grant Plaintiff relief. Cancellation of Defendants' registrations, and summary judgment to Plaintiff is appropriate, based on Defendants' fraud on the USPTO. *See MPC Franchise*, 826 F.3d at 661.

### D. The Court Should Enter a Permanent Injunction Against Defendants' Further Use of BLOODSPORT and Order Cancellation of the BLOODSPORT Trademark Registration

A permanent injunction is the usual, normal remedy once trademark infringement has been found in a final judgment. McCarthy, § 30:1. "Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement …. In cases where the infringing use is for a similar service [or product], broad injunctions are particularly appropriate." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180-81(9th Cir. 1988). Infringement causes continuing injury to the plaintiff's reputation and goodwill that is irreparable in the legal sense. *Id*. To enter a permanent injunction, the Court must find that (1) the plaintiff has suffered an irreparable injury from infringement; (2) monetary damages are inadequate; (3) the balance of hardships merits an equitable remedy; and (4) the public interest will not be disserved by a permanent injunction. *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1138 n. 11 (9th Cir. 2006)

The first element for injunctive relief, irreparable injury arising from infringement, is satisfied by 15 U.S.C. § 1116(a), which provides: "A plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction."

Monetary damages cannot compensate for the loss of reputation and goodwill suffered by a victim of trademark infringement. *OTR Wheel Eng'g, Inc. v. West Worldwide Servs., Inc.*, 602 F. App'x. 669, 672 (9th Cir. 2015). Defendants will suffer no cognizable hardship from being enjoined from trademark infringement, and the relevant public will benefit from removal of the confusion engendered by two virtually identical marks for the same motion picture products and services.

The Court should therefore enter judgment permanently enjoining Defendants, and all persons acting in concert with them, from further use in any manner of the BLOODSPORT mark, or any other mark so closely similar to Plaintiff's mark as to be likely to cause confusion.

The Court should also enter judgment cancelling U.S. Trademark Registration Nos. 4,865,217 and 5,655,926, and all of TFI's pending "intent-to-use" applications for which they have yet to file any Statements of Use.

The Court has the power to cancel registrations in any action involving a registered mark, 15 U.S.C. § 1119, on any ground that would have prevented registration in the first place, including for fraud on the USPTO, abandonment and where, as here, the registration are not incontestable, "likelihood of confusion between the mark sought to be cancelled and a mark for which the party seeking cancellation can establish either prior use". *Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*, 894 F.3d 1015, 1021 (9th Cir. 2018).

As shown above, Plaintiff has established TFI's repeated fraud on the PTO in connection with securing Registration Nos. 4,865,217 and 5,655,926, TFI's abandonment of its registered marks, DiSalle's both prior use of the BLOODSPORT mark and likelihood of confusion between Plaintiff's mark and Defendants' later identical mark. All or any one of these grounds supports the cancellation of TCI's marks from the Principal Register.

**V.    CONCLUSION**

For the reasons set forth above, the Court should grant summary judgment to Plaintiff on its First, Second, Third and Fifth Claims.

DATED:  October 27, 2023    TOBEROFF & ASSOCIATES, P.C.


By: _/s/ Marc Toberoff_____
       Marc Toberoff

TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
*mtoberoff@toberoffandassociates.com*

Attorneys for Plaintiff