Marc Toberoff (S.B. #188547)
*mtoberoff@toberoffandassociates.com*
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333
Facsimile: (310) 246-3101

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| MARK DISALLE, an individual,<br><br>Plaintiff,<br><br>v.<br><br>ALBERTO LENSI, an individual;<br>TRANS-AMERICAN FILMS<br>INTERNATIONAL<br>CORPORATION, a Delaware<br>corporation, and DOES 1-10,<br><br>Defendants. | Case No. 22-cv-02152-SSS-PVCx<br><br>**PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**<br><br>[*Filed with: Plaintiff's Motion for Summary Judgment; Declaration of Marc Toberoff; [Proposed] Judgment*]<br><br>Hearing Date: December 15, 2023<br>Hearing Time: 2:00PM<br>Judge: Hon. Sunshine S. Sykes<br><br>Oral Argument Requested |

Pursuant to Local Rule 56-1 of the Local Rules of the United States District Court for the Central District of California, Plaintiff Mark DiSalle ("DiSalle") respectfully submits the following Statement of Uncontroverted Facts in support of his Motion for Summary Judgment.

| Undisputed Fact | Evidence |
|---|---|
| 1.  DiSalle entered into an agreement with Frank Dux ("Dux") dated as of June 15, 1985 (the "Dux Agreement") which gave DiSalle the right to make motion pictures based on Dux's life story ("Life Story"). | Declaration of Marc Toberoff in Support of Plaintiff Mark DiSalle's Motion for Summary Judgment ("Toberoff Decl."), Ex. 1, ¶ 1 |
| 2.  Pursuant to an agreement between DiSalle and Sheldon Lettich ("Lettich") dated June 15, 1985, Lettich wrote an original motion picture screenplay, "Bloodsport," (the "Screenplay"). | Toberoff Decl., Ex. 2, ¶ 1 |
| 3.  The copyright to the Screenplay was owned by DiSalle as a "work-made-for-hire." Collectively, the Life Story and the Screenplay are referred to as the "Property." | Toberoff Decl., Ex. 2, ¶ 4 |
| 4.  DiSalle produced the 1988 film *Bloodsport*, pursuant to an agreement with Cannon Films, Inc. ("Cannon") dated March 25, 1986, (the "Cannon Agreement") wherein DiSalle granted Cannon "a license to produce one motion picture based upon the Property." | Toberoff Decl., Ex. 3, ¶ 2 |
| 5.  DiSalle thereafter entered into an agreement with Pathé Entertainment, Inc. ("Pathé"), the successor-in-interest to | Toberoff Decl., Ex. 4, ¶4 |

| Undisputed Fact | Evidence |
|---|---|
| Cannon, dated November 16, 1989 (the "Pathé Agreement"). | |
| 6. The Pathé Agreement licensed to Pathé the right to produce *one* sequel motion picture based upon the Property, which the Pathé Agreement called *Bloodsport II*. | Toberoff Decl., Ex. 4, ¶¶ 2(a)-(b), 2(d), 5(a)-(b) |
| 7. The Pathé Agreement acknowledged DiSalle's right to produce a remake of *Bloodsport*. | Toberoff Decl., Ex. 4, ¶ 2(a) |
| 8. The Pathé Agreement stated that Pathé would make no use of the Property "in a manner which would constitute 'Bloodsport II' a remake of 'Bloodsport'; nor shall any such use be deemed to be a remake of 'Bloodsport.'" | Toberoff Decl., Ex. 4, ¶ 2(e) |
| 9. Under the Pathé Agreement, if Pathé produced the sequel *Bloodsport II* based on the Property, it would thereafter have the right to produce sequels and remakes of *Bloodsport II*, which only exploited "new and original characters" and "original plot, story, scenes and events created by [Pathé] … in connection with a motion picture produced pursuant to th[e Pathé Agreement], including 'Bloodsport II.'" | Toberoff Decl., Ex. 4, ¶¶ 3(a), 6 |
| 10. DiSalle's company Pyramid Entertainment, Inc. ("Pyramid") entered into an agreement with MGM dated | Toberoff Decl., Ex. 5, ¶¶ 1, 1(a) |

| Undisputed Fact | Evidence |
|---|---|
| December 9, 1992, which granted Pyramid an option (the "Option") to acquire MGM's rights in the Property. | |
| 11. Pursuant to a December 8, 1993 agreement, a joint venture between ComEnt Picture Corp. I and Amazon Films, Inc. ("AFI") called The Bloodsport II Company, which had been formed to finance, develop and produce *Bloodsport II*, assigned whatever rights and interest it held in such project to F.M. Entertainment International (II), N.V. ("FM"). | Toberoff Decl., Ex. 6 at LENSI 0130-0133, ¶¶ 1(a)-(g) |
| 12. FM was formed in the Netherlands Antilles and was owned or controlled by siblings Alan and Diane Mehrez. | Toberoff Decl., Ex. 9 at LENSI 0150 |
| 13. In a letter agreement dated December 8, 1993, DiSalle and Pyramid assigned its Option to a California company called Transcontinental Cinema Group, Inc. ("Transcontinental"). | Toberoff Decl., Ex. 7, ¶ 1(a)-(d) |
| 14. Transcontinental produced the 1996 film, *Bloodsport II*, which was directed by Alan Mehrez. | Toberoff Decl., Ex. 14 at DISALLE-0347 |
| 15. *Bloodsport II*, was registered for copyright with the U.S. Copyright Office on May 28, 1996 in the name of "FM Entertainment (II), NV." | Toberoff Decl., Ex. 8 |
| 16. FM assigned whatever rights it had remaining | Toberoff Decl., Ex. 9 at LENSI 0150 |

| Undisputed Fact | Evidence |
|---|---|
| pursuant to the Bloodsport Rights Agreement to Trans-American Films International, a Cayman Islands company ("TFI") (the "TFI Agreement") pursuant to an agreement dated as of June 10, 1996, | |
| 17.  FM produced *Bloodsport III*, also directed by Alan Mehrez, which was released direct-to-video in 1997. | Toberoff Decl., Ex. 15 at DISALLE-0349 |
| 18.  *Bloodsport III* was registered for copyright with the U.S Copyright Office on December 10, 1996 in the name of "Transamerican Films, Ltd." | Toberoff Decl., Ex. 10 |
| 19.  *Bloodsport III*'s copyright registration was supplemented on February 23, 1998 by a filing with the U.S. Copyright Office that changed the copyright claimant to TFI. | Toberoff Decl., Ex. 11 at DISALLE-0148 |
| 20.  Pursuant to an agreement dated as of January 30, 1998, TFI assigned all of its rights "in the screenplay" and "all film elements related to *Bloodsport IV*" to Bloodsport 4, Inc., a California Corporation. | Toberoff Decl., Ex. 13, ¶ 1 |
| 21.  *Bloodsport: The Dark Kumite* (a.k.a. *Bloodsport IV*), produced by Alan Mehrez, was released direct-to-video in 1999. The credited production companies were FM and TFI. | Toberoff Decl., Ex. 16 at DISALLE-0351 |
| 22.  *Bloodsport IV: The Dark Kumite* was registered for | Toberoff Decl., Ex. 12 |

4

| Undisputed Fact | Evidence |
|---|---|
| copyright with the U.S. Copyright Office on March 25, 1999, in the name of "Trans-American Films." | |
| 23. Pursuant to an agreement dated as of July 3, 2001, TFI and FM assigned all rights in *Bloodsport II-IV*, and any underlying rights, to Jet Set Aviation, Ltd., a Cayman Islands company. | Toberoff Decl., Ex. 17 at LENSI 0432-0433, 0440 |
| 24. TFI entered into an option/purchase agreement with the Edward R. Pressman Film Corporation ("ERPFC") dated as of March 24, 2010, granting ERPFC the option to purchase rights in all four *Bloodsport* film – rights TFI represented that they held. | Toberoff Decl., Ex. 18, ¶¶ 1-4, 9, 12 |
| 25. Pursuant to an agreement dated as of October 19, 2010, ERPFC, Defendant Lensi and another Lensi company, Bloodsport Producers LLC, agreed to try to acquire "DiSalle's rights to produce motion picture productions based on [*Bloodsport*]." | Toberoff Decl., Ex. 19, ¶ 1 |
| 26. DiSalle entered into an assignment agreement with ERPFC dated as of December 17, 2010, (the "ERPFC/DiSalle Agreement") by which DiSalle assigned his "remake rights" in the First Film and the Property. | Toberoff Decl., Ex. 20, ¶ 4(a) |
| 27. The ERPFC/DiSalle Agreement made reference to DiSalle's remake, prequel and | Toberoff Decl., Ex. 20, ¶ 4(c) |

| Undisputed Fact | Evidence |
|---|---|
| sequel rights, and trademarks therein. | |
| 28. Paragraph 13(a) of the ERPFC/DiSalle Agreement stipulated that if a new derivative film was not "set up" for production and financing within 18 months, (the "First Period") the assigned rights, including "all copyrights, trademarks and other intellectual property rights," would revert to DiSalle. | Toberoff Decl., Ex. 20, ¶ 13(a) |
| 29. Pursuant to the ERPFC/DiSalle Agreement, ERPFC had "the right to extend the First Period for an additional … (18) months by written notice and a $50,000 increase in DiSalle's compensation. | Toberoff Decl., Ex. 20, ¶ 13(a) |
| 30. ERPFC was unable to set up a new derivative film in the First Period (or the second 18-month period provided for in the agreement) and subsequently amended and extended the "Reversion Period" on November 22, 2013, July 24, 2014, May 4, 2015, September 22, 2016 and March 5, 2018, each time for significant additional compensation to DiSalle. | Toberoff Decl., Ex. 21 at LENSI 0213-0214, 0217, 0219, 0221, 0249 |
| 31. The final Reversion Period, as extended by the March 5, 2018 amendment, had an expiry date of December 31, 2020. | Toberoff Decl., Ex. 21 at LENSI 0249 |

6

| Undisputed Fact | Evidence |
|---|---|
| 32. The amendments dated November 22, 2013, May 4, 2015, September 22, 2016 and March 5, 2018 to the ERPFC/DiSalle Agreement specifically reiterated: "In the event that ERPFC does not execute a production financing agreement for the Picture prior to the end of the Reversion Period (as so extended …), the Rights granted to ERPFC by [DiSalle] under the Assignment Agreement shall revert to [DiSalle] as per and subject to Paragraph 13 of the Agreement." | Toberoff Decl., Ex. 21 at LENSI 0214, 0219, 0221, 0249 |
| 33. ERPFC asserted in a December 4, 2020 letter, an automatic six-month extension under Paragraph 13(b) of the ERFPC/DiSalle Agreement, until June 30, 2021. | Toberoff Decl., Ex. 22 at LENSI 0251-0252 |
| 34. On February 25, 2021, Defendants sent a cease-and-desist letter to DiSalle, claiming for the first time: (i) that DiSalle had no remake rights or other rights in "Bloodsport" whatsoever; and (ii) that any use by DiSalle of his own title "Bloodsport" in a new film would infringe Defendants' purported trademarks. Defendants further threatened that any effort by DiSalle to finance or produce a remake of "Bloodsport" would "constitute a wrongful interference with the[] valuable | Toberoff Decl., Ex. 23 at LENSI 0254-0255 |

7

| Undisputed Fact | Evidence |
|---|---|
| rights of [Defendants] . . . subject[ing Plaintiff] to injunctive relief as well as damages, attorneys' fees and costs." | |
| 35. On August 21, 2013 TFI filed a trademark application (Serial No. 86043656) with the U.S. Patent and Trademark Office ("USPTO") for "Bloodsport" trademarks for "motion picture films." | Toberoff Decl., Ex. 24 at DISALLE-0291 |
| 36. On August 21, 2013 TFI filed an "intent-to-use" trademark application (Serial No. 86043667) with the USPTO for a "Bloodsport" trademark for "motion picture film production and distribution." | Toberoff Decl., Ex. 25 at DISALLE-0302, 0305 |
| 37. In connection with trademark application Serial No. 86043656, TFI filed five specimens consisting of "screenshots" "showing … goods bearing the mark." Two of the five specimens depict DiSalle's 1988 film *Bloodsport* in which TFI had no involvement; a third depicts *Bloodsport II* in which TFI was not involved either and a fourth depicts *Bloodsport III*. | Toberoff Decl., Ex. 24 at DISALLE-0297, 0298, 0299, 0301 |
| 38. In connection with trademark application Serial No. 86043667, Lensi, on behalf of TFI, signed a sworn declaration dated March 24, 2014, stating that "to the best of his[] knowledge and belief | Toberoff Decl., Ex. 26 at DISALLE-0322 |

8

| Undisputed Fact | Evidence |
|---|---|
| no other person, firm or corporation … has the right to use the mark in commerce … as to be likely to cause confusion". | |
| 39.  TFI filed a "Statement of Use" in connection with trademark application, Serial No. 86043667 on November 16, 2018 and provided as a specimen, screenshots depicting a deck for a new "Bloodsport" film which was never financed, cast or produced. Lensi signed a sworn declaration dated November 11, 2018, attached to the "Statement of Use" that stated the "specimen(s) show the mark … as used in commerce" and stated "to the best of his[] knowledge and belief no other person, firm or corporation … has the right to use the mark in commerce … as to be likely to cause confusion". | Toberoff Decl., Ex. 27 at DISALLE-0328-0329, 0330 |
| 40.  On December 8, 2015, the USPTO issued a "Bloodsport" trademark (Registration No. 4,865,217, Serial No. 86043656) to TFI, for the category "Motion picture films featuring drama, action and adventure, suspense, extreme action sports and fiction." | Toberoff Decl., Ex. 28 at DISALLE-0289 |
| 41.  On January 15, 2019, the USPTO issued a second "Bloodsport" trademark (Registration No. 5,655,926, | Toberoff Decl., Ex. 29 at DISALLE-0287 |

PLAINTIFF'S STATEMENT OF UNCONTROVERTED FACTS

| Undisputed Fact | Evidence |
| --- | --- |
| Serial No. 86043667) to TFI, for the category "Motion picture film production and distribution." | |
| 42. On May 10, 2021, Defendants filed an "Automatic Update of Assignment of Ownership" purporting to convey the mark (Registration No. 4,865,217) from the Cayman Islands entity Trans-American Films International to Defendant Trans-American Films International Corporation ("Trans-American"). | Toberoff Decl., Ex. 30 at DISALLE-0385 |
| 43. On December 7, 2021, Trans-American filed a "Declaration of Use and Incontestability under Sections 8 & 15" with the USPTO. As "specimens" demonstrating use of the "Bloodsport" mark (Registration No. 4,865,217) in commerce, Defendants provided the USPTO with screenshots from Amazon and Barnes & Noble showing the first *Bloodsport* film DiSalle originated and produced. | Toberoff Decl. Ex. 31 at DISALLE-0339-0341 |
| 44. Lensi, as President, signed a December 7, 2021 Declaration on behalf of Trans-American affirming: "The signatory being warned that willful false statements and the like are punishable by fine or imprisonment, or both, under 18 U.S.C. § 1001, and that such willful false statements | Toberoff Decl., Ex. 31 at DISALLE-0337-0338 |

| Undisputed Fact | Evidence |
| --- | --- |
| and the like may jeopardize the validity of this submission and the registration, declares that all statements made of his/her own knowledge are true and all statements made on information and belief are believed to be true." | |
| 45. TFI filed five (5) "Request[s] for Extension of Time to File a Statement of Use" from 2016 to 2018, regarding Serial No. 86043667, each containing a declaration by Lensi. | Toberoff Decl., Ex. 32 at DISALLE-0353-0381 |
| 46. On May 31, 2022, the USPTO issued an "Office Action" to Trans-American, regarding trademark registration no. 4,865,217, stating that Trans-American's Section 15 affidavit of incontestability would not be accepted because the subject mark was involved in litigation. | Toberoff Decl., Ex. 33 at DISALLE-0382-033 |
| 47. Lensi stated that he nor Defendant Trans-American was ever represented by Pryor Cashman, asserting under oath that they had "never been my lawyers." | Toberoff Decl., Ex. 34 at 23:11-24, 26:1-7 |
| 48. DiSalle was frequently mentioned as the producer and originator of *Bloodsport* in newspaper articles regarding his subsequent film projects that appeared in the years immediately following the | Toberoff Decl., Ex. 35 |

| Undisputed Fact | Evidence |
|---|---|
| 1988 release of the first *Bloodsport* film. | |

**Conclusions of Law:**

1.      The Court may grant summary judgment on "each claim or defense—or the part of each claim or defense—on which summary judgment is sought." Fed. R. Civ. P. 56(a).

2.      Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

3.      A disputed fact is material for purposes of summary judgment if, when applied to substantive law, it affects the outcome of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

4.      An issue is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the non-moving party. *Id.*

5.      The moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It may satisfy that burden by showing "that there is an absence of evidence to support the non-moving party's case." *Id.* at 325.

6.      When a properly supported motion for summary judgment is made, the adverse party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting prior version of Fed. R. Civ. P. 56(e)).

7.      The mere existence of some evidence to support the nonmoving party is not sufficient; there must be "sufficient evidence favoring the non-moving party for a jury to return a verdict for that party." *Id.* at 249.

8.     DiSalle was the "statutory author" and owner of the *Bloodsport* Screenplay. 17 U.S.C. § 101.

9.      DiSalle's copyright in the Screenplay consists of a bundle of exclusive rights, including, without limitation, motion picture rights (including remake, prequel and sequel rights), television and other rights.

10.    While there is always only one protected original work of authorship, there is no such single "copyright" in that work. "Copyright" is simply the name given to the exclusive rights granted in Sections 106 and 106A and vests initially as a bundle in the author. After initial vesting, the author may disaggregate the bundle of exclusive rights by assignment or bequest. 2 William F. Patry, *Patry on Copyright* § 5:1 (Sept. 2023 rev. ed.).

11.    Under the Copyright Act a transfer of copyright or of any rights under copyright "is not valid unless an instrument of conveyance . . . is in writing and signed by the owner of the rights conveyed."  17 U.S.C. § 204(a).

12.    Because Pressman was only assigned rights in the film, and not in the underlying Screenplay, it has rights only in "what was copyrightable as a new matter" in the film (excluding the creative expression in the Screenplay). *See Ricordi & Co. v. Paramount Pictures*, 189 F.2d 469, 472 (2d Cir. 1951) (copyright in derivative works such as a film protects "what was copyrightable as new matter" in such film not preexisting elements in the underlying work).

13.    DiSalle retained by operation of law all rights in his underlying *Bloodsport* Screenplay not expressly conveyed in the Pathé Agreement. 17 U.S.C. § 204(a).

14.    Under the Pathé Agreement, *Bloodsport II* would be a derivative work based on *Bloodsport* and DiSalle's underlying Screenplay, and the copyright to a derivative work solely covers new elements contained therein, not any pre-existing elements contained in the underlying works.

15.     Both the 1986 Cannon Agreement and the 1989 Pathé Agreement are governed by California law.

16.     A film is an audiovisual work that is categorized as a motion picture and is derivative of the script. *Garcia v. Google, Inc.*, 786 F.3d 733, 741 (9th Cir. 2015) (en banc). Similarly, a motion picture is a derivative work in relation to the novel or screenplay upon which it is based. *Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1197 (10th Cir. 2005) (quoting 1 Nimmer on Copyright § 2.10[A]).

17.     A contract's meaning must be derived from the whole contract and individual provisions must be interpreted together in order to give effect to all provisions and avoid rendering some meaningless. *Crytek GmbH v. Cloud Imperium Games Corp.*, No. CV 17-8937 DMG, 2018 WL 9491965, at *2–3 (C.D. Cal. Dec. 6, 2018).

18.     As a matter of law, with the possible exception of sequel motion picture rights, DiSalle retained and owns all of his exclusive rights to create further derivative works based on his Bloodsport Property, including, without limitation, remake and prequel motion picture rights, the rights to produce television series and other television programs, associated merchandising and interactive rights (*e.g.*, videogames).

19.     Defendants are not entitled to "Bloodsport" trademarks or to use them to encumber Plaintiff's rights.

20.     Inherent in Plaintiff's contractual retention of significant rights to produce new derivative works based on his original Screenplay entitled "Bloodsport," both before and after he produced the 1988 film *Bloodsport*, which popularized the title and mark, was his obvious right to continue to use his own original title and mark.

21.     *Dastar Corp. v. Twentieth Century Fox Film Corp.* requires courts to avoid recognizing a "species of mutant copyright law" by making such claims

cognizable under the Lanham Act. *Slep-Tone Ent. Corp. v. Wired for Sound Karaoke & DJ Services, LLC*, 845 F.3d 1246, 1250 (9th Cir. 2017) (quoting *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 34 (2003)).

22.     Trans-American Films International's ("TFI") trademark applications (Serial Nos. 86043656 and 86043667) to the U.S. Patent and Trademark Office ("USPTO") pursuant to which it illicitly obtained its unauthorized trademark Registrations Nos. 4,865,217 and 5,655,926, respectively are riddled with intentional misrepresentations of material fact mandating their cancellation.

23.     A trademark registration that is less than five years old may be cancelled on "any ground that would have prevented registration in the first place." *Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*, 894 F.3d 1015, 1021 (9th Cir. 2018) (quoting *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 946 (Fed. Cir. 2000)); *see also* 15 U.S.C. § 1064(1).

24.     *Bloodsport*, both originated and produced by DiSalle, has acquired a secondary meaning.

25.     The title of a film may receive trademark protection upon a showing that the title has acquired secondary meaning. *Warner Bros. Entertainment, Inc. v. Global Asylum, Inc*., 544 Fed. Appx. 683 (9th Cir. 2013); 15 U.S.C. §§ 1052(e), (f).

26.     A film title acquires secondary meaning when the title becomes well known such that the public associates it with a single source. *See Twin Peaks Productions, Inc. v. Publications Intern., Ltd.*, 996 F.2d 1366, 1379 (2d Cir. 1993) *Sugar Busters LLC v. Brennan*, 177 F.3d 258, 269, 1821 (5th Cir. 1999). The "particular source" may be unknown, as long as consumers believe the mark refers to a "single source, even if that source is anonymous." *Maljack Productions, Inc. v. GoodTimes Home Video Corp.,* 81 F.3d 881, 887 (9th Cir. 1996).

27. As stated in *Paramount Pictures Corp. v. Dorney Park Coaster Co*., 698 F. Supp. 1274, 1277 (E.D. Pa. 1988), "to establish secondary meaning, Paramount is required to show that the public associates the words Top Gun with its motion picture, thereby suggesting to the public that products bearing the same name emanated from a single source."

28. No consumer goodwill or recognition of a single source for *Bloodsport II*, *Bloodsport III*, and *Bloodsport IV* existed or could possibly take hold when no consistent origin among the films even remotely existed.

29. Neither TFI (nor its alleged offshore predecessor) acquired any independent trademark rights in "Bloodsport."

30. While TFI's registrations may create a presumption that TFI has an exclusive right in the U.S. to the BLOODSPORT mark, this presumption is rebutted on a number of grounds, including by DiSalle's undisputed evidence that he made bona fide commercial use of BLOODSPORT in commerce in connection with his iconic 1988 film long prior to TFI's claimed first use date.

31. In the Cannon Agreement and again in the Pathe Agreement, DiSalle contractually retained the right to produce additional *Bloodsport* derivatives, including without limitation remake motion pictures, which entailed continued use the mark.

32. DiSalle, not Defendants, owns the BLOODSPORT mark in the U.S.

33. "Ownership of a mark can be challenged on a number of grounds, including 'priority of use'. . . ." *Miramar Brands Grp., Inc. v. Fonoimoana*, No. CV 16-4224 PSG (RAOx), 2017 WL 2903256, at *4 (C.D. Cal. June 13, 2017).

34. It is axiomatic in trademark law that the standard test of ownership is priority of use. To acquire ownership of a trademark it is not enough to have invented the mark first or even to have registered it first; the party claiming ownership must have been the first to actually use the mark in the sale of goods or services. *Sengoku Works Ltd. v. RMC Int'l, Ltd.,* 96 F.3d 1217, 1219 (9th Cir.

16

1996) (citing J. Thomas McCarthy, 2 *McCarthy on Trademarks and Unfair Competition* § 16.03 (3d ed. 1996)); *see also Levy v. adidas AG*, No CV 18-6542 PSG (MAAx), 2020 WL 1934977, at * 3 (C.D. Cal. Mar. 24, 2020).

35.    The non-registrant can rebut the presumption of ownership arising from a trademark registration "by showing that the registrant had not established valid ownership rights in the mark at the time of registration-in other words, if the non-registrant can show that he used the mark in commerce first, then the registration may be invalidated." *Sengoku Works*, 96 F.3d at 1220; *Levy*, 2020 WL 1934977, at *3.

36.    Under the Lanham Act, a party seeking to establish priority must establish that its claimed prior use was a "use in commerce." *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1204 (9th Cir. 2012).

37.    A mark is deemed to be in "use in commerce" where the mark is "placed in any manner on the goods . . . and "the goods are sold . . . in commerce."  15 U.S.C. § 1127(1).

38.    The Ninth Circuit uses a "totality of the circumstances" analysis to determine whether these two prongs of the "use in commerce" test have been satisfied. *Rearden*, 683 F.3d at 1205. Sales activity accompanied by the mark is of course relevant, but "non-sales activities such as solicitation of potential customers may [also] be taken into account as part of the 'totality of the circumstances' inquiry," and may be used to establish priority. *Id.*

39.    Where evidence of use of a mark in connection with sale of goods or services is offered, those sales "need not be extensive." *Dep't of Parks & Recreation for State of Cal. v. Bazaar Del Mundo Inc.,* 448 F.3d 1118, 1126 (9th Cir. 2006).

40.    A "single sale" under a mark is enough, if it is a bona fide transaction and accompanied or followed by acts indicating a "continuing effort or intent to continue the use" with commercial sales. *Id.*; *Sarieddine*, 2019 WL

17

1966661, at *6 ("A small number of sales may be sufficient so long as they are bona fide, commercial in character, and part of a continuing effort to use a mark.").

41.     DiSalle's use of the BLOODSPORT mark during the Priority Period met both prongs of the "use in commerce" requirement. *See Rearden*, 683 F.3d at 1204.

42.     TFI's registrations should be cancelled due to abandonment. 15 U.S.C. § 1064(3).

43.     A federal court may cancel a trademark registration if it is abandoned. 15 U.S.C. § 1064(3).

44.     Under the Lanham Act, "[n]onuse for 3 consecutive years shall be prima facie evidence of abandonment[,]" shifting the burden of proof on this issue to Defendants. *Id.* § 1127; *see also Sutton v. Williamsburg Winery, Ltd.*, No. 12-333 GEB, 2013 WL 5348127, at *3 (E.D. Cal. Sept. 23, 2013) (granting summary judgment); *Mosaic Brands, Inc. v. Ridge Wallet LLC*, No. CV 20-4556 AB (JCx), 2021 WL 4535351 (C.D. Cal. Aug. 5, 2021).

45.     Continued use of a mark on promotional items that are ancillary to the mark owner's discontinued goods or services is generally insufficient to overcome an abandonment claim. *See e.g., Imperial Tobacco Ltd. v. Philip Morris, Inc.*, 899 F.2d 1575, 1582-83 (Fed. Cir. 1991); *Emergency One, Inc. v. Am. FireEagle, Ltd.*, 228 F.3d 531, 539 (4th Cir. 2000) (holding use of mark on promotional t-shirts and caps cannot be basis for finding that use continued in connection with fire trucks). Once a mark has been abandoned, subsequent use will not revive the mark. *Sodima v. Int'l Yogurt Co.*, Inc., 662 F. Supp. 839, 850 (D. Or. 1987); 3 *McCarthy* § 17:3.

46.     Trademark use means use that "includes placement on goods sold or transported in commerce; [that] is bona fide; is made in the ordinary course of

trade; and is not made merely to reserve a right in a mark." *Electro Source, LLC v. Brandess-Kalt-Aetna Grp., Inc.*, 458 F.3d 931, 936 (9th Cir. 2006).

47.     A mark is deemed abandoned if the party fails to ever present any concrete plans to resume use. *UV RML NL Assets, LLC v. Coulter Ventures, LLC,* No. 221CV04913(VAPASX), 2021 WL 5706870, at *15 (C.D. Cal. Oct. 22, 2021); *see also Nat. Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325, 1330 (11th Cir. 2008).

48.     The elements necessary to prevail on common law causes of action for trademark infringement mirror Lanham Act claims. *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1288 (9th Cir. 1992). To prevail, Plaintiff must establish: (1) ownership of the BLOODSPORT mark in the U.S.; and (2) a likelihood that use by Defendants of their competing BLOODSPORT mark is "likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association" of Defendants with Plaintiff or "as to the origin, sponsorship, or approval of [Defendants'] . . . services, or commercial activities". 15 U.S.C. § 1125(a)(1)(A); *Network Automation, Inc. v. Advanced Sys. Concepts,* 638 F.3d 1137, 1144 (9th Cir. 2011).

49.     Plaintiff has established ownership of the mark as a matter of law: prior use and ownership of the BLOODSPORT mark.

50.     Defendants' unauthorized registration and use of such registered BLOODSPORT marks, coupled with their misleading descriptions, misrepresentations and insinuations that Plaintiff's iconic 1988 *Bloodsport* film (and even the unsuccessful *Bloodsport II and Bloodsport III* films) were their own film productions is all "likely to cause confusion, mistake and deception" among consuming members of the public and the entertainment industry.

51.     In the Ninth Circuit, courts consider the eight "Sleekcraft" factors in determining whether there is a likelihood of confusion: "(1) the similarity of the marks; (2) the relatedness of the parties' goods; (3) the similarity of trade or

_____

marketing channels; (4) the strength of the plaintiff's marks; (5) the defendant's intent; (6) evidence of actual confusion; (7) the degree of care exercised by the average purchaser; and (8) the likelihood of expansion into other markets." *Miramar Brands*, 2017 WL 2903256, at *8 (citing *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).

52.     The similarity factor, which is often deemed a particularly important one in the *Sleekcraft* analysis, *see Brookfeld Comms.*, 174 F.3d at 1054, indicates a likelihood of confusion. "Obviously, the greater the similarity between the two marks at issue, the greater the likelihood of confusion." *Fortune Dynamic, Inc.*, 618 F.3d at 1032.

53.     The identity of goods, services and trade channels, combined with the fact that the marks themselves are *identical*, effectively require judgment for Plaintiff on "likely confusion" even before other *Sleekcraft* factors are considered. *Brookfield*, 174 F.3d at 1056 ("In light of the virtual identity of marks, if they were used with identical products or services likelihood of confusion would follow as a matter of course.").

54.     Since the parties are already in the same market, the Court need not consider the *Sleekcraft* factor addressing expansion into new markets. "The use of similar marks to offer similar products accordingly weighs heavily in favor of likelihood of confusion." *Brookfield*, 174 F.3d at 1056-57.

55.     The first *Sleekcraft* factor, the strength of the mark, heavily favors likelihood of confusion. "The stronger a mark . . . the greater the protection it is accorded by the trademark laws." *Brookfield Comm., Inc. v. West Coast Ent. Corp.*, 174 F.3d 1036, 1058 (9th Cir. 1999). An unregistered mark is protected against infringement if it is inherently distinctive, even if it has not acquired secondary meaning. *Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 768 (1992). Marks are classified on a spectrum of increasing inherent distinctiveness as: generic, descriptive, suggestive, arbitrary, or fanciful. *Id*. An arbitrary or

fanciful mark is a coined word or phrase, such as Kodak, invented solely to function as a trademark. *Off. Airline Guides, Inc. v. Goss*, 6 F.3d 1385, 1390 (9th Cir. 1993).

56.     Because the uses and services here are identical and the BLOODSPORT marks in question are identical, the strength of DiSalle's mark is of "diminished importance in the likelihood of confusion analysis." *Id.* at 1059; *see also Go-To.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1206 (9th Cir. 2000).

57.     The intent factor under *Sleekcraft* is of "minimal importance," and courts have often found likelihood of confusion even where the defendant had no actual or constructive knowledge of the plaintiff's mark. *Brookfield*, 174 F.3d at 1059; *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1208 (9th Cir. 2000) (Even if "Disney was as innocent as a fawn with *no* intent to copy or appropriate GoTo's logo, it would prove nothing since no such intent is necessary to demonstrate a likelihood of confusion.") (emphasis in original).

58.     Proof of actual confusion is not necessary to a finding of likelihood of confusion. *Perfumebay.com Inc. v. eBay, Inc.*, 506 F.3d 1165, 1176 (9th Cir. 2007). The absence of such evidence does not weigh against a finding of likelihood of confusion. J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition (3d ed. 1996) ("McCarthy"), §§ 23.12, 23.18.

59.     Under *Sleekcraft* factor regarding the degree of care exercised by purchasers, "[t]he fact that a buyer is an expert in his or her field does not necessarily dictate that that person is correspondingly cautious and wary in distinguishing similar trademarks." McCarthy, § 23.103. Moreover, "where [as here] the products are identical and the marks are identical, the sophistication of buyers cannot be relied on to prevent confusion." *McGregor-Doniger, Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1137 (2d Cir. 1979); *see also Electropix v. Liberty Livewire Corp.*, 178 F. Supp. 2d 1125 (C.D. Cal. 2001).

60. The *Sleekcraft* factors should not be rigidly weighed. *Dreamwerks*, 142 F.3d at 1130.

61. Even three factors are sufficient to find a strong showing of likelihood of confusion. *Brookfield*, 174 F.3d at 1057-61.

62. Defendants secured TFI's trademark registrations through fraud on the USPTO.

63. Fraud in either the procurement of trademark registration or incontestability status of a trademark is grounds for cancellation. 15 U.S.C. § 1064(3).

64. Any false statements made in an incontestability affidavit may jeopardize not only the incontestability claim, but also the underlying registration. In particular, filing a fraudulent incontestability affidavit provides a basis for cancelling the registration itself. *Robi v. Five Platters, Inc*., 918 F.2d 1439, 1444 (9th Cir. 1990).

65. To prevail on a claim for fraudulent trademark registration, Plaintiff must establish: "[1] a false representation regarding a material fact, [2] the registrant's knowledge or belief that the representation is false, [3] the intent to induce reliance upon the misrepresentation and reasonable reliance thereon, and [4] damages proximately resulting from the reliance." *Id.,* 918 F.2d at 1444; *see also Hotko Kinoko Co. v. Concord Farms, Inc.,* 738 F.3d 1085, 1097 (9th Cir. 2013). The standard is that of clear and convincing evidence; however, an intent to deceive may be inferred from indirect or circumstantial evidence. *Marketquest Grp., Inc. v. BIC Corp.*, 316 F. Supp. 3d 1234, 1278 (S.D. Cal. 2018).

66. Reckless disregard for the truth of a statement is sufficient to prove the defendant's intent. *Chutter, Inc. v. Great Mgmt. Grp., LLC,* 2021 WL 4494251, at *6, 13 (T.T.A.B. 2021) ("We find the facts of this case at a minimum demonstrate reckless disregard, and hold as a matter of law that

22

reckless disregard satisfies the requisite intent for fraud on the USPTO in trademark matters."), rev'd on other grounds, 2023 WL 6854647 (Fed. Cir. Oct. 18, 2023); On *Site Energy Co. v. MTU Onsite Energy Corp.*, 2013 WL 3990919, at *6-7 (E.D.N.Y. 2013) (holding willful blindness can support a fraud claim based on an exclusive use misrepresentation).

67.     Trademark applicants must swear that "no other person has the right to use [the] mark in commerce." 15 U.S.C. § 1051(b)(3)(D).

68.     Where an applicant makes this statement knowing it to be false, cancellation is proper. *See e.g., Robi*, 918 F.2d at 1444 (registration cancelled where mark holder made knowing false statements to USPTO); *MPC Franchise, LLC v. Tarntino*, 826 F.3d 653, 661 (2d Cir. 2016) (summary judgment and cancellation affirmed where registrant "knew that others had rights to use the mark that were at least equal, if not clearly superior, to his own").

69.     Defendants repeatedly misrepresented their use of the BLOODSPORT mark in the specimens they submitted to the USPTO to attain registration and incontestability. These specimens falsely and unfairly misrepresented that Defendants were and are the source responsible for each of the films, when TFI is only first credited as a production company on *Bloodsport IV*, and Defendants had no credit or involvement in *Bloodsport II* and *III*.

70.     Defendants intentionally misrepresented to the USPTO that DiSalle's Bloodsport film was proof of Defendants' use of the mark in commerce.

71.     Defendants' fraudulently-submitted specimens misrepresented BLOODSPORT's goodwill, and Plaintiff's association with it, as well as his rights to utilize the mark.

72.     Defendants' false statements caused significant damage because Defendants "falsely secur[ed] the registration[s]" and thereafter sought to encumber and prevent Plaintiff's further utilization of the mark, as is his right,

and from being able to apply for registration of his mark based on his *Bloodsport* film and intended derivative motion pictures in the foreseeable future. *See Amusement Art, LLC v. Life is Beautiful, LLC*, No. 14-cv-08290, 2016 WL 6998566, at *5 (C.D. Cal. Nov. 29, 2016) (summary judgment based on fraud on the USPTO), *aff'd,* 768 F. App'x 683 (9th Cir. 2019).

73. Cancellation of Defendants' registrations, and summary judgment to Plaintiff is appropriate, based on Defendants' fraud on the USPTO. *See MPC Franchise*, 826 F.3d at 661.

74. Plaintiff is entitled to a permanent injunction against Defendants' further use of BLOODSPORT and an order cancelling the BLOODSPORT trademark registration. 15 U.S.C. § 1119; *Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*, 894 F.3d 1015, 1021 (9th Cir. 2018).

75. A permanent injunction is the usual, normal remedy once trademark infringement has been found in a final judgment. McCarthy, § 30:1.

76. "Injunctive relief is the remedy of choice for trademark and unfair competition cases, since there is no adequate remedy at law for the injury caused by a defendant's continuing infringement . . . . In cases where the infringing use is for a similar service [or product], broad injunctions are particularly appropriate." *Century 21 Real Estate Corp. v. Sandlin*, 846 F.2d 1175, 1180-81 (9th Cir. 1988).

77. To enter a permanent injunction, the Court must find that (1) the plaintiff has suffered an irreparable injury from infringement; (2) monetary damages are inadequate; (3) the balance of hardships merits an equitable remedy; and (4) the public interest will not be disserved by a permanent injunction. *Reno Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1138 n. 11 (9th Cir. 2006).

78. The first element for injunctive relief, irreparable injury arising from infringement, is satisfied by 15 U.S.C. § 1116(a), which provides that "[a]

24

plaintiff seeking any such injunction shall be entitled to a rebuttable presumption of irreparable harm upon a finding of a violation identified in this subsection in the case of a motion for a permanent injunction."

79.    Monetary damages cannot compensate for the loss of reputation and goodwill suffered by a victim of trademark infringement. *OTR Wheel Eng'g, Inc. v. West Worldwide Servs., Inc.*, 602 F. App'x. 669, 672 (9th Cir. 2015).

DATED:  October 27, 2023        TOBEROFF & ASSOCIATES, P.C.


                                By:  */s/ Marc Toberoff*
                                     Marc Toberoff

                                TOBEROFF & ASSOCIATES, P.C.
                                23823 Malibu Road, Suite 50-363
                                Malibu, CA 90265
                                Telephone: (310) 246-3333
                                *mtoberoff@toberoffandassociates.com*

                                Attorneys for Plaintiff