Marc Toberoff (S.B. #188547)
*mtoberoff@toberoffandassociates.com*
TOBEROFF & ASSOCIATES, P.C.
23823 Malibu Road, Suite 50-363
Malibu, CA 90265
Telephone: (310) 246-3333

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARK DISALLE, an individual,<br><br>Plaintiff,<br><br>v.<br><br>ALBERTO LENSI, an individual; TRANS-AMERICAN FILMS INTERNATIONAL CORPORATION, a Delaware corporation, and DOES 1-10,<br><br>Defendants. | Case No. 22-cv-02152-SSS-PVCx<br><br>**PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date: December 15, 2023<br>Time: 2:00 pm<br>Judge: Hon. Sunshine S. Sykes<br><br>Oral Argument Requested<br><br>*Plaintiff's Reply In Support of His Rule 56.1 Statement; Plaintiff's Response to Defendants' Rule 56.1 Statement; Second Declaration of Marc Toberoff; Plaintiff's Objections filed concurrently.* |

# **TABLE OF CONTENTS**

**Page**

I.  INTRODUCTION ...................................................................................1

II.  ARGUMENT.........................................................................................1

    A.  DiSalle Retained Remake and Other Rights in Bloodsport; Defendants Mischaracterize the Chain-of-Title ..................................1

    B.  Defendants' Life Story Arguments Are Unavailing .........................6

    C.  Defendants' Statute of Limitations Defense Has No Merit ..............8

    D.  Defendants' Estoppel Defense is Without Merit..............................9

    E.  Defendants' Laches Defense is Equally Unpersuasive ...................11

    F.  Defendants' Preemption Argument Makes No Sense......................12

    G.  Defendant TFI's Purported Trademarks Fail Because There Are Four Major Gaps in Its Proffered Chain-of-Title.....................12

    H.  Defendants Failed to Rebut Plaintiff's "Priority of Use in Commerce" of the BLOODSPORT Mark. ......................................14

    I.  Defendants Are Not Entitled to BLOODSPORT Marks, Irrespective of DiSalle's Entitlement to a Common-Law Mark.......16

    J.  Defendants Have Failed to Rebut Significant Evidence of Fraud on the USPTO....................................................16

    K.  Defendant TFI's Registrations Should, in Any Event, Be Cancelled Due to Abandonment. ....................................................20

i

# **TABLE OF AUTHORITIES**

**FEDERAL CASES**

*Aalmuhammed v. Lee*,
  202 F.3d 1227 (9th Cir. 2000) ............................................................................ 9

*Bauer Bros. LLC v. Nike, Inc.*,
  No. CV 09-0500, 2012 WL 1900047 (S.D. Cal. May 24, 2012) .............. 17, 19

*Baugher v. GoDaddy.com LLC*,
  No. CV 19-0034, 2021 WL 4942658 (D. Ariz. Oct. 22, 2021) ...................... 10

*Brown v. Beatty*,
  No. CV 16-7666, 2017 WL 6940518 (C.D. Cal. Nov. 9, 2017) ..................... 12

*Cedric Kushner Promotions, Ltd. v. King*,
  533 U.S. 158 (2001) ...................................................................................... 14

*Chutter, Inc. v. Great Mgmt. Grp., LLC*,
  2021 WL 4494251 (T.T.A.B. 2021),
  *rev'd on other grounds,* 2023 WL 6854647 (Fed. Cir. Oct. 18, 2023) ........... 18

*Clarex Ltd. v. Natixis Sec. Am. LLC*,
  No CV 12-7908, 2012 WL 4849146 (S.D.N.Y. Oct. 12, 2012)) .................... 14

*Dep't of Parks & Recreation for State of Cal. v. Bazaar Del Mundo Inc.*,
  448 F.3d 1118 (9th Cir. 2006) ....................................................................... 15

*Fuji Med. Instruments Mfg. Co., Ltd. v. Am. Crocodile Int'l Grp., Inc.*,
  No. 20-62760, 2021 WL 3286400 (TTAB July 28, 2021) .............................. 17

*Hachette Filipacchi Presse v. Elle Belle, LLC*,
  85 USPQ2d 1090 (TTAB 2007) ..................................................................... 18

*Hampton v. Paramount Pictures Corp.*,
  279 F.2d 100 (9th Cir. 1960) ......................................................................... 18

*In re Bose Corp.*,
  580 F.3d 1240 (Fed. Cir. 2009) ..................................................................... 17

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

*Incredible Features, Inc. v. Backchina, LLC,*
    No. CV 20-0943, 2021 WL 6337194 (C.D. Cal. Dec. 16, 2021) ...................20

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.,*
    304 F.3d 829 (9th Cir. 2002) ...........................................................................11

*Lardenois v. Lazarus,*
    168 USPQ 604 (TTAB 1970) ................................................................... 18-19

*Marketquest Grp., Inc. v. BIC Corp.,*
    316 F. Supp. 3d 1234 (S.D. Cal. 2018) ...........................................................11

*Mosaic Brands, Inc. v. Ridge Wallet LLC,*
    No. CV 20-4556, 2021 WL 4535351 (C.D. Cal. Aug. 5, 2021) .....................20

*MPC Franchise, LLC v. Tarntino,*
    826 F.3d 653 (2d Cir. 2016) ...........................................................................17

*On Site Energy Co. v. MTU Onsite Energy Corp.,*
    2013 WL 3990919 (E.D.N.Y. 2013) ...............................................................18

*Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.,*
    894 F.3d 1015 (9th Cir. 2018) .........................................................................16

*Rearden LLC v. Rearden Commerce, Inc.,*
    683 F.3d 1190 (9th Cir. 2012) .........................................................................15

*Roley v. New World Pictures, Ltd.,*
    19 F.3d 479 (9th Cir.1994) ................................................................................9

*San Diego Cnty. Credit Union v. Citizens Equity First Credit Union,*
    344 F. Supp. 3d 1147 (S.D. Cal. 2018) .............................................................4

*Seven Arts Filmed Entm't Ltd. v. Content Media Corp. PLC,*
    733 F.3d 1251 (9th Cir. 2013) ...........................................................................5

*Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.,*
    802 F. Supp. 2d 1125 (C.D. Cal. 2011) .............................................................1

*Tokidoki, LLC v. Fortune Dynamic, Inc.,*
    No. CV 07-1923, 2009 WL 2366439 (C.D. Cal. July 28, 2009) .............. 18-19

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

*Waite v. UMG Recordings, Inc.*,
  450 F. Supp. 3d 430 (S.D.N.Y. 2020) ................................................................ 14

*Warner Bros. Ent. Inc. v. Loyd*,
  No. CV 20-0062, 2023 WL 5727468 (D.N.M. Sept. 5, 2023) ......................... 19

*Zuill v. Shanahan*,
  80 F.3d 1366 (9th Cir.1996) ............................................................................... 8

**FEDERAL STATUTES, RULES AND REGULATIONS**

15 U.S.C.

     § 1051 .......................................................................................... 17, 19

     § 1064 .......................................................................................... 16, 20

     § 1127 .......................................................................................... 15, 20

     § 1271 .......................................................................................... 14, 20

17 U.S.C.

     § 101 ................................................................................................... 1

     § 102 ................................................................................................. 10

     § 103 ................................................................................................... 2

     § 301 ................................................................................................... 2

     § 408 ................................................................................................. 10

     § 507 ............................................................................................. 22-23

28 U.S.C. § 2201 ..................................................................................................... 11

37 C.F.R. §11.18 ..................................................................................................... 11

Fed. R. Civ. P. 57 ................................................................................................... 12

**OTHER AUTHORITIES**

Mark S. Lee, *Entertainment and I.P. Law* § 13:31 (2023) ................................... 11

5 J. Thomas McCarthy, *McCarthy on Trademarks
   and Unfair Competition* § 28:20 (5th ed. & 2023 Supp.) ............................... 20

2 J. Thomas McCarthy, *The Rights of Publicity
   and Privacy* § 8:64 (2d ed. & 2023 Supp.) ...................................................... 20

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## I.    **INTRODUCTION**

Defendants Alberto Lensi ("Lensi") and Trans-American Films International Corporation's ("TFI") Opposition ("Opp.") to Plaintiff Mark DiSalle's ("DiSalle") Motion for Summary ("Mot.") misapprehends basic copyright law, resulting in attacks on a series of irrelevant "straw men." It is riddled with false statements of fact and erroneous conclusions of law on nearly every page. And after this Court graciously extended the word limitation from 7,000 to 10,000, Defendants, in addition to a 10,740-word Opposition, submitted a 6,292-word brief in the guise of an attorney's declaration, replete with brief-like headings, legal arguments, and mischaracterizations of the record evidence.[1]

## II.    **ARGUMENT**

### A.    **DiSalle Retained Remake and Other Rights in Bloodsport; Defendants Mischaracterize the Chain-of-Title.**

Defendants offer one erroneous legal conclusion after another, reflecting a fundamental misconception (or willful ignorance) of well-settled copyright principles.  The chain of title to rights under copyright underlying a motion picture (e.g., *Bloodsport* (1988)) starts with underlying literary material (e.g., screenplay or novel). Here, it was the screenplay "Bloodsport," written by Sheldon Lettich ("Screenplay") pursuant to a 1985 "work for hire" agreement for producer DiSalle. SUF 2. Defendants admit this. Declaration of Michael Kernan ("Kernan Decl.") ¶4 ("Plaintiff also hired Sheldon Lettich ("Lettich") to write a script for Bloodsport I as a work-for-hire.").

By definition, what followed (e.g., a revised screenplay and motion picture(s)) using elements of the Screenplay are "derivative works" under copyright law. 17 U.S.C. §101. The copyright in such derivative works only

---

[1] *See* Second Declaration of Marc Toberoff ("Toberoff Decl. II"), ¶¶2-8; and Plaintiff's Objections.

extends to new elements therein, not to elements in the underlying work. 17 U.S.C. §103(b). Thus, DiSalle's original *Bloodsport* Screenplay—which started it all—is of paramount importance. That copyright owned by DiSalle as work-for-hire consists of a bundle of rights, including without limitation, remake, prequel, sequel film and television rights. *See* 2 William F. Patry, *Patry on Copyright* §5:1 (Sept. 2023).

### The Cannon and Pathé Agreements

It is indisputable that in an agreement dated March 25, 1986 (the "Cannon Agreement"), DiSalle granted Cannon Films, Inc. ("Cannon") "a license **to produce one motion picture** based on the Property [defined as DiSalle's Screenplay and so-called "life story rights" per a 1985 agreement with Frank Dux ("Dux Agreement")] (emphasis added). SUF 1-4. Yet, after quoting this limiting language, Defendants misleadingly represent that "Plaintiff … sold and assigned his rights in the [S]creenplay to Cannon[.]" Opp. 2:7-8.

Notwithstanding Cannon's acknowledgement of DiSalle's ownership of the Screenplay (SUF 2), and Defendants' own admission of this (Kernan Decl., ¶4), they misleadingly assert (without citation), that Cannon owns the Screenplay copyright because "Cannon registered the copyright in 1986." Opp. 3:9-11; 17-18. Closer inspection of Cannon's registration reveals it is not of Disalle's 1985 Screenplay by Lettich, but a "1986" "Final draft" "screenplay/ by …Christopher Cosby & Mel Friedman." Dkt. 79-5.

Thus, after DiSalle granted Cannon a "license to produce one motion picture" based on his Screenplay, Cannon hired writers to revise it. *Id*., Dkt. 79-12, 0372 (referencing Cannon's 1986 Writer's Agreement with Cosby and Friedman).  The resulting "final draft" Cannon registered as "employee for hire" was a derivative work, and its copyright solely applied to their revisions, ***not*** DiSalle's underlying Screenplay. 17 U.S.C. §103(b); SUF 2.

DiSalle originated and produced the 1988 *Bloodsport* film (another

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

derivative work) but has never claimed he owned it. This is one of many "straw men" attacked by Defendants to support frivolous defenses. Opp. 8:3-5, 16-17, 23-24; 10:4-5, 15-19.

Defendants further mislead by hyping DiSalle's grant to Cannon of the rights to exploit its licensed "one motion picture" in all media, as an assignment of "virtually all related rights thereto." Kernan Decl. ¶5.

The record evidence demonstrates, however, that after *Bloodsport* was a break-out success, Cannon's successor Pathé Entertainment, Inc. ("Pathé"), had to secure a license from DiSalle in their 1989 agreement (the "Pathé Agreement") in order to make a *Bloodsport* sequel. SUF 5.

Importantly, Defendants admit that ***their rights are as delineated by the Pathé Agreement*** as its alleged successor. Opp. 2:21; 3:1-2; Kernan Decl., ¶21. The Pathé Agreement, while acknowledging DiSalle's "right … to remake 'Bloodsport'", licensed to Pathé the right to produce just "one (1*)* sequel motion picture to 'Bloodsport'": "Bloodsport II." SUF 6-7. Because DiSalle retained, without limitation, remake rights, the Pathé Agreement emphasized that it would make no use "in a manner which would constitute 'Bloodsport II' a remake of 'Bloodsport'; nor shall any such use be deemed to be a remake of 'Bloodsport.'" SUF 8.

If Pathé produced its "one (1) sequel", it would thereafter have the right to produce sequels to and remakes of Bloodsport II, *provided* such film(s) *only* exploited "new and original characters" and "original plot, story, scenes and events created by [Pathé]…, including [in] 'Bloodsport II.'" SUF 9. ***But Pathé expressly did not have the right to produce more than "one (1) sequel motion picture" containing any elements (e.g., plot, character(s), story, scene(s), sequence of event(s), settings, and themes) from DiSalle's Screenplay on which Bloodsport (1988) was based***. *Id.*

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Defendants lose all credibility in falsely proclaiming that "the copyrights [*sic*] to the Lettich [S]creenplay were unambiguously assigned to Cannon"; and "Plaintiff was not entitled to any rights with respect to Bloodsport I and related materials." Kernan Decl. ¶¶8-9, Opp. 2:7-8. These statements (made under oath no less) are knowingly false and designed to mislead. Moments later, Defendants contradict themselves, stating: "Under the Pathé Agreement, Plaintiff sold and assigned his right to make a Bloodsport I sequel and other related rights[.]" *Id*. 4:11-12; Opp. 2:16-17.

Facts matter. Due to the *expressly limited* license by DiSalle in the Cannon Agreement ("one motion picture"—"Bloodsport") and the Pathé Agreement ("one (1) sequel motion picture to 'Bloodsport'"), DiSalle retained significant rights *in his Screenplay* from which *Bloodsport* was derived, including remake, prequel, (additional) sequel rights, rights to produce television shows, and interactive rights (e.g., videogame). Of course, Cannon and Pathé had the right to distribute their derivative works—"one motion picture" and "one (1) sequel motion picture"—in all media, but that is ***not*** the same thing as an exclusive grant of all rights in DiSalle's underlying property. Because that original literary property was the "tail that wags the dog," Cannon and Pathé, as a matter of copyright law, could not produce additional derivative *Bloodsport* works (e.g., remake, prequel, television shows, etc.) beyond the scope of their limited licenses. So too, as to Defendants. SUF 4, 6.

Defendants admit that any alleged "Bloodsport" rights TFI has is as an alleged successor to Pathé via MGM. Opp. 2:26; 3:1-2; Kernan Decl., ¶¶16, 21 ("Pathé's rights under the Cannon and Pathé Agreements were later acquired by…MGM"). It is undisputed that Defendants could have no more rights in DiSalle's "Bloodsport" Screenplay than as expressly granted *and cabined* by the Pathé Agreement. Because DiSalle's literary property was a blueprint for the only noteworthy derivative film—the iconic *Bloodsport* (1988)—that is quite

4

1  significant from a copyright and chain-of-title perspective.

2  **Edward R. Pressman Film Corp.'s Attempt to Produce a *Bloodsport* Sequel**

3       Further underscoring DiSalle's retention of significant *Bloodsport* rights,

4  after TFI entered into a 2010 agreement with Edward R. Pressman Film Corp.

5  ("ERPFC") to produce a sequel film derived from *Bloodsport*, ERPFC

6  (represented by Pryor Cashman) was constrained to enter into a December, 2010

7  agreement with DiSalle for important rights for significant compensation. SUF

8  26-28. That agreement expressly refers to DiSalle's "remake rights" in

9  *Bloodsport*, and elsewhere to DiSalle's remake, prequel and sequel rights and

10  trademarks therein (the "ERPFC/DiSalle Agreement"). SUF 26-27.

11       In further acknowledgement of DiSalle's rights, and to prevent a reversion

12  of his rights, ERPFC extended its agreement *five* consecutive times over a ten-

13  year period—each for increased compensation to DiSalle—and entered into four

14  careful amendments to that agreement in November, 2013, May, 2015,

15  September, 2016, and March, 2018. SUF 30. Each reiterated that if "ERPFC

16  does not execute a production financing agreement for the Picture prior to the

17  end of the Reversion Period (as so extended …), the Rights granted to ERPFC

18  by [DiSalle] ... shall revert to [DiSalle]." SUF 32.

19       In October-November 2020, ERPFC requested yet another extension.

20  When this failed, ERPFC asserted an automatic six-month *force majeure*

21  extension, until June 30, 2020, after which DiSalle's rights would automatically

22  revert to him. SUF 33.

23       That is an awful lot of attention and money to spend on someone who

24  purportedly has no rights. And ERPFC was not acting alone. Pursuant to an

25  October 2010 Agreement, ERPFC, ***Defendant Lensi*** and his entity, Bloodsport

26  Producers LLC, expressly agreed to try to acquire "DiSalle's rights to produce

27  motion picture productions based on [*Bloodsport*]." SUF 25.

28       True to form, Defendants try to hand waive all this away and mislead,

stating *without any evidence* that "[h]aving secured access to Trans-American's extensive rights, Pressman" entered into the December 2010 agreement with Plaintiff "primarily to gain access to Frank Dux ("Dux") through Plaintiff's relationship with him." Kernan Decl., ¶34. But, of course, this contradicts Defendants' assertions elsewhere that "the copyrights related to Dux's life story rights ...were unambiguously assigned to Cannon" (their alleged predecessor), and that DiSalle no longer had anything to do with Dux. *Id*. ¶¶9, 29.[2]

After numerous agreements, consistently acknowledging, ratifying and reflecting DiSalle's *Bloodsport* rights, after DiSalle refused to further extend the ERPFC/DiSalle Agreement, ERPFC and TFI (described as ERPFC's "partner") sent, on February 25, 2021, an aggressive cease and desist letter to DiSalle, frivolously claiming *for the very first time* that DiSalle had no rights whatsoever and that, in any event, any use by DiSalle of his "Bloodsport" Screenplay would violate TFI's alleged trademarks. SUF 34.

Accordingly, on March 31, 2022, DiSalle filed this suit to clear title, including by requesting a declaratory judgment as to the parties' respective rights in his "Bloodsport" Screenplay and Bloodsport trademark(s), if any.

## B. Defendants' Life Story Arguments Are Unavailing.

Defendants' arguments are falsely premised on the assumption that Dux's alleged "life story rights" control DiSalle's copyright in his "Bloodsport" Screenplay. However, life story "rights" are a misnomer. Whereas people colloquially refer to "life story rights," no one has a legally cognizable

---

[2] As they did with the Pathé and Cannon Agreements, Defendants muddy and deflect the obvious significance of the ERPFC/DiSalle Agreement by claiming that all these agreements were based on DiSalle's supposed misrepresentations (without evidence), ignoring that the agreements (including their reps and warranties) were drafted by these companies and reflect their own due diligence as to the chain-of-title (the approval of which is usually a condition precedent).

proprietary interest in their life story. *See* Mark Lee, Entertainment & I.P. Law §
13:31 (2023) (nearly every court has held "there is no such right"); 5 McCarthy,
*McCarthy on Trademarks & Unfair Competition* §28:20 (2023) ("There Are No
'Life Story Rights.' The First Amendment prevents a person from having any
right to bar an unauthorized story...about events in his or her life").

Nor does the fact that DiSalle entered into a 1985 agreement with Dux
("Dux Agreement") alter this. Such contracts "purport[] to give [a person] the
exclusive right to prepare and sell a story about [another person's] life, but in
fact, [the] 'rights' [] being transferred [are not] legally recognizable.... [N]o one
has the 'right' to prevent others from describing or discussing events in their life
that are of public interest." 2 J. McCarthy, *The Rights of Publicity & Privacy*,
§8:64 (2023). In reality, when the subject enters in to a "life story" contract, "the
subject can only promise two things: (1) cooperation by the subject; and (2) a
waiver of suing for defamation and invasion of privacy." *Id.*[3]

"Life story rights" are therefore not property rights at all. That movie-
business people may not always comprehend this does not transform its legal
status.

Even if the above did not dispose of this non-issue (as it does), there are
numerous additional barriers to Defendants' "life story" argument. For example,
Defendants effectively assert that any further "Bloodsport" film by DiSalle
would breach his Dux Agreement, but they lack "standing" to assert such claim.
Relatedly, there would also be nothing to stop DiSalle or his licensee (e.g., a

---

[3] Even as to this latter point, according to Defendants' alleged predecessor, FM
(Opp. 2:28-3:1), Dux's "life story" is fictional. Defendants repeatedly rely on
*Frank Dux v. Mehrez, FM Entertainment et al.*, 97-CV-8409 (C.D. Cal.).
Therein, Defendants alleged predecessor FM Entertainment ("FM") exposed that
soon after *Bloodsport's* release, articles in the Los Angeles Time and martial arts
magazines asserted that Dux's exploits were fabricated and that Dux was neither
a "Ninja" nor a CIA operative. Toberoff Decl. II, Ex. 36; Dkt. 79-16, ¶¶5-6.

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

film financier/distributor) from entering into a revised or new agreement with
Dux for further pictures, if advisable.

### C.    Defendants Statute of Limitations Defense Has No Merit.

Defendants erroneously assert that Plaintiff's claim for declaratory relief
is time-barred by 17 U.S.C. §507(b) ("No civil action shall be maintained under
the provisions of this title unless commenced within three years after the claim
accrued." Defendants quote *Seven Arts Filmed Entm't Ltd. v. Content Media
Corp. PLC,* 733 F.3d 1251, 1254 (9th Cir. 2013): "'Claims of co-ownership, as
distinct from claims of infringement,' accrue only once, 'when plain and express
repudiation of co-ownership is communicated to the claimant, and are barred
three years from the time of repudiation.'" *Id.* (quoting *Zuill v. Shanahan,*80
F.3d 1366, 1369 (9th Cir.1996) (concerning co-authorship of joint work)).

DiSalle did not file a co-authorship claim, but assuming *arguendo* that a
"a plain and express repudiation" of a claimant's rights under copyright triggers
Section 507(b), Plaintiff filed suit well within the statute. This is underscored by
Plaintiff's filing under the Declaratory Judgment Act (Dkt. 1), restricted to
"actual controversies[.]" 28 U.S.C. §2201(a).

Here, up until ERPFC/TFI's 2021 cease and desist letter (Dkt. 78-27),
there was no plain and express repudiation of DiSalle's rights. On the contrary,
the Cannon, Pathé and ERPFC/DiSalle Agreements acknowledged and ratified
DiSalle's rights.

After receiving Defendants' 2021 letter repudiating his rights, DiSalle
filed suit on March 31, 2022, well within §507(b)'s three-year period. Tellingly,
Defendants *omit* their 2021 letter, knowing it triggered the statute, at the earliest.

Instead, Defendants make "kitchen-sink" arguments claiming all sorts of
immaterial things were "a plain and express repudiation" of DiSalle's rights in
his Screenplay.  First, they point to Cannon's registrations of two *derivative
works*: (1) the final draft "1986" screenplay, revised by "Christopher Cosby &

Mel Friedman" (Kernan Decl., Ex. D) and (2) the *Bloodsport* film licensed by DiSalle in the Cannon Agreement.

Neither of these derivative works or their copyright registrations repudiate DiSalle's retained rights in his underlying Screenplay—as further shown by his subsequent agreement with Cannon's successor—Pathé.

Defendants next reference *Bloodsport II -IV* registrations (without evidentiary cites) but again, these were derivative works produced by alleged successors to Pathé (which licensed "Bloodsport II" and sequels thereto (on conditions)). SUF 9. Plaintiff has made no claim that he owns these films, nor any copyright infringement claim[4] regarding them.

Next, Defendants argue that DiSalle did not get credit on the sequels "as the owner" (not a credit). But again, DiSalle has never claimed to own these films. Defendants also misconstrue cases like *Aalmuhammed v. Lee*, 202 F.3d 1227, 1231 (9th Cir. 2000) which view the failure to credit *a screenwriter* as often repudiating his *co-authorship* claim.

Defendants' perfunctory argument that Plaintiff's "trademark claims (except fraud) are all [time] barred" (Opp. 9) fails for similar reasons. Under the Cannon, Pathé and ERPFC/DiSalle Agreements (reversion), DiSalle retained rights to exploit his Screenplay and use of his "Bloodsport" title. SUF 4, 6-7, 28. Defendants' 2021 cease and desist letter (SUF 34) was the first time TFI's purported marks were asserted against DiSalle, resulting in this action.

### D.    Defendants' Estoppel Defense is Without Merit.

Defendants' equitable estoppel arguments are even worse. Opp. 10-11. "Four necessary elements must be present to establish the defense of estoppel:

---

[4] "Ordinary" "claims for copyright infringement" apply to each infringing act which causes a new claim to accrue. *Seven Arts,* 733 F.3d at 1254 (citing *Roley v. New World Pictures, Ltd.,* 19 F.3d 479, 481–82 (9th Cir.1994) as "adopting a 'rolling' [statute] looking back three years").

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

(1) The party to be estopped must know the facts; (2) he must intend that his conduct shall be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended; (3) the latter must be ignorant of the true facts; and (4) he must rely on the former's conduct to his injury." *Hampton v. Paramount Pictures Corporation*, 279 F.2d 100, 104 (9th Cir. 1960). Defendants fail the first element, saying "Plaintiff knew that Cannon claimed ownership in *an allegedly infringing way* on the release of the Bloodsport film in 1988 (or at a minimum, Defendants' predecessors were doing so as late as 1999…)." Opp. 10. Cannon's *Bloodsport* film complied with its "one motion picture" license; DiSalle has not claimed otherwise. Nor has DiSalle claimed copyright infringement regarding *Bloodsport II-IV*.

Defendants fail the second element. They repeat the non-sequitur that DiSalle did not tell Cannon "to cease their allegedly infringing activity" and claim that "Plaintiff even testified in 1997 that he had no rights in Bloodsport[.]" *Id*. (citing *their* SUF 6). However, no infringement by Cannon is alleged and the 1997 exhibit Defendants cite says nothing like that. *Id*. Defendants again say Plaintiffs did not "object to Cannon's use of the screenplay or registration of the copyright" (unclear) when Cannon's use and registrations were unobjectionable under the Cannon Agreement. *Id*.

Defendants argue: "Plaintiff never registered a copyright in the screenplay, only Cannon did." *Id*.  But, as shown, Cannon's legitimate registration was of a *revised* derivative screenplay—not DiSalle's Screenplay. DiSalle automatically had a federal copyright in his Screenplay from the moment the work was "fixed in any tangible medium of expression," and registration is only a prerequisite to a copyright "infringement" action. 17 U.S.C. §§102(a), 408(a); *Baugher v. GoDaddy.com*, 2021 WL 4942658, at *4 (D. Ariz. Oct. 22, 2021).

Defendants likewise fail the third element, falsely claiming "Plaintiff

10

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

made no attempt to inform any of Defendants' predecessors, of his alleged ownership in the [S]creenplay" which is belied by the Cannon and Pathé Agreements, which expressly reference DiSalle's Screenplay. SUF 3-6.

Lastly, Defendants fail the fourth element—detrimental reliance. Defendants were well aware of DiSalle's rights in his "Bloodsport" Screenplay, as evidenced by the October 2010 **Lensi**/ERPFC agreement expressly agreeing to acquire "DiSalle's rights to produce motion picture productions based on [*Bloodsport*]" and the ERPFC/DiSalle Agreement then doing so, subject to reversion. SUF 25, 26-28. Defendants' argument regarding its predecessors' liability for *Bloodsport* films makes no sense because Plaintiff made/makes no infringement claim(s).

Defendants' equitable estoppel and laches defenses are additionally barred by their unclean hands. *See Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 841-42 (9th Cir. 2002).

### E.    Defendants Laches Defense is Equally Unpersuasive.

For similar reasons, Defendants' scattershot laches arguments regarding Plaintiffs' trademark claims are unpersuasive. Opp. 12-14. "The defense is not a favored one in trademark cases.... The test for laches involves two factors: (1) whether the plaintiff unreasonably delayed in bringing suit and (2) whether the defendant was prejudiced by that delay." *Marketquest Grp., Inc. v. BIC Corp.*, 316 F. Supp. 3d 1234, 1293 (S.D. Cal. 2018) (no laches as a matter of law).

Defendants say: "The question is when Plaintiff should have known that Cannon…claimed sole ownership of Bloodsport." *Id*. If Defendants refer to the 1988 film, Plaintiff made no claim to it. It was owned by Cannon, and now by MGM. If Defendants refer to Plaintiff's Screenplay, DiSalle's continued ownership was not refuted by Cannon's 1988 film, as shown by DiSalle's agreement with Cannon's successor—Pathé. What this has to do with trademark, Defendants never say. The Cannon, Pathé and ERPFC/DiSalle Agreements all

acknowledged DiSalle's rights. But after Defendants sent their 2021 cease and desist letter, using their purported marks to encumber DiSalle's ability to exploit his rights, he filed this action to clear title. There was no delay.

### F.    Defendants' Preemption Argument Makes No Sense.

Federal preemption applies to state-law claims. *See Brown v. Beatty*, 2017 WL 6940518, at *5 (C.D. Cal. Nov. 9, 2017). This Court has obvious jurisdiction to decide claims concerning trademark and rights under copyright. 17 U.S.C. §301(a). Plaintiff's request for a declaratory judgment was properly brought under the Declaratory Judgment Act, 28 U.S.C. §2201 which provides: in "a case of actual controversy within its jurisdiction", a court may "declare the rights and other legal relations of any interested party …whether or not further relief is or could be sought". F.R.C.P. 57 (same).

### G.    Defendant TFI's Purported Trademarks Fail Because There Are Four Major Gaps in Its Proffered Chain-of-Title.

As set forth in Plaintiff's Motion, Defendant Trans-American Films International Corporation ("TFI") had no authority to register trademarks in its name. TFI's trademarks are based upon its erroneous claim that "[a]fter the 1996 transfer from FM Entertainment of all the Bloodsport rights, Defendant Trans-American was the sole owner of all rights in Bloodsport[]" and that "[a]s Defendants owned the rights to the Bloodsport movies, Defendants properly had the Bloodsport trademark filed." Opp. 3.

Defendants' assertions are demonstrably false, and, in addition, major gaps exist in TFI's record chain-of-title.

*First*, Defendants do ***not*** own the iconic *Bloodsport* (1988)—the only movie with any real public awareness—MGM does—as successor to Cannon/Pathé. Dkt. 79-12 (MGM Option Agreement ("MGM Option"), 1 ("MGM shall retain all ownership rights in and to the Picture [*Bloodsport*]").

*Second*, Defendants rely on (i) the assignment dated December 8, 1993 to

12

**FM** from the Bloodsport II Company joint venture (Dkt. 79-14) and (ii) the assignment dated June 10, 1996 from FM to TFI. Dkt. 78-13; Kernan Decl., ¶26. But, whereas Bloodsport II Company was originally intended as the assignee, it was not assigned the MGM Option. Instead, *Transcontinental Cinema Group, Inc.* ("**TCG**") was assigned the MGM Option in an assignment from Pyramid to TCG dated December 8, 1993. Dkt. 79-15.

As Defendants admit that FM is a "company distinct from TCG" (Kernan Decl., ¶26), they know about this critical gap in their chain-of-title. Thus, Defendants blankly assert that "TCG [] immediately assigned [the "acquired MGM rights"] to FM" but cite **no evidence whatsoever demonstrating this.** *Id.,* ¶27.

*Third*, in a Rights Assignment Agreement, back-dated "as of July 3, 2001", a bunch of offshore companies, including TFI, purported to assign their rights to unidentified "Properties" ("more fully described in Exhibit 'A'" thereto) to Jet Set Aviation, Ltd. ("JSA"), another Cayman Islands company. But, oddly, the only copy of this supposed agreement in the record, is as produced by Defendants (Dkt. 79-17 (Lensi 0432-0443)), but it is <u>not</u> executed by JSA <u>and</u> Exhibit "A" (page 9) **appears to have been removed from the document Defendants produced**. Dkt. 79-17 (0436-0437).

To make matters worse, Defendants rely on a notarized Assignment executed May 5, 2005 from JSA to a *different* company "Trans American Film, Ltd." of all rights in *Bloodsport II-IV*, plus little-known projects, **but tellingly absent from that Assignment are any rights in Bloodsport**. Dkt. 79-18.

Thus, although MGM may be the successor to Cannon/Pathé, and Defendant TFI relies on the MGM Option for their supposed rights and trademarks, there are very serious gaps in the chain-of-title Defendants placed in the record. The key MGM Option rights went to **TCG**, not FM (Dkt. 79-15), and there is **no assignment from TCG to TFI**. The supposed 2001 agreement with

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

JSA in the record (produced by Defendants) purports to assign **unidentified**
"Properties" (listed in a *removed* Exhibit "A" (page 9)) and is not fully executed.
Dkt. 79-17. And the subsequent 2005 assignment from JSA is **not to TFI,** but to
a different entity (Trans-American Film, Ltd.) and although *Bloodsport II-IV* are
listed, **no derivative rights to the critical Bloodsport film are included**. Dkt. 79-
18. There likewise **no assignment** in the record **from Trans-American Film,
Ltd. to TFI**.[5]

The different companies (formed in offshore tax havens) comprising
Defendant TFI's alleged chain-of-title are also separate juridical entities. As held
in the copyright context, "people cannot use a corporate structure for some
purposes—e.g., taking advantage of tax benefits—and then disavow it for
others." *Waite v. UMG Recordings, Inc*., 450 F. Supp. 3d 430, 441-42 (S.D.N.Y.
2020). "Corporate form matters. Here, there were distinct legal entities, whose
separate nature cannot simply be ignored when inconvenient." *Clarex Ltd. v.
Natixis Sec. Am. LLC*, 2012 WL 4849146, at *6 (S.D.N.Y. Oct. 12, 2012) "It is
[also] black-letter law that one corporation cannot assert an affiliate's legal
rights." *Id*. at *18. Indeed, "incorporation's basic purpose is to create a distinct
legal entity, with legal rights, obligations, powers, and privileges different from
those of the natural individuals who created it, who own it, or whom it
employs." *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001).

## H.    Defendants Failed to Rebut Plaintiff's "Priority of Use in Commerce" of the BLOODSPORT Mark.

To demonstrate priority under the Lanham Act, a party must establish that

---

[5] Finally, though mooted by the other deficiencies, Defendants failed to include
an assignment of any Bloodsport assets from TFI(CI) to TFI(US). Defendants'
Teresa Lee declaration attaches an exhibit for every statement (Dkt. 79-45), but
as to this, Lee just claims that "[TFI(US)] is the successor to all of the assets of
[TFI(CI),]" without an exhibit evidencing this. *Id*., ¶27.

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

its claimed prior use was a "use in commerce." 15 U.S.C. §1127(1); *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190, 1204-05 (9th Cir. 2012).

In this regard, not only is the sale of goods bearing the mark relevant, but "non-sales activities such as solicitation of potential customers…are part of the 'totality of the circumstances' inquiry," used to establish priority. *Id.* And such "need not be extensive." *Dep't of Parks & Recreation for State of Cal. v. Bazaar Del Mundo Inc.,* 448 F.3d 1118, 1126 (9th Cir. 2006). A "single sale" under a mark is enough, followed by acts indicating a "continuing effort or intent to continue the use" in commerce. *Id.*

Defendants' assumption that "only Cannon, by virtue of…the Cannon Agreement can claim priority of use in commerce" is dead wrong. Opp. 20.

Here, it is undisputed that DiSalle used the BLOODSPORT mark in commerce prior to Cannon and TFI (from at least 1986-1993 (the "Priority Period")). SUF 48. After solely commissioning his BLOODSPORT Screenplay, DiSalle used it to solicit a film financier/distributor for his project, resulting in his "license" of "one motion picture" to Cannon. SUF 4. DiSalle then produced that famous film, bearing the BLOODSPORT mark. This is not about film credits—another defense "straw man"—DiSalle's retention of significant rights in his "Bloodsport" Screenplay reflected both his right and intent to control and continue to use his BLOODSPORT mark. SUF 4.

DiSalle then engaged in further commerce by licensing to Pathé "one (1) sequel motion picture" bearing the mark—"Bloodsport II." SUF 6. Thereafter, in 1992, DiSalle continued to engage in commerce by securing the MGM Option and in 1993 via his TCF Agreement for "Bloodsport II." SUF 10, 13.  In sum, given the "totality of the circumstances," the undisputed evidence—showing DiSalle's use of the BLOODSPORT mark during the Priority Period—more than meets the prior "use in commerce" requirement. *See Rearden*, 683 F.3d at 1204.

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## I.    Defendants Are Not Entitled to BLOODSPORT Marks, Irrespective of DiSalle's Entitlement to a Common-Law Mark.

Defendant TFI was not entitled to register a BLOODSPORT mark(s) regardless of whether DiSalle held a prior common-law mark.

*First*, all of Defendants' arguments as well as their trademark applications and registrations rest on the false construct that TFI is the successor to Cannon/Pathé/MGM, and the owner of *Bloodsport I-IV*. Opp. 3 ("As Defendants owned the rights to the Bloodsport movies, Defendants properly had the Bloodsport trademark filed.").

However, as shown, Defendants do ***not*** own the iconic *Bloodsport* (1988)—the only film with any real public awareness. MGM owns it, as successor to Cannon/Pathé, and distributes it. Dkt. 79-12, ¶1.

As shown above, Defendants have also failed to adduce competent evidence demonstrating that TFI is the actual successor-in-interest to even *Bloodsport II-IV*. *See* Section G.

Defendant TFI's trademark applications/registrations are based on TFI's claim that it owns *Bloodsport I-IV*. Accordingly, as that fails on summary judgment, Defendant's erroneous trademark Registration Nos. 4,865,217 and 5,655,926, and pending applications must be cancelled. Since neither registration has secured "incontestable" status (SUF 40) both must be cancelled on "any ground that would have prevented registration in the first place." *Pinkette Clothing, Inc. v. Cosmetic Warriors Ltd.*, 894 F.3d 1015, 1021 (9th Cir. 2018); 15 U.S.C. §1064(1).

## J.    Defendants Have Failed to Rebut Significant Evidence of Fraud on the USPTO.

Defendants failed to rebut Plaintiff's clear and convincing evidence that Defendants secured their trademark registrations through fraud on the USPTO. As previously shown, Defendants misrepresented: (1) that no other person had

16

the right to use the mark in commerce, and (2) the source of goods displayed in
their specimens of the *Bloodsport* film. Motion at 28-31. Defendants'
Opposition evades the first point and ignores the second.

Essential to every trademark application is that the applicant swear that
"no other person has the right to use [the] mark in commerce." 15 U.S.C.
§1051(b)(3)(D). Where an applicant makes this statement knowing it to be false,
cancellation is proper. *See e.g., MPC Franchise, LLC v. Tarntino*, 826 F.3d 653,
661 (2d Cir. 2016) (summary judgment and trademark cancellation affirmed
where registrant "knew that others had rights to use the mark").

In Lensi's March 24, 2014 declaration regarding all of TFI's applications,
**Lensi swore that "no other person, firm or corporation … has the right to
use the mark in commerce [except TFI]"**. Dkt. 79-51 at 6. Lensi repeated this
falsehood under oath *numerous times*, including in *five* extension requests
(2016-2018) to file a Statement of Use for the 5,655,926 mark (SUF 45) *and* in
TFI's 2018 intent-to-use applications. Dkt. 79-70. *See Fuji Med. Instruments
Mfg. Co., Ltd. v. Am. Crocodile Int'l Grp., Inc.*, 2021 WL 3286400, at *19
(T.T.A.B. July 28, 2021) (applicant's "false and material…declaration that no
other entity had the right to use the mark in commerce were made knowingly
and with intent to deceive the USPTO").

The record evidence shows that Defendants intended to deceive the
USPTO because not only did Defendants know that DiSalle had retained rights
to do a "Bloodsport" remake (SUF 7, 25-27), ***they knew full well that MGM
owned and was distributing Bloodsport in the U.S.*** Dkt. 79-12, ¶1. *See Bauer
Bros. LLC v. Nike, Inc.*, 2012 WL 1900047, at *10 (S.D. Cal. May 24, 2012)
("intent to induce reliance upon the false representation, '[] can be inferred from
indirect and circumstantial evidence.'") (citing *In re Bose Corp.*, 580 F.3d 1240,
1245 (Fed. Cir. 2009)).

The USPTO's rules specify that "[b]y presenting to the [USPTO]…any

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

paper…a practitioner or non-practitioner[] is certifying" that they have undertaken "an inquiry reasonable under the circumstances [.]" 37 C.F.R. §11.18. That necessarily includes *reading* the paper.

Defendants wrongly believe that by testifying they did not read their own filings they are off the hook. Dkt. 78-38 (Lensi Deposition), 110:19-112:16, 137:2-138:25. *See Chutter, Inc. v. Great Mgmt. Grp., LLC*, 2021 WL 4494251, at *6-9 (T.T.A.B. Sept. 30, 2021) (finding declarant's admission that he "did not review the []Declaration 'carefully enough' " constituted "reckless disregard for the truth," "satisfy[ing] requisite intent for fraud on the USPTO in trademark matters"), rev'd on other grounds, 2023 WL 6854647 (Fed. Cir. Oct. 18, 2023). That Lensi signed numerous declarations, attesting to having made a reasonable inquiry as to TFI's contentions, only later to admit to not reading the applications (Dkt. 78-38, 110:19-112:16, 137:2-138:25)) itself shows a willful misrepresentation. "Thus, at the very least, [Defendants] *should have known* that the representations in [the filings] were false, as [they] knew at that time what the true facts were." *Tokidoki, LLC v. Fortune Dynamic, Inc.*, 2009 WL 2366439, at *11 (C.D. Cal. July 28, 2009). *See On Site Energy Co. v. MTU Onsite Energy Corp.*, 2013 WL 3990919, at *6-7 (E.D.N.Y. 2013) (willful blindness supports fraud regarding exclusive-use misrepresentation).

The Opposition sidesteps, claiming "Lee, [] the filing attorney[], attests [] she was diligent in her work[.]" Opp. 27. But this is unresponsive. Lee's Declaration does not indicate that she even reviewed the chain-of-title prior to filing TFI's applications. Dkt. 79-45. Moreover, reliance on counsel is no defense. *Hachette Filipacchi Presse v. Elle Belle, LLC*, 85 USPQ2d 1090, 1094 (TTAB 2007). This even more so, as Lensi testified that Pryor Cashman (Lee) "have never been my lawyers." SUF 47 (Response: "Undisputed").

"Mr. [Lensi], however, having signed the affidavits, must alone be held accountable for the false and fraudulent representations made therein." *Ets.*

*Lardenois v. Lazarus*, 168 U.S.P.Q. 604 (T.T.A.B. 1970) (finding fraud as to purported exclusive ownership where applicant was a nonexclusive distributor).

Reliance, materiality, and harm have also been established. "The PTO relies on the thoroughness, accuracy and honesty of each applicant." *Tokidoki,* 2009 WL 2366439, at *11 (USPTO relied on misrepresentations in declaration of use *by issuing the registration*); *Bauer Bros.*, 2012 WL 1900047, at *10 (USPTO relied on truth of verified statements in applications *by granting them*); 15 U.S.C. §1051(a)-(d).

Defendants' fraudulent statements to the USPTO resulting in TFI's registrations have just as obviously damaged DiSalle because, after DiSalle did not further extend the DiSalle/ERPFC Agreement, Defendants expressly asserted TFI's trademark registrations to encumber DiSalle's ability to secure financing/distribution for a "Bloodsport" remake. SUF 34. "Plaintiff has demonstrated that [if he proceeds with his film there is] a real and reasonable apprehension that [he] w[ill] be subject to an infringement action" by Defendants. *San Diego Cnty. Credit Union v. Citizens Equity First Credit Union*, 344 F. Supp. 3d 1147, 1158 (S.D. Cal. 2018).

Defendants' willful misrepresentations to the USPTO are compounded by their repeated submission of screenshots of *Bloodsport* (1988), as their specimen, misrepresenting TFI as the source of such film and the specimen signifies *their* "use in commerce." *See* Dkts. 79-47 (two of five specimens feature *Bloodsport*); 79-73 (three "screenshot[s] displaying the mark in use with the[ir] goods[,]" all of *Bloodsport*.).

By these knowingly false submissions for TFI's actual "use in commerce," Defendants committed repeated fraud on the USPTO, mandating cancellation of their registrations and pending applications. *See Warner Bros. Ent. Inc. v. Loyd*, 2023 WL 5727468, at *13 (D.N.M. Sept. 5, 2023) ("[T]he USPTO requires applicants to provide 'specimens':…evidence of how you are

19

actually using your trademark in the marketplace with the goods or services in your application or registration maintenance filing.") (quoting *USPTO, What is a Specimen?*, https://perma.cc/QYB5-CPFQ).

**K.    Defendant TFI's Registrations Should, in Any Event, Be Cancelled Due to Abandonment.**

A federal court may cancel any trademark *registration* for abandonment. 15 U.S.C. §1064(3). Here, Defendants made no use in commerce of TFI's purported mark(s) since its 2015 and 2019 registrations, seven and four years ago, respectively.  Under the Lanham Act, "[n]onuse for 3 consecutive years shall be prima facie evidence of abandonment[,]" shifting the burden of proof to Defendants. *Id.* §1127l, *Mosaic Brands, Inc. v. Ridge Wallet LLC*, 2021 WL 4535351 (C.D. Cal. Aug. 5, 2021) (granting summary judgment).

Defendants' Opposition does *not* address Plaintiff's abandonment argument, thereby conceding that no material issue precludes cancellation on its improper registrations due to prima facie evidence of abandonment. *See Incredible Features, Inc. v. Backchina, LLC*, 2021 WL 6337194, at *3 (C.D. Cal. Dec. 16, 2021) ("Defendant's Opposition does not address Plaintiffs' prima facie [] claim…Defendant therefore concedes [it]".) (citing *Stichting Pensioenfonds ABP v. Countrywide Fin. Corp.*, 802 F. Supp. 2d 1125, 1132 (C.D. Cal. 2011) ("[I]n most circumstances, failure to respond in an opposition brief to an argument put forward in an opening brief constitutes waiver or abandonment in regard to the uncontested issue.")).

DATED:  November 17, 2023        TOBEROFF & ASSOCIATES, P.C.


                                 By:  */s/ Marc Toberoff*
                                      Marc Toberoff

                                 Attorneys for Plaintiff

PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff, Mark Disalle, certifies that this brief contains less than 6,000 words, which complies with the word limit set by the Court's Order dated October 25, 2023 (Dkt. 76).

DATED:  November 17, 2023    TOBEROFF & ASSOCIATES, P.C.

By: _/s/ Marc Toberoff_____

Marc Toberoff

*Attorneys for Plaintiff*

1