1
2
3
4
5
6
7
8              **UNITED STATES DISTRICT COURT**

9          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

10

11   MARK DISALLE,                          Case No. 2:22-cv-02152-SSS-PVCx

12                        Plaintiff,        **ORDER DENYING THE**
                                            **PARTIES' MOTIONS FOR**
13                                          **SUMMARY JUDGMENT [DKT.**
                                            **77; DKT. 79]**
14        v.

15   ALBERTO LENSI, et al.

16                        Defendant.

17

18        Before the Court is Plaintiff Mark DiSalle's ("DiSalle") motion for

19   summary judgment as to his first, second, third, and fifth claims ("DiSalle's

20   Motion") and Defendants Alberto Lensi and Trans-American Film International

21   Corporation's ("TFI") opposition to DiSalle's Motion ("Defendants' Motion").[1]

22   [Dkt. 77; Dkt. 78; Dkt. 79].  This matter is fully briefed and ripe for review.

23   [Dkt. 82; Dkt. 92].  Having reviewed the Parties' arguments, relevant legal

24   authority, and record in this case, the Court **DENIES** the Parties' Motions.

25   [Dkt. 78; Dkt. 79].

26   _____

27   [1] Defendants move for summary judgment on their affirmative defenses and
28   against DiSalle's claims within their filing.  [Dkt. 79].

                                    -1-

I.      **BACKGROUND**

This matter arises out of the rights to the source material for the 1988 film *Bloodsport* starring the "Muscle from Brussels," Jean Claude Van Damme.  The factual history of the *Bloodsport* franchise is long and complex, and the Court discusses it in detail below.

A.      **The Dux Agreement & The DiSalle-Lettich Screenplay**

On June 15, 1985, DiSalle entered into an agreement (the "Dux Agreement") with Frank Dux giving DiSalle the right to make motion pictures based on Dux's life story.  [Dkt. 82-2 at 2].  More specifically, the Dux Agreement provided DiSalle an option to "produce, distribute, and commercially exploit …. one (1) feature length theatrical motion picture … based upon [Dux's life story][,]"[2] and, in the event DiSalle made the film, to "remake the [f]ilm or to produce one (1) sequel to the film."  [Dkt. 78-5 at 2–4.]

On that same day, June 15, 1985, DiSalle entered a "work-made-for-hire" agreement with Sheldon Lettich, a screenplay writer, who wrote an original screenplay based on Dux's life story (the "Disalle- Lettich Screenplay") entitled "Bloodsport."  [Dkt. 82-2 at 2].

B.      **The Development of *Bloodsport* and *Bloodsport II***

On March 25, 1986, DiSalle entered into an agreement (the "Cannon Agreement") with Cannon Films, Inc. ("Cannon").  [Dkt. 82-2 at 4].  In the Cannon Agreement, DiSalle sold Cannon a "license to produce one motion picture based upon the Property."  [Dkt. 78-7 at 2].  The Cannon Agreement defined the "Property" as Dux's life story and the DiSalle-Lettich Screenplay.

---

[2] For those who are not fervent *Bloodsport* fans, the Dux Agreement defined Dux's life story as the "true incidents, events, experiences, and involvements of [Dux's] … generally consisting of [Dux's] training as a [n]inja beginning as a child and culminating with [Dux's] victory at the 1975 Kumite Championship and [Dux's] military experience."  [Dkt. 78-5 at 2].

1   [Dkt. 78-7 at 2].  The 1988 film *Bloodsport* was made pursuant to the Cannon

2   agreement.  [Dkt. 82-2 at 4].  On December 4, 1986, Cannon registered the

3   copyright in the *Bloodsport* screenplay.  [Dkt. 92-2 at 2].  On July 27, 1988,

4   Cannon registered the copyright in the *Bloodsport* film.  *Id*. at 3.

5       On November 16, 1989, after *Bloodsport* was released under the Cannon

6   Agreement, DiSalle entered into an agreement (the "Pathé Agreement") with

7   Pathé Entertainment, Inc. ("Pathé"), the successor to Cannon's rights under the

8   Cannon Agreement.  [Dkt. 82-2 at 4].  In the Pathé Agreement, DiSalle sold

9   Pathé, among other rights, his "Owned Sequel Rights."  [Dkt. 78-8 at 6].

10  DiSalle's "Owned Sequel Rights" included his right to produce one sequel to

11  *Bloodsport*.  *Id*. at 3.  The Pathé Agreement also provided Pathé would have the

12  sole and exclusive right to create and exploit "sequel motion pictures" based on

13  or derived from the sequel to *Bloodsport*.  *Id*. at 5.

14      On December 9, 1992, Metro-Goldwyn-Mayer, Inc., ("MGM"), Pathé's

15  successor-in-interest, granted Pyramid Entertainment, Inc., DiSalle's company,

16  an option to purchase the *Bloodsport* rights previously held by Pathé.  [Dkt. 82-

17  2 at 8].  A year later, on December 8, 1993, DiSalle assigned his option from

18  MGM to Transcontinental Cinema Group, Inc. ("Transcontinental").  *Id*. at 9.

19  Transcontinental produced *Bloodsport II* in 1996.  *Id*.  The copyright to

20  *Bloodsport II* was registered to "FM Entertainment, NV" ("FM") in 1996.  *Id*.

21      ***C.***    **The Development of *Bloodsport III* and *Bloodsport IV***

22      FM produced *Bloodsport III* in 1997.  *Id*. at 9–10.  The copyright to

23  *Bloodsport III* was registered on December 10, 1996, to Transamerican Films,

24  Ltd.  *Id*. at 10.  Two years later, *Bloodsport III*'s copyright was supplemented to

25  reflect ownership by TFI.  *Id*.  On January 30, 1998, TFI assigned all its rights

26  to Bloodsport 4, Inc., a California Corporation.  [Dkt. 82-2 at 10].  *Bloodsport*

27  *IV: The Dark Kumite* ("*Bloodsport IV*") was released direct-to-video in 1999,

28  and FM and TFI were credited as producers.  [Dkt. 82-2 at 10].  The copyright

1    to *Bloodsport IV* was registered on March 25, 1999, by Trans-American Films.

2    *Id*. at 11.  On July 3, 2001, TFI and FM assigned all their rights to *Bloodsport II*,

3    *III*, and *IV* to Jet Set Aviation.[3]

4          **D.     The Involvement of Edward R. Pressman Film Corporation**

5          On March 24, 2010, TFI entered into an agreement with Edward R.

6    Pressman Film Corporation ("ERPFC") whereby ERPFC received the option to

7    purchase all of TFI's rights in the *Bloodsport* films.  *Id*. at 12.  On December 17,

8    2010, after TFI agreed with ERPFC to try to acquire DiSalle's remaining rights

9    to the *Bloodsport* franchise, DiSalle entered into an agreement with ERPFC

10   purporting to assign DiSalle's remake rights to ERPFC.  *Id*.; [Dkt. 78-24 at 3].

11   Under this assignment, ERPFC possessed the right to extend the period it

12   controlled DiSalle's alleged rights if it could not find financing and production

13   support for a new *Bloodsport* film within a certain allotted period of time.  [Dkt.

14   82-2 at 15–16].

15         Eventually, ERPFC declined to renew its control over DiSalle's remake

16   rights, and the agreement provided that the rights would revert to DiSalle.  *Id*.

17   After this, Defendants sent DiSalle a cease-and-desist letter in 2021, sparking

18   this litigation.  *Id*. at 19.

19         **E.     Bloodsport Trademark Registrations**

20         On August 21, 2013, TFI filed a trademark application, serial no.

21   86043656, for a Bloodsport mark for "motion picture films."  *Id*. at 20.  On that

22   same day, TFI filed an intent-to-use trademark application, serial no. 86043667.

23   *Id*.  In connection with the application, TFI's representative, Alberto Lensi,

24   signed a declaration on March 24, 2014, stating that, to the best of his

25   _____

26   [3] Defendants contend Jet Set Aviation assigned its *Bloodsport* rights back to TFI
     on January 1, 2003.  [Dkt. 82-2 at 10].  DiSalle argues that is not so because the
27   assignment from Jet Set Aviation was to "Trans American Film, Ltd.[,]" not
     TFI.  *Id*.
28

1   knowledge, "no other person, firm or corporation … has the right to use the

2   mark in commerce[.]"  [Dkt. 82-2 at 21].  On December 8, 2015, the United

3   States Patent and Trademark Office ("USPTO") issued a Bloodsport trademark

4   to TFI.  *Id*. at 22.  On January 15, 2019, the USPTO issued a second Bloodsport

5   trademark to TFI.  *Id*.

6   **II.    EVIDENTIARY OBJECTIONS & REQUESTS FOR JUDICIAL**

7   **NOTICE**

8       **A.    Objections**

9       In motions for summary judgment with numerous objections, it is often

10  unnecessary and impractical for a court to methodically scrutinize each

11  objection and give full analysis to each argument.  *Doe v. Starbucks*, No. 08-cv-

12  0582 AG (CWx), 2009 WL 5183773, at *1 (C.D. Cal. Dec. 18, 2009).  This is

13  especially so in cases like this where "many of the objections are boilerplate

14  recitations of evidentiary principles or blanket objections without analysis[.]"

15  *Id*.

16      Here, both Parties fail to even cursorily argue or explain their objections,

17  and instead merely identify what Federal Rules of Evidence possibly bars the

18  evidence at issue.  [Dkt. 82–5; Dkt. 79-120].  The Parties' failure to even

19  cursorily argue or narrow their objections fails to provide this Court an adequate

20  basis from which it can rule on the objections, and thus the Court

21  **OVERRULES** the Parties' objections.  *See Rodriguez v. JLG Indus, Inc.*, No.

22  11-cv-04586 MMM (SHx), 2012 WL 12883784, at *1 n.9 (C.D. Cal. Aug. 3,

23  2012) (disregarding purported objections unless "evidence in the record or

24  argument … explain the objection"); *see also Forsberg v. Pac. N.w. Tele.

25  Comp.*, 850 F.2d. 1409, 1418 (9th Cir. 1988) (stating "[t]he district judge is not

26  required to comb the record to find some reason to deny a motion for summary

27  judgment"); *United States v. RaPower-3, LLC*, No. 2:15-cv-00828-DN, 2020

28  WL 5531563, at *15 (D. Ut. Sept. 15, 2020) (finding "nonspecific objections

-5-

1  based on hearsay and lack of authentication fail to comport with Federal Rule of

2  Evidence 103(a)(1)(B)").[4]

3       **B.    Requests for Judicial Notice**

4       Defendants ask this Court to take judicial notice of over 40 exhibits

5  ("Defendants' Requests for Judicial Notice").  [Dkt. 79-75; Dkt. 83-4].  DiSalle

6  does not oppose Defendants' Requests for Judicial Notice.  [Dkt. 82].

7       "[J]udicial notice is only appropriate when the Court is taking notice of

8  'undisputed matters of public record,' … from 'sources whose accuracy cannot

9  reasonably be questioned.'"  *Jones v. Billionaire Burgers, Inc.*, No. 2:22-cv-

10  00110-MEMF(PVCx), 2023 WL 1107866, at *4 (C.D. Cal. Jan. 26, 2023)

11  (citing *Lee v. City of L.A.*, 250 F.3d 668, 690 (9th Cir. 2001); Federal Rule of

12  Evidence 201(b)).  A court may deny a request for judicial notice if the request

13  is for irrelevant documents.  *See Santa Monica Nativity Scenes Comm. v. City of

14  Santa Monica*, 784 F.3d 1286, 1298 n.6 (9th Cir. 2015).

15       Here, the Court finds the documents Defendants submit are proper for

16  judicial notice.  [Dkt. 79-75; Dkt. 84-4].  As such, the Court **GRANTS**

17  Defendants' Requests for Judicial Notice.  *Id.*; *see e.g.*, *Evo Brands, LLC v. Al

18  Khalifa Grp., LLC*, 657 F. Supp. 3d 1312, 1321 (C.D. Cal. 2023) (citations

19  omitted) (noting records of administrative bodies are proper for judicial notice);

20

21

          ─────────────────

22  [4] The Court also notes, while such objections may be cognizable at trial, on a

23  motion for summary judgment, the Court is concerned only with the

    admissibility of the relevant facts at trial, and not the form of these facts as

24  presented in the motions.  *Sandoval v. Cty. of San Diego*, 985 F.3d 657, 666 (9th

25  Cir. 2021).   Where "the contents of a document can be presented in a form that

    would be admissible at trial – for example, through live testimony by the author

26  of the document – the mere fact that the document itself might be excludable

27  hearsay provides no basis for refusing to consider it on summary judgment." *Id.*

    (citations omitted).  As such, even if the Court were to address the Parties'

28  conclusory objections, most, if not all, would fail.

1   *Gerritsen v. Warner Bros. Ent.*, 112 F. Supp. 3d 1011, 1033–34 (C.D. Cal.
2   2015) (citations omitted).

3   **III.    LEGAL STANDARD**

4          Summary judgment is appropriate when there is no genuine issue as to
5   any material fact, so that the moving party is entitled to judgment as a matter of
6   law.  Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248
7   (1986).  "A factual issue is 'genuine' when there is sufficient evidence such that
8   a reasonable trier of fact could resolve the issue in the non-movant's favor, and
9   an issue is 'material' when its resolution might affect the outcome of the suit
10   under the governing law."  *Headlands Reserve, LLC v. Ctr. for Nat. Lands*
11   *Mgmt.*, 523 F. Supp. 2d 1113, 1122-23 (C.D. Cal. 2007).

12          The moving party has the initial burden of informing the court of the
13   basis for its motion and identifying the portions of the pleadings and the record
14   that it believes demonstrate the absence of an issue of material fact.  *Celotex*
15   *Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the non-moving party bears
16   the burden of proof at trial, the moving party need not produce evidence
17   negating or disproving every essential element of the non-moving party's case.
18   *Id*. at 325.  Instead, the moving party need only prove there is an absence of
19   evidence to support the nonmoving party's case.  *In re Oracle Corp. Sec. Litig.*,
20   627 F.3d 376, 387 (9th Cir. 2010).  If the moving party sustains its burden, the
21   non-moving party must then show that there is a genuine issue of material fact
22   that must be resolved at trial.  *Celotex*, 477 U.S. at 324.

23          When deciding a motion for summary judgment, the court construes the
24   evidence in the light most favorable to the non-moving party.  *Barlow v.*
25   *Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991).  The court does not make

26   _____

27

28

1   credibility determinations, nor does it weigh conflicting evidence. *Eastman*

2   *Kodak Co. v. Image Tech. Servs., Inc*., 504 U.S. 451, 456 (1992).

3   **IV.   DISCUSSION**

4         DiSalle moves for summary judgment on his (1) declaratory judgment,

5   (2) federal unfair competition, (3) federal fraudulent trademark registration, and

6   (4) federal common law trademark infringement claims.  Defendants move for

7   summary judgment on all of DiSalle's claims.  [Dkt. 79].  Defendants contend,

8   among other arguments, DiSalle's claims are barred by (1) the relevant statute

9   of limitations, (2) estoppel, and (3) laches.  *Id*. at 19–24.  Because DiSalle's

10  claims will fail if Defendants succeed on their affirmative defenses, the Court

11  discusses those first.

12        **A.   Statute of Limitations**

13             **1.     Copyright Ownership Claim**

14        Defendants argue DiSalle's copyright declaratory judgment and

15  trademark claims are barred by their relevant statute of limitations.  [Dkt. 79 at

16  15, 19].  In response, DiSalle argues he did not file a copyright ownership claim

17  and, even if he did, the only event that could trigger the relevant statute of

18  limitations was the Defendants' 2021 cease-and-desist letter.  [Dkt. 82 at 14–

19  15].  For the reasons stated below, the Court finds Defendants fail to establish

20  DiSalle's claims are time barred, and thus the Court **DENIES** Defendants'

21  Motion on this defense.

22        First, DiSalle's declaratory judgment claim is subject to the statute of

23  limitations for copyright ownership claims.  [Dkt. 82 at 14].  In his Complaint,

24  DiSalle seeks a declaratory judgment from the Court stating DiSalle is the sole

25  owner of the mark and the DiSalle-Lettich Screenplay.  [Dkt. 1 at 2; *Id*. at 12].

26  When a declaratory judgment seeks to declare the ownership rights in a

27  copyright, it is subject to the statute of limitations for copyright ownership

28  claims in 17 U.S.C. § 507(b).  *See Zuill v. Shanahan*, 80 F.3d 1366, 1371 (9th

Cir. 1996).  Unlike copyright infringement claims, claims of copyright
ownership accrue only once when "plain and express repudiation of []ownership
is communicated to the claimant."  *Seven Arts Filmed Ent.*, *Ltd*. *v. Content
Media Corp. PLC*, 733 F.3d 1251, 1254 (9th Cir. 2013).  Under 17 U.S.C. §
507(b), a copyright ownership claim is barred if it is not brought within three
years of such repudiation.  *Predestined Ent., LLC v. Webber Films, LLC.*, No.
2:21-cv-00729-FWS-E, 2023 WL 2629156, at *6–7 (C.D. Cal. Feb. 6, 2023).

What constitutes plain and express repudiation depends on the facts of the
underlying act.  *See Welles v. Turner Ent. Co.*, 503 F.3d 728, 734 (9th Cir.
2007); *see also Zuill*, 80 F.3d at 1368 (holding two written notices of sole
ownership constitutes plain and express repudiation).  For example, express
repudiation of a claimant's ownership rights occurs when someone other than
the claimant registers the copyright in the work or when another party fails to
credit or pay royalties to the claimant.  *See Zahedi v. Miramax*, LLC, No. 2:20-
cv-04512-MCS-E, 2022 WL 4596551, at *7 (C.D. Cal. Aug. 19, 2022)
(collecting cases).

Here, Defendants argue Cannon clearly and expressly repudiated
DiSalle's ownership rights by registering the copyrights for the *Bloodsport* film
and screenplay.  [Dkt. 79 at 15].  It is undisputed Cannon registered the
copyrights for the *Bloodsport* film's screenplay and film in 1986 and 1988
respectively.  [Dkt 92-2 at 2–3].  However, because Cannon's registrations were
of works *other than* the DiSalle-Lettich Screenplay, and DiSalle only claims
ownership of the DiSalle-Lettich Screenplay, such registration is not plain and
express repudiation of DiSalle's ownership rights.  *Id*.[6];  *see also Saenger Org.,*

---

[6] The Court also notes that at least one court has found that registration of a
copyright is insufficient to establish plain and express repudiation.  *Hathaway v.
Hathaway*, No. 09-cv-1123-GHK (CTx), 2009 WL 10673230, at *3 (C.D. Cal.
Sept. 29, 2009) (concluding plain and express repudiation requires "more than

1   *Inc. v. Nationwide Ins. Licensing Assocs., Inc.*, 119 F.3d 55, 66 (1st Cir. 1997)

2   (finding copyright registration "put the world on constructive notice as to the

3   ownership of the copyright").  Moreover, because Cannon's registrations

4   occurred pursuant to the license from DiSalle within the Cannon Agreement,

5   Cannon's registrations are not contrary to DiSalle's interests, and thus are not

6   plain and express repudiation.  [Dkt. 78-7 at 2]; *Zahedi*, 2022 WL 4596551, at

7   *7 (citing *Everly v. Everly*, 958 F.3d 442, 453 (6th Cir. 2020) (noting "[t]he

8   purported repudiation should be an act that is *adverse* to the party whose

9   ownership is being repudiated") (emphasis added)).

10      Defendants also claim plain and express repudiation occurred when

11   DiSalle was not credited as the owner of *Bloodsport*.  [Dkt. 79 at 18].  However,

12   as noted above, such actions by Defendants, when they are taken pursuant to a

13   valid license from DiSalle, and on a different underlying property, do not

14   constitute plain and express repudiation of DiSalle's rights in the Disalle-Lettich

15   Screenplay.  *Zahedi*, 2022 WL 5496551, at *7; *see also Hathaway v. Hathaway*,

16   No. 09-cv-1123-GHK (CTx), 2009 WL 10673230, at *3 (C.D. Cal. Sept. 29,

17   2009).

18      Defendants' reliance of *Aalmuhammed, v. Lee*, 202 F.3d 1227 (9th Cir.

19   2000), and *Silva v. Sunich*, No. 03-cv-0327 GPS (CWx), 2006 WL 6116645, at

20   *7 (C.D. Cal. Sept. 6, 2006), is misplaced.  [Dkt. 79 at 17–18].  In

21   *Aalmuhammed*, the Ninth Circuit found plain and express repudiation where the

22   credits of the at issue property, a movie, listed the plaintiff below "the more

23   prominent names as an 'Islamic technical consultant.'"  *Aalmuhammed*, 202

24   F.3d at 2000.  Thus, importantly, the credits in question in *Aalmuhammed* were

25   related to, and in fact featured within, the property at issue.  *Id*. at 1231.  Here,

26   as noted above, Cannon's registrations are of properties *other* than the property

27   

28   mere registration with the U.S. Copyright Office").

1    DiSalle claims ownership of, the DiSalle-Lettich Screenplay.  As such,

2    *Aalmuhammed* is factually distinct and inapplicable.

3        As for *Silva*, there the Court the Court held plain and express repudiation

4    occurred when the defendant was selling products bearing plaintiff's copyright

5    without paying plaintiff royalties and the defendant failed to credit plaintiff as a

6    creator of the work.  *Silva*, 2006 WL 6116645, at *5.  Here, unlike in *Silva*,

7    Cannon paid DiSalle for the relevant rights under the Cannon Agreement and,

8    again, Cannon's copyrights were of *other* works.  As such, *Silva* is

9    inapplicable.[7]

10       In accordance with the above, the Court finds Defendants fail to establish

11   as a matter of law that a plain and express repudiation of DiSalle's alleged

12   ownership rights occurred, and thus the Court **DENIES** summary judgment on

13   this affirmative defense.  *See Zuill*, 80 F.3d at 1369 (noting claims of copyright

14   ownership "accrue when plain and express repudiation of co-ownership is

15   communicated to the claimant").

16                **1.    Trademark Related Claims**

17       Defendants also move for summary judgment on DiSalle's trademark

18   claims arguing those claims are time barred.  In his Complaint, DiSalle brings

19   claims for (1) federal unfair competition, (2) federal fraudulent trademark

20   registration, (3) federal trademark dilution, and (4) federal common law

21   trademark infringement.  [Dkt. 1 at 1].

22

23

24   _____

25   [7] Defendants also argue DiSalle's deposition supports a finding of repudiation.
     [Dkt. 79 at 18–19].  However, a close reading of DiSalle's testimony shows
26   DiSalle stated he "think[s] there were elements in Bloodsport 3 of Bloodsport
     1," not that there were shared elements between the movies.  [Dkt. 79-24 at 5].
27   Such a statement is insufficient to meet Defendants' burden regarding evidence
     of clear and express repudiation.
28

                                    -11-

"When a federal statute lacks a specific statute of limitations, we generally presume that Congress intended to 'borrow' the limitations period from the most closely analogous action under state law." *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 836 (9th Cir. 2002) (citations omitted).  As the Lanham Act does not include a statute of limitations, courts apply the four-year limitations period of California law for trademark infringement claims.  *See Warner Bros. Ent., Inc. v. Random Tuesday, Inc.,* No. 20-cv-02416 JAK (PLAx), 2020 WL 12762735, at * 4 (C.D. Cal. Nov. 9, 2020).[8]  Importantly, the four-year statute of limitations is "used only to determine if the equitable principle of laches" bars the trademark claims.  *See Pak's*, 2018 WL 8333362, at *8 (citing *Tandy Corp. v. Malone & Hyde, Inc.*, 769 Fed 362, 365 (6th Cir. 1996)); *see also Warners Bros.*, 2020 WL 12762735, at *4.  As discussed below, laches does not apply, and thus the Court **DENIES** Defendants' Motion as to this defense.  *See* Section D.

**B.    Preemption of DiSalle's Declaratory Judgment Claim**

Defendants also argue DiSalle's declaratory judgment claim is preempted by the Copyright Act because the declaratory relief seeks to enforce DiSalle's copyright in *Bloodsport*.  [Dkt. 79 at 27].  This argument fails.

The federal Copyright Act preempts common law and state law claims, not other federal cause of actions.  *See Jules Jordan Video, Inc. v. 144942 Canada, Inc.*, 617 F.3d 1146, 1152–53 (9th Cir. 2010) (citation omitted) (noting the intention of Section 301 of the Copyright Act was to "'preempt and abolish any rights under the *common law or statutes of a State*'" [emphasis added]); *see*

---

[8] Because DiSalle fails to oppose Defendants' assertion that the analogous statute of limitations is California's four-year period for trademark infringement claims, the Court adopts this period.  [Dkt. 82 at 15]; *see Pak's Trading Europe B.V. v. Target*, No. 18-cv-0536-DOC (DFMx), 2018 WL 8333362, at *8 (C.D. Cal. July 5, 2018)

1   *also Laws v. Sony Music Ent., Inc.*, 448 F.3d 1134, 1137 (9th Cir. 2006)

2   (emphasis added) (noting the Ninth Circuit applies a "two-part test to determine

3   whether a *state law* claim is preempted by the [Copyright] Act").  Because

4   DiSalle brought his declaratory judgment claim under the Declaratory Judgment

5   Act, and the Declaratory Judgment is a creature of federal, not state or common,

6   law, preemption is inapplicable.[9]  *See Reilly v. Wozniak*, No. 18-cv-03775-PHX-

7   MTL, 2020 WL 1033156, at 6–7 (D. Az. Mar. 3, 2020) (declining to find

8   preemption where claim was brought pursuant to the Declaratory Judgment

9   Act); [Dkt. 1 at 12–13].

10          **C.     Estoppel**

11          Defendants argue DiSalle's claims are barred by estoppel because DiSalle

12   knew Cannon used and registered the screenplay of *Bloodsport* in 1988.  [Dkt.

13   79 at 19].  First, the Court notes Defendants' estoppel argument is peculiar

14   because it seeks to expand a line of cases addressing estoppel of copyright

15   infringement claims to DiSalle's claims of trademark infringement and

16   declaratory relief.  *See e.g.*, *Hadady Corp. v. Dean Witter Reynolds, Inc.*, 739

17   F.Supp. 1392, 1401 (C.D. Cal. 1990) (finding plaintiff equitably estopped from

18   asserting a copyright infringement claim); *Hampton v. Paramount Pictures

19   Corp.*, 279 F.2d 100, 104 (9th Cir. 1960) (discussing equitable estoppel on

20   appeal for a copyright infringement suit); *Interscope Recs. v. Time Warner*, *Inc.*,

21   No. 10-cv-1662 SVW (PJWx), 2010 WL 11505708, at *1, 11 (C.D. Cal. June

22   28, 2010).  Defendants fail to explain in their Motion how these cases apply

23   _____

24   [9] Defendants cited cases support the Court's holding on this point as they all
     involve preemption of state law claims under the Copyright Act.  *See Motown
25   Rec. Corp. v. George A. Hormel & Co.*, 657 F. Supp. 1236, 1240 (C.D. Cal.
     1987) (finding preemption of plaintiff's state law negligence, intentional
26   interference, and unfair competition claims); *Worth v. Universal Pictures, Inc.*,
27   5 F. Supp. 2d 816, 828 (C.D. Cal. 1998) (finding preemption of state law
     conversion claim).
28

1    substantively to DiSalle's trademark claims.  However, as discussed below, the

2    Court need not wrestle with this issue because, even assuming the

3    aforementioned cases apply, Defendants' estoppel argument fails.

4           Equitable estoppel is an affirmative defense on summary judgment, and

5    thus Defendants bear the burden of establishing it.  *See Hadady*, 739 F. Supp. at

6    1401.  To prevail on their estoppel defense, Defendants must show: (1) DiSalle

7    knew of the allegedly infringing conduct, (2) DiSalle intended that Defendants

8    rely upon his conduct or acted so that Defendant had a right to believe it was so

9    intended, (3) Defendants were ignorant of the true facts, and (4) Defendants

10   detrimentally relied on DiSalle's conduct.  *See Kramer v. Thomas*, No. 05-cv-

11   8381 AG (CTx), 2006 WL 4729242, at *9 (C.D. Cal. Sept. 28, 2006).

12          Here, the Court **DENIES** Defendants' Motion because Defendants fail to

13   establish as a matter of law Defendants were ignorant of DiSalle's claims.

14   Defendants argue they lacked knowledge of DiSalle's claims because DiSalle

15   never attempted to inform Cannon, or any of their predecessors, of his rights in

16   the screenplay.  [Dkt. 79 at 21].  However, this fact is clearly contravened by the

17   portions of the Cannon and Pathé Agreements mentioning DiSalle's rights to the

18   DiSalle-Lettich Screenplay.  [Dkt. 78-7 at 2 (defining "Property" in the Cannon

19   Agreement to include the "screenplay" DiSalle hired Lettich to create); Dkt. 78-

20   8 (stating Pathé is the successor in interest to Cannon)].

21          Based on the above, a reasonable juror could find Defendants knew of

22   DiSalle's alleged rights, and thus the Court **DENIES** summary judgment on

23   Defendants' estoppel defense.  *See Softketeers, Inc. v. Regal W. Corp.*, No.

24   8:19-cv-00519-JWH (JDEx), 2022 WL 17968835, at *17 (C.D. Cal. Dec. 22,

25   2022) (finding defendants failed to prove affirmative defense of estoppel where

26   their lawyer told them plaintiff may have to transfer ownership in a piece of

27   software); *Quicksilver, Inc. v. Kymsta Corp.*, 466 F.3d 749, 755 (9th Cir. 2006)

28   (quoting *Brookfield Commc'ns, Inc. v. W. Coast Entm't Corp.*, 174 F.3d 1036,

-14-

1047 (9th Cir. 1999) ("'Judgment as a matter of law is proper when the evidence

permits a reasonable jury to reach only one conclusion'").

### D. Laches

"Laches is an equitable time limitation on a party's right to bring suit."

*Jarrow Formulas*, 304 F.3d at 835.  For laches to apply, a defendant must show

a plaintiff unreasonably delayed in filing suit and that the delay caused the

defendant prejudice.  *Agua Caliente Band of Cahuilla Indians v. Coachella*

*Valley Water Dist.*, No. 13-cv-883 JGB (SPx), 2016 WL 2621301, at *3 (C.D.

Cal. Feb. 23, 2016).  To determine if a plaintiff unreasonably delayed in filing

suit, courts (1) assess the length of the delay and (2) determine whether the

delay was reasonable.  *Kiva Health Brands LLC v. Kiva Brands, Inc.,* 439 F.

Supp. 3d 1185, 1196 (C.D. Cal. Feb. 14, 2020).  "[T]he relevant delay is the

period from when the plaintiff knew (or should have known) of the allegedly

infringing conduct, until the initiation of the lawsuit in which the defendant"

seeks to argue the defense of laches.  *Danjaq LLC v. Sony Corp.*, 263 F.3d 942,

952 (9th Cir. 2001).

Here, the issue lies in determining the length of delay.  Defendants argue

the delay began as early as 1988 because DiSalle knew Cannon produced and

registered the film and screenplay of *Bloodsport*.  [Dkt. 79 at 23; *Id*. at 22].  For

the reasons set forth below, Defendants fail to establish Cannon's registration of

the copyrights constitutes actionable infringing conduct such that laches can

apply based on that conduct.

"The existence of a license creates an affirmative defense to a claim of

copyright infringement."  *Worldwide Church of God v. Philadelphia Church of*

*God, Inc.*, 227 F.3d 1110, 1114 (9th Cir. 2000) (citing *I.A.E., Inc. v. Shaver*, 74

F.3d 768, 775 (7th Cir. 1996)).  However, a license is not an absolute shield to

infringement liability.  *Ticketmaster L.L.C. v. Prestige Ent.*, *Inc*., 306 F. Supp.

-15-

3d 1164, 1172 (C.D. Cal. Jan. 31, 2018).  Rather, a licensor can sue a licensee for infringement if the licensee acts outside of the license.  *Id*.

Here, it is undisputed Cannon received a license from DiSalle to make *Bloodsport* and thereafter retained the "customary ancillary, subsidiary, and incidental rights" related to the film.  [Dkt. 79-4 at 2].  Such language clearly empowered Cannon to produce and register the copyright for the *Bloodsport* film and screenplay.  As Cannon possessed a valid license from DiSalle to produce *Bloodsport* and register its related copyrights, and Cannon's conduct fell within the scope of the license, Cannon's conduct is not, as a matter of law, infringement.  *See Ticketmaster*, 306 F. Supp. 3d at 1172.  Thus, the Court cannot find Cannon's conduct to be a valid basis from which to start the delay calculation for an affirmative defense of laches.[10]

As Defendants cannot show *Bloodsport* and *Bloodsport II* are infringing works capable of triggering the delay necessary to support a defense of laches, the Court **DENIES** Defendants summary judgment.  *See Kiva*, 439 F. Supp. 3d at 1193 (denying summary judgment on laches defense and "permit[ting] the jury to decide when the delay period should begin").

**E.      DiSalle's Remaining Rights in the *Bloodsport* Franchise**

DiSalle argues the Court should find DiSalle retained "exclusive rights to create further derivative works based on" the DiSalle-Lettich Screenplay.  [Dkt. 78-3 at 25].  Defendants argue DiSalle has no further rights in the *Bloodsport* franchise because DiSalle exhausted the rights granted to him under the Dux Agreement.  [Dkt. 79 at 24–25].  Based on the above, the Court construes the

---

[10] The same holds true for the creation of *Bloodsport II* as Pathé received the right to make a sequel to *Bloodsport* from DiSalle.  [Dkt. 82-2 at 4; Dkt. 92-2 at 27].  Based on the record before the Court, the production and registration of *Bloodsport II* was done pursuant to that license, and as such it is not an infringing act.  [Dkt. 82-2 at 8, 9, 10].

arguments to be cross motions on the issue of whether DiSalle has any retained rights to the DiSalle-Lettich Screenplay.  The Court will discuss the relevant arguments below.

### 1.    Defendants' Arguments

Defendants argue, because the Dux Agreement granted DiSalle the right to remake or produce a sequel to *Bloodsport*, and *Bloodsport II* was created pursuant to the Pathé Agreement, DiSalle has no further rights left in the *Bloodsport* franchise.  *Id*.  To begin, Defendants met their burden of production by pointing to the terms of the Dux Agreement and the eventual production of *Bloodsport II*.  *Id*.  However, Defendants' argument fails because the Dux Agreement does not negate or limit the rights DiSalle holds in the DiSalle-Lettich Screenplay.  *See* David Nimmer, 6 Nimmer on Copyright § 23.07 (Lexis 2024) (stating "'life story rights' agreements are, in fact, more akin to covenants not to sue for invasion of privacy, slander, libel, etc. then they are a true grant of rights"); *DC Comics v. Towle*, 802 F.3d 1012, 1023 (9th Cir. 2015) (noting the Copyright Act provides the owner of a copyright various rights in the work such as the right to make derivative works).  Thus, as Defendants fail to show they are entitled to judgment as a matter of law, the Court **DENIES** Defendants' Motion as to this argument. [11]

---

[11] Defendants further argue the Dux Agreement matters because California recognizes torts for violations of the right to publicity and for false invasion of privacy.  [Dkt. 92 at 14].  However, Defendants fail to explain how these torts effect DiSalle's rights in the DiSalle-Lettich Screenplay or why Defendants, who are not Frank Dux or his representatives, would be able to avail themselves of the benefits of those torts and the Dux Agreement.

## 2.     DiSalle's Argument

To determine whether DiSalle possesses any rights in the DiSalle-Lettich Screenplay, the Court must first determine whether DiSalle owned the copyright to the DiSalle-Lettich Screenplay in the first place.

Under the Copyright Act, "copyright ownership 'vests initially in the author or authors of the work,' which is generally the creator of the copyrighted work." *U.S. Auto Parts Network, Inc. v. Parts Geek, LLC*, 692 F.3d 1009, 1014–15 (9th Cir. 2012). However, the Copyright Act explicitly carves out an exception to this general rule for "works made for hire." *Id*. at 1015 (citing 17 U.S.C. § 201(b)). If a work is made for hire, "the employer or other person for whom the work was prepared is considered the author" and, unless the parties agree otherwise, he or she owns the "rights comprised in the copyright." 17 U.S.C. § 201(b). Under the Copyright Act, a work does not have to be registered to be protected, and the owner of a copyright has various exclusive rights including the right to reproduce and prepare derivatives of the copyrighted works. 17 U.S.C. § 106(1–2); *Alaska Stock, LLC v. Houghton Mifflin Harcourt Pub. Co.*, 747 F.3d 673, 678 (9th Cir. 2014).

Here, it is undisputed that the DiSalle-Lettich Screenplay was made pursuant to a work-made-for-hire agreement in 1985. [Dkt. 82-1 at 3]. As such, as of June 15, 1985, DiSalle was considered the owner of the copyright to the DiSalle-Lettich Screenplay and all relevant rights therein. *See e.g.*, 17 U.S.C. § 101(1); *Carol Wilson Fine Arts, Inc. v. Zifen Qian*, 71 F. Supp. 3d 1151, 1156 (D. Or. 2014), *aff'd*, 671 Fed. Appx. 701, 702 (9th Cir. 2016).

Having found DiSalle owned the copyright to the DiSalle-Lettich Screenplay, the Court now must determine if DiSalle transferred his copyright, or any part thereof. Under the Copyright Act, a copyright owner can transfer "any of the exclusive rights comprised in a copyright" such as the right of reproduction or the right to create derivative works. 17 U.S.C. § 201(d)(2); *see*

1    *also Minden Pictures, Inc. v. John Wiley & Sons, Inc.*, 795 F.3d 997, 1002 (9th

2    Cir. 2015).  Further, the Copyright Act allows a copyright owner to "subdivide

3    his or her interest in what otherwise would be a wholly owned 'exclusive

4    right[.]'"  *Id.*  For example, a copyright owner could convey the right to make a

5    graphic novel version of a work to one company and convey the right to make a

6    movie of the same work to another.  *Id.* (citing *Hyperquest, Inc. v. N'Site Sols.,*

7    *Inc.*, 632 F.3d 377, 383 (7th Cir. 2011)).

8         Here, based on the record before the Court, the Court **DENIES** DiSalle's

9    Motion as to this argument.  In analyzing motions for summary judgment

10   involving contracts, courts routinely deny motions where the movant fails to

11   address a choice of law provision, if one is present in the contract, or where the

12   movant more generally fails to adequately brief what law applies to the

13   agreement.  *See Madoff v. America's Adventure, Inc.*, No. 12-cv-6147577, 2013

14   WL 6147577, at *8 (D. Haw. 2013) (denying summary judgment where the

15   party "entirely fail[ed] to acknowledge that there are broader legal principles"

16   that must be addressed to determine if a choice of law provision controls); *Cen*

17   *Com, Inc. v. Numerex Corp.*, No. 17-cv-0560RSM, 2018 WL 4184335, at *3

18   (W.D. Wash. 2018) (stating "[a]s a result of the parties' failure to address the

19   choice of law question and the appropriate standard under which to construe the

20   contract at issue, the Court finds summary judgment … inappropriate").

21        Here, in 1998, DiSalle assigned his option to MGM's rights to TCG in an

22   agreement that stated in part:

23        "[y]ou warrant and represent to us that you own the exclusive right
         to produce further sequels to the motion picture 'Bloodsport' and
24       hereby grant to us the exclusive right to produce all such further
         sequels." [Dkt. 78-11 at 4].
25

26        To determine whether DiSalle retained any rights in the DiSalle-Lettich

27   Screenplay, the Court must determine whether the above language amounted to

28

-19-

1    a transfer of his derivative work rights.[12]  However, DiSalle fails to address

2    what law this Court should apply in interpreting this provision.  [Dkt. 78-3 at

3    24].  As such, DiSalle fails to meet his burden on summary judgment, and the

4    Court **DENIES** his Motion.  *See Madoff*, 2013 WL 6147577, at \*8; *Cen Com,*

5    *Inc.*, 2018 WL 4184335, at \*3.[13]

6         **F.    Federal Unfair Competition & Common Law Trademark**
          **Infringement**

7

8              **1.    DiSalle's Arguments**

9         DiSalle argues the Court should grant summary judgment on his federal

10   unfair competition claim and common law trademark infringement claim

11   because (1) he established a valid protectable trademark via his prior use and

12   ownership of the *Bloodsport* mark, and (2) Defendants usage of their *Bloodsport*

13   marks is likely to cause confusion.  [Dkt. 78-3 at 33].  As the elements of the

14   two claims are identical, the Court addresses them together.  *See E. & J. Gallo*

15   *Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1288 (9th Cir. 1992).  For the

16   reasons set forth below, the Court **DENIES** DiSalle's Motion as to these claims.

17        To prevail on his claims, DiSalle must show he possesses "(1) [] a valid,

18   protectable trademark that (2) defendant is using in a confusingly similar

19   manner."  *AK Futures, LLC v. TBH Supply LLC*, No. 8:23-cv-01030-JVS

20   (ADSx), 2023 WL 8000243, at \*4 (C.D. Cal. Oct. 11, 2023) (citing *S. Cal.*

21   *Darts Ass'n v. Zaffina*, 762 F.3d 921, 929 (9th Cir. 2014)).  "To be valid and

22

23   _____

24   [12] DiSalle implicitly acknowledges the importance of this analysis by arguing
     the terms of the agreement should be narrowly construed to only pertain to the
25   rights granted to Pathé.  [Dkt. 78-3 at 24].

26   [13] The Court also notes the fact that the agreement is susceptible to different
     meanings is sufficient reason to deny DiSalle's Motion.  *See JIPC Mgmt., Inc. v.*
27   *Incredible Pizza, Co., Inc*., No. 08-cv-04310 MMM (PLAx), 2009 WL
     10672777, at \*3 (C.D. Cal. June 29, 2009) (noting summary judgment is
28   generally inappropriate if a contract is ambiguous).

protectable, a mark must be 'distinctive.'" *Zobmondo Ent., LLC v. Falls Media, LLC*, 602 F.3d 1108, 1113 (9th Cir. 2010).  A mark is "distinctive" if its primary significance in the minds of consumers is an indicator of the source of a particular good or service.  *Jason Scott Collection, Inc. v. Trendily Furniture, LLC*, 68 F.4th 1203, 1212 (9th Cir. 2023) (citations omitted).  While some marks are inherently distinctive, others may acquire distinctiveness (also called "secondary meaning") over time, if the public forms a sufficiently strong association between the mark and the source or brand it is intended to signify. *Wal-Mart v. Samara Bros., Inc.*, 529 U.S. 205, 210–11 (2000).

Direct evidence, such as consumer surveys and testimony, generally provides the "most persuasive" indicia of a mark's acquired distinctiveness. *Vision Sports, Inc. v. Melville Corp.,* 888 F.2d 609, 615 (9th Cir. 1989).  Useful circumstantial evidence of secondary meaning may concern the "exclusivity, manner, and length" of plaintiff's use of the mark, the extent and nature of plaintiff's advertising efforts, the "amount of [plaintiff's] sales and the number of customers," whether plaintiff's products embodying its mark have an "established place" in the relevant market; and defendant's intent in copying the mark.  *See Cont'l Lab'y Prods. V. Medax Intern, Inc.*, 114 F. Supp. 2d 992, 999 (S.D. Cal. 2000) (citing *Filipino Yellow Pages v. Asian J. Publ'n*, 198 F.3d 1143, 1151 (9th Cir. 1999)); *see also Switchmusic.com, Inc. v. U.S. Music Corp.*, 416 F. Supp. 2d 812, 821-22 (C.D. Cal. 2006).  "Evidence of deliberate copying may, in appropriate cases, support an inference of secondary meaning." *Continental*, 114 F. Supp. 2d at 1000.

While no single factor or type of evidence is dispositive of this analysis, the ultimate test of secondary meaning is the "effectiveness of the effort to create it," and so "the chief inquiry is directed towards the consumer's attitude about the mark in question: does it denote to him a single thing coming from a single source?" *Marketquest Grp., Inc. v. BIC Corp.*, 316 F. Supp. 3d 1234,

1  1262 (S.D. Cal. 2018) (citing *Carter–Wallace, Inc. v. Procter & Gamble Co*.,

2  434 F.2d 794, 802 (9th Cir. 1970)).

3      Here, the Court **DENIES** Disalle's Motion because he fails to establish

4  his alleged mark possesses secondary meaning. [14]  In his Motion, DiSalle

5  summarily states that it is "undisputed that *Bloodsport* was a break-out success

6  … acquiring secondary meaning." [Dkt. 78-3 at 27–28].  However, that

7  statement is unsupported by any citation to an uncontroverted fact or evidence,

8  and as such the Court need not credit it.  *See Stillwater Ltd. v. Basilotta*, No. 16-

9  CV-1895 FMO (SSx), 2018 WL 2718041, at *3 (C.D. Cal. Mar. 24, 2018)

10 (noting a factual assertion unsupported by a citation to the evidence will be

11 disregarded).  Moreover, DiSalle's only cited evidence supporting his mark's

12 secondary meaning is a statement of use filed in connection with the trademark

13 application.  [Dkt. 78-3 at 28].

14      Viewing the statement of use in the light most favorable to Defendants,

15 such evidence alone is insufficient to establish the public primarily understood

16 the *Bloodsport* mark to identify the source of the product.  *See P and P Imps.*

17 *LLC v. Johnson Enter., LLC*, 46 F.4th 953, 961 (9th Cir. 2022) (noting to

18 determine whether secondary meaning exists courts look to evidence such as

19 "direct consumer testimony, survey evidence, exclusivity, manner, and length of

20 use of a mark, amount and manner of advertising, amount of sales and number

21 of customers, established place in the market, and the proof of intentional

22 copying by the defendant"); *see also Continental*, 114 F. Supp. 2d at 1008

23 (granting summary judgment for failure to establish secondary meaning where

24 plaintiff provided only circumstantial evidence); *Braun, Inc. v. Dynamics Corp.*

25 *of Am.*, 975 F.2d 815, 827 (Fed. Cir. 1992) (reversing jury verdict in part

26

27

28  ――――――――――――――
[14] The Parties agree that the mark is not inherently distinctive.  [Dkt. 79 at 31;
Dkt. 78-3 at 27].

1  because plaintiff failed to offer "surveys, quantitative evidence or testimony
2  suggesting the existence of secondary meaning").

3      Thus, because DiSalle failed to carry his burden in establishing the title
4  *Bloodsport* obtained secondary meaning, DiSalle fails to show his mark is
5  sufficiently distinct to warrant trademark protections.  *Continental*, 114 F. Supp.
6  3d at 999 (citing *Levi Strauss & Co. v. Blue Bell, Inc.*, 778 F.2d 1352, 1358 (9th
7  Cir. 1985) (en banc)).  As such, the Court **DENIES** DiSalle's Motion as to his
8  federal unfair competition and common law trademark infringement claims.

9          **2.    Defendants' Arguments**

10     Defendants argue DiSalle's trademark claims fail because Defendants,
11  not DiSalle, have priority use of the marks in question.  [Dkt. 79 at 24].
12  Defendants argue further that only its predecessor Cannon can claim priority of
13  use because of its development of the first *Bloodsport*.  *Id*. at 30.  DiSalle argues
14  in response that he has priority of use by virtue of the sales of his rights to the
15  DiSalle-Lettich Screenplay and Dux's life story. [Dkt. 82 at 21].  For the
16  reasons set forth below, Defendants' argument fails.

17     The standard test of trademark ownership is priority of use.  *See Sengoku*
18  *Works Ltd. v. RMC Intern.*, *Ltd*., 96 F.3d 1217, 1219 (9th Cir. 1996).  While
19  proof of a federally registered trademark is "prima facie evidence that the
20  registrant is the owner of the mark[,]" a non-registrant can rebut this
21  presumption if they can show they used the mark first in commerce.  *Id*. at
22  1219–20.  "To demonstrate priority of use, plaintiffs must show that (1) they
23  first used the mark in commerce, and (2) that their use of the mark was
24  continuous and uninterrupted."  *Abbywho, Inc.v. Interscope Recs.*, No. 06-cv-
25  06724 MMM (JTLx), 2007 WL 9701989, at *6 (C.D. Cal. Oct. 23, 2007)
26  (citations omitted); *see also Toughlove Am., LLC v. MTV Networks Comp.*, 2009
27  WL 10669245, at *5 (C.D. Cal. Apr. 21, 2009).  To determine if a mark has
28  been sufficiently used in commerce to gain protection under the Lanham Act,

1    courts look at the "totality of the circumstances."  *Hanginout, Inc. v. Google,*

2    *Inc.*, 54 F. Supp. 3d 1109, 1135 (S.D. Cal. 2014) (citing *Chance v. Pac-Tel*

3    *Teletrac, Inc.*, 242 F.3d 1151, 1159 (9th Cir. 2001)).

4         As Defendants have two federally registered marks, DiSalle must rebut

5    the validity of their marks.  *Sengoku*, 96 F.3d at 1219.  In support of his priority

6    of use argument, DiSalle argues the following acts are sufficient to meet the use

7    in commerce requirement:

8            • DiSalle's commissioning of the DiSalle-Lettich Screenplay in

9               1985;

10          • DiSalle's use of the Disalle-Lettich Screenplay to solicit the

11             Cannon Agreement;

12          • DiSalle's involvement in the production of *Bloodsport*;

13          • DiSalle's licensing of his right to make a sequel to Pathé;

14          • DiSalle's securing of the MGM option;

15          • DiSalle's engagement in the agreement with TCF.  [Dkt. 82 at 21].

16         Here, for the reasons set out below, the Court **DENIES** Defendants'

17    Motion on DiSalle's claim.  First, it is undisputed *Bloodsport* featured a

18    "produced by" credit for DiSalle.  [Dkt. 79 at 29].  Second, it is also undisputed

19    DiSalle sold his rights associated with the mark to both Cannon and Pathé.

20    [Dkt. 79-4; Dkt. 79-8].  Such actions, when construed in the light most

21    favorable to DiSalle, constitute evidence from which a reasonable jury could

22    find DiSalle, not Defendants, was the first user of the mark in commerce.  *See*

23    *Russell Road Food and Beverage, LLC v. Galam*, 180 F. Supp. 3d 724, 735 (D.

24    Nev. 2016) (finding plaintiff had priority of use where plaintiff used the mark in

25    opening its club, purchasing the real estate for the club, and promoting the club);

26    *see also Hana Fin., Inc. v. Hana Bank*, 398 F. Appx. 257, 258 (9th Cir. 2010)

27    ("To establish priority of use, … [plaintiff] was required to demonstrate that it

28    continuously used the mark in commerce prior to [defendant]").  As there

remains a factual dispute about who first used the mark in commerce, the Court **DENIES** Defendants' Motion.

Defendants also argue DiSalle's second and fifth claims fail because DiSalle failed to present any evidence of damages resulting from the trademark infringement or unfair competition.  If damages is a required element of a claim, and the plaintiff fails to present any evidence of damages, summary judgment is proper. *See Golden Eye Media USA, Inc. v. Trolley Bags UK Ltd.*, 525 F. Supp. 3d 1145, 1245 (S.D. Cal. 2021).  However, damages is not an enumerated element of common law trademark infringement or unfair competition.  *See Nissan Motor Co., Ltd. v. Nissan Comput. Corp.*, 89 F. Supp.2d 1154, 1163 (C.D. Cal. 2000); *see also Evo Bands, LLC. v. Al Khalifa Grp. LLC*, 657 F.Supp.3d 1312, 1324–25 (C.D. Cal. 2023).  As neither claim requires damages as an element, DiSalle's claim does not fail for the alleged lack of evidence regarding damages.[15]

### G.    Federal Fraudulent Trademark Registration

The Lanham Act provides as follows:

"Any person who shall procure registration in the Patent and Trademark Office of a mark by a false or fraudulent declaration or representation, oral or in writing, or by any false means, shall be liable in a civil action by any person injured thereby for any damages sustained in consequence thereof."  15 U.S.C. § 1120.

To prevail on his claim for fraudulent trademark registration, DiSalle must provide evidence of (1) a false representation of a material fact; (2) the registrants' knowledge or believe of the falsity of the representation; (3) the

---

[15] The Court also notes Defendants' argument would fail because of the failure to identify evidence from which the Court could find a lack of evidence.  *See* Section F (1) (discussing standard).

1   registrant's intent to induce the USPTO's reliance; (4) actual reasonable reliance

2   on the representation, and (5) damages proximately caused by that reliance

3   *Opulent Treasures, Inc. v. Ya Ya Creations, Inc.,* No. 2:22-cv-02616-SSS-JCx,

4   2023 WL 3568061, at *2 (C.D. Cal. Apr. 17, 2023) (citing *Hokto Kinoko Co. v.*

5   *Concord Farms, Inc.*, 738 F.3d 1085, 1097 (9th Cir. 2013)).  Claims under this

6   section of the Lanham Act must be proven by clear and convincing evidence

7   and all doubts are resolved against the charging party.  *Robi v. Five Platters*

8   *Inc.*, 918 F.3d 1439, 1444 (9th Cir. 1990).

9       Here, DiSalle's Motion fails because DiSalle fails to establish by clear

10  and convincing evidence Defendants intended to induce the USPTO's reliance

11  on Defendants' alleged falsehood.  [*See* Dkt. 78-3 at 39 (summarily stating

12  "Defendants made these false representations to induce the USPTO to grant its

13  registrations, all to Plaintiff's detriment").  While intent may be proven by direct

14  or circumstantial evidence, it is a "indispensable element" of a fraudulent

15  trademark registration claim.  *In re Bose Corp.*, 580 F.3d 1240, 1245 (Fed. Cir.

16  2009).  DiSalle argues intent is shown because Defendants knew MGM, not

17  Defendants, owned and was distributing *Bloodsport* in the United States.  [Dkt.

18  82 at 23].  Even assuming this is true, the Court finds such knowledge is not

19  clear and convincing evidence of Defendants' alleged intent to deceive such that

20  a reasonably jury could only find for DiSalle.[16]  Rather, such knowledge is more

21  probative of the Defendants' knowledge of falsity.  *See Spin Master, Ltd. v.*

22  *Zobmondo Ent., LLC*, 778 F. Supp. 2d 1052, 1061 (C.D. Cal. 2011).

23      Thus, because DiSalle failed to present sufficient evidence to establish

24  Defendants' intent as a matter of law, the Court **DENIES** DiSalle's Motion.

25  _____

26  [16] The Court notes the proffered evidence is far weaker than that presented in
    other cases where courts granted summary judgment on this issue.  *See*
27  *Tokidoki, LLC v. Fortune Dynamic, Inc.*, No. 07-cv-1923 DSF (PJWx), 2009
28  WL 2366439, at *12.

*Quicksilver*, 466 F.3d at 755 (stating "'[j]udgment as a matter of law is proper when the evidence permits a reasonable jury to reach only *one* conclusion'" [emphasis added]); *see also S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (stating summary judgment is improper if a court finds that a reasonable jury could find, based on the evidence as a whole, in the non-movant's favor).

Defendants argue summary judgment in their favor is proper because DiSalle fails to present evidence establishing (1) Defendants made a material misrepresentation to the USPTO, (2) Defendants did so with the requisite *mens rea*, and (3) DiSalle suffered damages as a result of the alleged fraud. [Dkt. 79 at 36–38]. As material falsity, knowledge, intent, and damages are all required elements of the claim, DiSalle's claim fails if he did not present sufficient evidence of one of those elements. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court will discuss the elements below.

### 1. Material Falsity

First, Defendants argue DiSalle fails to establish Defendants' trademark applications contain a material falsehood. [Dkt. 79 at 36]. In support of his fraudulent registration claim, DiSalle relies on the following undisputed facts:

- On March 24, 2014, and November 16, 2018, Defendant Alberto Lensi, swore in declarations associated with Defendants' trademark applications, to "the best of his [] knowledge and belief no other person, firm or corporation … has the right to use the mark in commerce." [Dkt. 78-3 at 37].

- Defendants filed three specimens in connection with a trademark application and three of the specimens depicted *Bloodsport*. [Dkt. 82-2 at 20; Dkt. 78-3 at 38].

"A moving party without the ultimate burden of persuasion at trial–usually but not always the defendant– has both the initial burden of production

1    and the ultimate burden of persuasion on a motion for summary judgment."
2    *Nissan Fire & Marine Ins. Co., Ltd., v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102
3    (9th Cir. 2000).  Such a party can meet their burden of production by (1)
4    presenting evidence *negating* an essential element of the opposing party's claim
5    or defenses or (2) "showing" the opposing party does not have enough evidence
6    of an essential element of their claim to carry its burden at trial.  *Id*.

7         As Defendants argue DiSalle has insufficient evidence to support this
8    claim, Defendants must "show" the lack of such evidence to meet their initial
9    burden.  *Id*.  In *Fairbank v. Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th
10   Cir. 2000), the Ninth Circuit stated, "a moving defendant may shift the burden
11   of producing evidence to the nonmoving plaintiff merely by 'showing'–that is,
12   point out through argument–the absence of evidence to support plaintiff's
13   claim."  However, when a movant endeavors to show the lack of evidence
14   through argument, the argument cannot be conclusory, and it must be supported
15   by summary judgment type evidence.  *See Celotex*, 477 U.S. at 328 (J. White
16   concurring) (finding a conclusory statement that a party has no evidence is
17   insufficient to support summary judgment); *Brooks v. U.S..*, No. 98-cv-1341
18   VRW, 1999 WL 300645, at 1 (N.D. Cal. May 10, 1999) (noting "the lack of
19   evidence must be demonstrated"); *see also* Judge Karen L. Stevenson and Judge
20   James E. Fitzgerald*, Federal Civil Procedure Before Trial* 14:136 (The Rutter
21   Group Apr. 2024) (citing *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op.,*
22   *Inc.*, 838 F.2d 268. 273 (8th Cir. 1988); *Russ v. Int'l Paper Co.*, 943 F.2d 589,
23   592 (5th Cir. 1991)).

24        Put more directly, to "show" a lack of evidence, the movant must, at a
25   minimum, point to evidence in which the alleged absence can be identified.  *See*
26   *Abad v. Gen. Nutrition Ctrs., Inc.*, No. 09-cv-00190-JVS (RNBx), 2013 WL
27   4038617, at *5 (C.D. Cal. Mar. 7, 2013) (quoting *Celotex*, 477 U.S. at 323); *see*
28   *also Celotex,* 477 U.S. at 320 & 323 (stating " respondent had failed to identify,

in answering interrogatories specifically requesting such information, any

witnesses who could testify about the decedent's exposure to petitioner's

asbestos products"); *Nissan Fire*, 210 F.3d at 1105–06 ("In a typical case, … to

carry its initial burden of production by pointing to the absence of evidence …

the [movant] will have made reasonable efforts, using the normal tools of

discovery of discovery"); *Id.* (citing *Clark v. Coats & Clark, Inc.*, 929 F.2d 604,

608 (11th Cir. 1991) ("noting that a moving party must 'point to materials on

file which demonstrate that a party will not be able to meet that burden'").

Here, Defendants failed to cite any evidence from which the Court could

find the absence of evidence.  [Dkt. 79 at 23].  As such, Defendants failed to

show an absence of evidence, and thus failed to carry their initial burden.

Therefore, Defendants' argument fails.

## 2.  Damages

Here, Defendants' argument regarding the lack of damages fails for the

same reason discussed above.  Defendants fail to identify any evidence from

which the Court could find a lack of sufficient evidence on damages.  [Dkt. 79

at 38–39].  Because Defendants failed to cite any such evidence, Defendants

failed to meet their initial burden, and the Court **DENIES** Defendants' Motion.

*Nissan Fire*, 210 F.3d at 1105–06.

## 3.  Knowledge of Falsity

Defendants also assert DiSalle presented no evidence of Defendants

knowingly making a false statement to the USPTO.  [Dkt. 79 at 36–37].  In

addition to falsity, DiSalle must also show Defendants knew, or had the belief

that, the statement was false.  *Anhing Corp., v. Thuan Phong Comp. Ltm.*, 215

F. Supp. 3d 919, 936–37 (C.D. Cal. 2015).  "There is no fraud if a false

misrepresentation is occasioned by an honest misunderstanding or

inadvertence[.]"  *In re Bose*, 580 F.3d at 1246.  As already discussed,

knowledge of the falsity must be shown by clear and convincing evidence.  *Id.* at 1243.

Here, Defendants, again, fail to identify evidence from which the Court can find DiSalle lacks sufficient evidence to prove Defendants' knowledge. [Dkt. 79 at 36–37].  As such, Defendants failed to meet their initial burden, and the Court **DENIES** Defendants' Motion.  *Nissan Fire*, 210 F.3d at 1105–06.

## H.   Trademark Dilution

Defendants seek summary judgment on DiSalle's trademark dilution claim arguing DiSalle fails to present sufficient evidence of his marks fame and of a likelihood of confusion.  [Dkt. 79 at 39–40]

To succeed on a trademark dilution claim, DiSalle must show (1) the mark is famous and distinctive, (2) the defendant is making use of the mark in commerce, (3) the defendant's use began after the mark became famous, and (4) the defendant's use of the mark is likely to cause dilution by blurring or dilution by tarnishment. *Jada Toys, Inc. v. Mattel, Inc.*, 518 F.3d 628, 634 (9th Cir. 2008).  To determine if a mark is sufficiently famous, courts consider all relevant factors including: (1) the duration, extent, and geographic reach of advertising and publicity of the mark, (2) the amount, volume, and geographic extent of sales of goods or services offered under the mark, (3) the extent of actual recognition of the mark, and (4) what act the mark was registered under. 15 U.S.C. 1125(c)(2)(A)(i–iv).

Here, the Court **DENIES** Defendants' Motion as to this claim because Defendants failed to identify evidence from which the Court may find the absence of relevant evidence.  [Dkt. 79 at 39–40]; *see also Nissan Fire*, 210 F.3d at 1105–06.

## I.   Abandonment

DiSalle also argues Defendants' marks should be cancelled due to abandonment.  [Dkt. 78-3 at 31–32].  However, DiSalle failed to make this

claim in his complaint and thus cannot move for summary judgment on it.  [Dkt. 1]; *see also Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292–94 (9th Cir. 2000); *Daubert v. City of Lindsay*, No. 1:08-cv-01611 DLB, 2009 WL 4135861, at *4 (E.D. Cal. Nov. 23, 2009).

## V.     CONCLUSION

In accordance with the opinion above, the Court rules as follows;

- DiSalle's Motion for Summary Judgment is **DENIED** in its entirety, [Dkt. 78];
- Defendants' Motion for Summary Judgment on their affirmative defenses and DiSalle's claims is also **DENIED** in its entirety. [Dkt. 79].

**IT IS SO ORDERED.**

DATED: May 7, 2024

_____
SUNSHINE S. SYKES
United States District Judge